No. 23-10656-B

# In the United States Court of Appeals for the Eleventh Circuit

---

MOMS FOR LIBERTY – BREVARD COUNTY, FL, et al.,

*Plaintiffs-Appellants*,

v.

BREVARD PUBLIC SCHOOLS, et al.,

*Defendants-Appellees*.

---

Appeal from a judgment of the United States District Court
for the Middle District of Florida, The Hon. Roy B. Dalton, Jr.
(Dist. Ct. No. 6:21-cv-01849-RBD-DAB)

---

APPELLANTS' BRIEF

---

David Osborne
GOLDSTEIN LAW PARTNERS, LLC
4651 Salisbury Rd., Suite 400
Jacksonville, FL  32256
610-949-0444
dosborne@goldsteinlp.com

Alan Gura
Ryan Morrison
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W.
Suite 801
Washington, DC 20036
202.301.3300
agura@ifs.org
rmorrison@ifs.org

April 10, 2023

*Counsel for Appellants*

*Moms for Liberty – Brevard County, Fl. v. Brevard Public Schools*
Case No. 23-10656-B

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Astor, Martha – Counsel for Appellants

2. Baker, Hon. David A. – United States Magistrate Judge

3. Brevard County Public Schools Office of Legal Services – Counsel for Appellees

4. Brevard Public Schools – Appellee

5. Bridges, Gennifer – Counsel for Appellees

6. Burr & Forman LLP – Law firm representing Appellees

7. Campbell, Katye – Appellee

8. Cholewa, Joseph – Appellant

9. Dalton, Jr., Hon. Roy B. – United States District Judge

10. Delaney, Katie – Appellant

11. Gibbs, Paul – General Counsel for Brevard County School Board

12. Goldstein Law Partners, LLC – Law firm representing Appellants

13. Gura, Alan – Counsel for Appellants

*Moms for Liberty – Brevard County, Fl. v. Brevard Public Schools*

Case No. 23-10656-B

14. Haggard-Belford, Misty – Appellee

15. Hall, Ashley – Appellant

16. Institute for Free Speech – Organization representing Appellants

17. Jenkins, Jennifer – Appellee

18. Kelly, Hon. Gregory J. – United States Magistrate Judge

19. Kneessy, Amy – Appellant

20. Londono, Valerie – Assistant General Counsel for Brevard County

   School Board

21. Marks, Howard – Counsel for Appellee

22. McDougall, Cheryl – Appellee

23. Moms for Liberty – Brevard County, FL – Appellant

24. Moms for Liberty, Inc. – National affiliate of Appellant

25. Morrison, Ryan – Counsel for Appellants

26. Nolan, Brett R.  – Counsel for Appellants

27. Osborne, David – Counsel for Appellants

28. Susin, Matt – Appellee

29. Thakrar, Sheena – Counsel for Appellees

30. Trent, Gene – Appellee

31. Wright, Megan – Appellee

*Moms for Liberty – Brevard County, Fl. v. Brevard Public Schools*
Case No. 23-10656-B

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Alan Gura
Alan Gura
Counsel for Appellants

STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request that the case be orally argued. This case concerns a matter of significant public concern: the First Amendment speech and petition rights of Florida parents, taxpayers, and other community members in addressing their local school boards at public meetings, criticizing officials and official policy, and demanding change. The district court declined to follow precedent striking down identical speech restrictions, from the Sixth Circuit and from the Eastern District of Pennsylvania, asserting that this Court's precedent requires a different outcome. Affirmance would create a circuit split with respect to important questions of federal law. Plaintiffs believe oral argument would assist the Court in deciding the consequential issues presented by this appeal.

TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. C-1 of 3

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ................................................................ ii

TABLE OF CITATIONS ............................................................... iv

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 2

STATEMENT OF ISSUES .............................................................. 3

STATEMENT OF THE CASE ............................................................ 3

    A.   The Board's public speaking policy ....................................... 3

    B.   Defendants' rationale for maintaining the policy ........................ 6

    C.   Moms for Liberty ........................................................ 8

    D.   Defendants' censorship of speakers at BPS meetings ..................... 9

        1. "Abusive" ......................................................... 9

        2. "Personally directed" ............................................ 10

        3. "Obscene" ........................................................ 16

    E.   Continuing impact on Plaintiffs' speech ............................... 17

    F.   Procedural history .................................................... 19

SUMMARY OF ARGUMENT .............................................................. 27

STANDARD OF REVIEW .................................................................. 28

ARGUMENT ............................................................................... 29

I.    PLAINTIFFS HAVE STANDING TO SEEK RELIEF FROM THE POLICY'S
      ENFORCEMENT BECAUSE IT CHILLS THEIR SPEECH ........................... 29

II.   PLAINTIFFS HAVE STANDING TO SEEK NOMINAL DAMAGES FOR
      THEIR PAST INJURIES ......................................................... 33

III.  DEFENDANTS' PROHIBITIONS OF "ABUSIVE" AND "PERSONALLY
      DIRECTED" SPEECH ARE FACIALLY UNCONSTITUTIONAL FORMS OF
      VIEWPOINT DISCRIMINATION ................................................ 34

IV.   DEFENDANTS' ENFORCEMENT OF THEIR "ABUSIVE" AND
      "PERSONALLY DIRECTED" SPEECH BANS VIOLATED AND
      CONTINUES TO VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS ..... 46

V.    DEFENDANTS' APPLICATION OF THEIR "OBSCENITY" PROHIBITION
      VIOLATED AND CONTINUES TO VIOLATE PLAINTIFFS' FIRST
      AMENDMENT RIGHTS ......................................................... 50

VI.   DEFENDANTS' PROHIBITIONS OF "ABUSIVE" AND "PERSONALLY
      DIRECTED" SPEECH ARE VAGUE AND OVERBROAD ........................... 55

CONCLUSION .............................................................................. 61

CERTIFICATE OF COMPLIANCE ................................................... 62

TABLE OF CITATIONS

CASES

*Am. Booksellers v. Webb*,

   919 F.2d 1493 (11th Cir. 1990) ...................................................... 57, 59

*Anderson v. Hansen*,

   489 F. Supp. 3d 836 (E.D. Wis. 2020) .................................................. 41

*Baca v. Moreno Valley Unified School Dist.*,

   936 F. Supp. 719 (C.D. Cal. 1996) ........................................................ 40

*Bach v. Sch. Bd. of Va. Beach*,

   139 F. Supp. 2d 738 (E.D. Va. 2001) ..................................................... 39

*Barrett v. Walker Cty. Sch. Dist.*,

   872 F.3d 1209 (11th Cir. 2017) ...................................................... 35, 36

*Bloedorn v. Grube*,

   631 F.3d 1218 (11th Cir. 2011) ............................................................ 35

*Bolger v. Youngs Drugs Prods. Corp.*,

   463 U.S. 60 (1983) ................................................................................ 54

*Borough of Duryea v. Guarnieri*,

   564 U.S. 379 (2011) ...................................................................... 41, 42

*Brown v. Louisiana,*

   383 U.S. 131 (1966) ................................................................ 49

*Buchanan v. Warley,*

   245 U.S. 60 (1917) .................................................................. 49

*Burns v. Town of Palm Beach,*

   999 F.3d 1317 (11th Cir. 2021) ............................................ 56

*Butler v. Michigan,*

   352 U.S. 380 (1957) ........................................................ 53, 54

*Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n,*

   942 F.3d 1215 (11th Cir. 2019) ............................................ 36

*Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty.,*

   48 F.4th 1222 (11th Cir. 2022) ........................................ 29, 30

*Chicago v. Morales,*

   527 U.S. 41 (1999) .................................................................. 55

*Cohen v. California,*

   403 U.S. 15 (1971) .................................................................. 38

*Cornelius v. NAACP Legal Def. & Educ. Fund,*

   473 U.S. 788 (1985) ................................................................ 35

*DeMartini v. Town of Gulf Stream*,

    942 F.3d 1277 (11th Cir. 2019) ............................................................ 41

*Doe v. Valencia Coll.*,

    903 F.3d 1220 (11th Cir. 2018) ............................................................ 60

*Dombrowski v. Pfister*,

    380 U.S. 479 (1965) .............................................................................. 58

*Dyer v. Atlanta Indep. Sch. Sys.*,

    852 F. App'x 397 (11th 2021) (per curiam) ........................ 43, 44, 45, 60

*F.C.C. v. Fox Television Stations, Inc.*,

    567 U.S. 239 (2012) .............................................................................. 56

*Fla. Ass'n of Prof'l Lobbyists Inc. v. Div. of Legislative Info. Servs.*,

    525 F.3d 1073 (11th Cir. 2008) ............................................................ 57

*Floyd v. Cty. of Miami-Dade*,

    No. 17-cv-21709, 2017 U.S. Dist. LEXIS 76631  (S.D. Fla. May 18,

    2017) ..................................................................................................... 42

*Forsyth County. v. Nationalist Movement*,

    505 U.S. 123 (1992) .............................................................................. 48

*Fort Lauderdale Food not Bombs v. City of Fort Lauderdale*,

    11 F.4th 1266 (11th Cir. 2021) ............................................................ 48

*Gay Lesbian Bisexual Alliance v. Pryor*,

   110 F.3d 1543 (11th Cir. 1997) ............................................................. 35

*Gooding v. Wilson*,

   405 U.S. 518 (1972) ................................................................... 37, 58

*Grayned v. City of Rockford*,

   408 U.S. 104 (1972) .............................................................. 55, 56, 59

*Grigley v. City of Atlanta*,

   136 F.3d 752 (11th Cir. 1998) ............................................................. 42

*Hill v. Colorado*,

   530 U.S. 703 (2000) ........................................................................ 55

*Horton v. City of St. Augustine*,

   272 F.3d 1318 (11th Cir. 2001) ........................................................... 60

*Iancu v. Brunetti*,

   139 S. Ct. 2294 (2019) .............................................................. 38, 45, 46

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,

   3 F.4th 887 (6th Cir. 2021) ................................................. 40, 45, 46, 47

*Jones v. Heyman*,

   888 F.2d 1328 (11th Cir. 1989) (per curiam) ........................... 43, 44, 45

*Leventhal v. Vista Unified Sch. Dist.*,

    973 F. Supp. 951 (S.D. Cal. 1997) .......................................................... 39

*Mack v. Loretto*,

    839 F.3d 286 (3d Cir. 2016) ................................................................... 42

*Mama Bears of Forsyth Cty. v. McCall*,

    No. 2:22-cv-142-RWS, 2022 U.S. Dist. LEXIS 234538 (N.D. Ga. Nov.

    16, 2022) ........................................................... 40, 50, 51, 52

*Marshall v. Amuso*,

    571 F. Supp. 3d 412 (E.D. Pa. 2021) ........................................... passim

*Matal v. Tam*,

    582 U.S. 218 (2017) ................................................................ passim

*McBreairty v. Sch. Bd. of RSU22*,

    No. 1:22-cv-00206-NT, 2022 U.S. Dist. LEXIS 128353 (D. Me. July 20,

    2022) ........................................................................ 49, 51

*MedImmune, Inc. v. Genentech, Inc.*,

    549 U.S. 118 (2007) ...................................................................... 31, 33

*Miller v. California*,

    413 U.S. 15 (1973) .................................................................... 50, 51, 52

*Minn. Voters All. v. Mansky*,

    138 S. Ct. 1876 (2018) ......................................................... 37, 56, 58, 59

*Moms for Liberty – Brevard Cnty., Fl. v. Brevard Pub. Schs.*,

    11th Cir. No. 22-10297 (Nov. 21, 2022) ................................................ 25

*Moms for Liberty – Brevard Cnty., Fl. v. Brevard Pub. Schs.*,

    11th Cir. No. 22-10297 (Sept. 14, 2022) ............................................... 24

*Moore v. Asbury Park Bd. of Educ.*,

    No. 05-2971, 2005 U.S. Dist. LEXIS 18372 (D.N.J. Aug. 23, 2005) .... 41

*NAACP v. Alabama*,

    377 U.S. 288 (1964) ............................................................................... 57

*NAACP v. Button*,

    371 U.S. 415 (1963) ............................................................................... 57

*Nat'l Endowment for the Arts v. Finley*,

    524 U.S. 569 (1998) ............................................................................... 57

*New York Times Co. v. Sullivan*,

    376 U.S. 254 (1964). .............................................................................. 38

*Otto v. City of Boca Raton*,

    981 F.3d 854 (11th Cir. 2020) ...................................................... passim

*Patterson & Wilder Constr. Co. v. United States*,

    226 F.3d 1269 (11th Cir. 2000) ............................................................ 29

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,

    460 U.S. 37 (1983) ............................................................................... 35

*Rosenberger v. Rectors and Visitors of the Univ. of Virginia*,

    515 U.S. 819 (1995) ................................................................ 36, 37, 48

*Rowe v. City of Cocoa Beach*,

    358 F.3d 800 (11th Cir. 2004) (per curiam) ...................................... 43

*Smith v. Owens*,

    848 F.3d 975 (11th Cir. 2017) ............................................................ 29

*Speech First, Inc. v. Cartwright*,

    32 F.4th 1110 (11th Cir. 2022).................................................... passim

*Susan B. Anthony List v. Driehaus*,

    573 U.S. 149 (2014) ............................................................................ 31

*Texas v. Johnson*,

    491 U.S. 397 (1989) ..................................................................... 34, 49

*United States Telecom Ass'n v. FCC*,

    825 F.3d 674 (D.C. Cir. 2016)........................................................... 31

*United States v. Eckhardt,*

    466 F.3d 938 (11th Cir. 2006) ............................................................ 60

*Uzuegbunam v. Preczewski,*

    141 S. Ct. 792 (2021) ......................................................................... 34

*Virginia v. Hicks,*

    539 U.S. 113 (2003) ........................................................................... 57

*Wacko's Too, Inc. v. City of Jacksonville,*

    522 F. Supp. 3d 1132 (M.D. Fla. 2021) ............................................. 57

*Wollschlaeger v. Governor,*

    848 F.3d 1293 (11th Cir. 2017) (en banc) ......................................... 57

## Statutes

28 U.S.C. § 1291 ........................................................................................ 2

28 U.S.C. § 1331 ........................................................................................ 2

28 U.S.C. § 1343 ........................................................................................ 2

42 U.S.C. § 1983 ........................................................................................ 2

FLA. STAT. § 286.0114(2) ........................................................................... 4

FLA. STAT. § 877.13 ................................................................................... 6

## Other Authorities

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0163 ................ 4

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ A ..... 4

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ C ..... 4

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ E ..... 5

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ H(1) 5

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ H(2) 5

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ H(3) 6

Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ H(4) 6

FCC, Obscene, Indecent and Profane Broadcasts,

    www.fcc.gov/sites/default/files/obscene_indecent_and_profane_broadca

    sts.pdf (last visited Apr. 9, 2023) ........................................................ 53

J.K. Rowling, HARRY POTTER AND THE CHAMBER OF SECRETS  (1999) .... 39

School Board Meeting Videos, Brevard Public Schools,

    https://www.brevardschools.org/Page/2305 (last visited Apr. 9, 2023)

    .......................................................................................................... 53

INTRODUCTION

The First Amendment guarantees people the right to tell their school board that its policies are "evil," and to criticize school board members for their alleged infidelity to the Constitution. It guarantees people the right to mention the names of school officials and employees when criticizing them or petitioning them for a redress of grievances. And it guarantees people the right to read from school library books at school board meetings, even (and perhaps especially) if the board believes that the books' language is not "clean."

School boards may select the topics for discussion at their meetings, but they may not select speakers' viewpoints. The First Amendment's protection from viewpoint discrimination extends to one's choice of words. If school boards wish to regulate people's words, they must do so with precision, addressing only speech that might lawfully be proscribed. And while no one questions school boards' authority to address disruptive conduct, boards may not silence speech for fear that it might spark disruption or offend the sensibilities of children.

Accordingly, Brevard Public Schools' prohibitions of "abusive" and "personally directed" speech, on their face and as applied against

Plaintiffs, violate the First Amendment, as does Defendants' practice of prohibiting "obscene" language.

Plaintiffs have standing to seek declaratory and injunctive relief against these continuing practices, as they have altered their words, and in at least one case refrained from speaking altogether for fear of enforcement. Plaintiffs also have standing to seek damages for Defendants' past enforcement of these policies.

The district court's dismissal of Plaintiffs' facial First Amendment and vagueness claims, and its entry of summary judgment against them on their as-applied claims, should be reversed.

JURISDICTIONAL STATEMENT

The district court had jurisdiction over this First Amendment challenge to Defendants' regulations and practices under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983. The district court entered final judgment on February 14, 2023. Plaintiffs timely filed their notice of appeal from this final judgment disposing of all parties' claims, and all orders merging into this final judgment, on February 28, 2023. This Court has jurisdiction over this appeal per 28 U.S.C. § 1291.

STATEMENT OF ISSUES

1.    Whether speakers have standing to challenge speech restrictions when they self-censor, by modifying their speech or refraining from speaking altogether, for fear of enforcement;

2.    Whether civil rights plaintiffs have standing to seek nominal damages for past violations of their rights;

3.    Whether regulations banning "abusive" and "personally directed" speech at school board meetings, on their face and as-applied by Defendants; and Defendants' prohibition of allegedly "unclean" speech as "obscenity," constitute viewpoint discrimination in violation of the First Amendment rights of free speech and petition; and

4.    Whether regulations banning "abusive" and "personally directed" speech at school board meetings are unconstitutionally vague and overbroad.

STATEMENT OF THE CASE

A.  The Board's Public Speaking Policy.

Brevard Public Schools ("BPS"), Brevard County, Florida's public school district, is administered by an elected board. The Board Chairman presides over its meetings. If the Chairman is unavailable,

3

the Vice Chairman presides. If neither is available, a plurality of members designates a presiding officer. Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0163.[1] The Board schedules a public comment period for its meetings pursuant to FLA. STAT. § 286.0114(2). People wishing to speak at a Board meeting must register with the Board. Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1, ¶ C ("Policy"). The presiding officer recognizes speakers for three minutes "in the order in which the requests were received." *Id*. at ¶ A.

At the time of all events referenced in Plaintiffs' complaint, speakers were required to direct their comments "to the presiding officer; no person may address or question Board members individually." Doc. 20 at 114 (policy effective to Oct. 26, 2021); *id*. at 118 (policy as of Oct. 26, 2021).[2] The policy also enabled the presiding officer to "interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant." *Id*.

---

[1] Available at https://go.boarddocs.com/fl/brevco/Board.nsf/Public#
[2] Per Circuit Rule 28-5, references to the record conform to the following format: Doc. <district court docket number> at <page number>.
Defendants also reissued the policy, without relevant changes, on May 11, 2022. After this appeal was docketed, Defendants again reissued the policy, this time making relevant changes discussed *infra*.

4

On March 7, 2023, the BPS Board altered the Policy in two relevant respects. First, the Policy now provides that "public speakers may address their comments to the Board as a whole, the presiding officer, or to an individual Board member," but "[s]taff members or other individuals shall not be addressed by name during public comment." Policy ¶ E. Accordingly, the Policy now clarifies that the presiding officer may "interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed *(except as allowed above)*, abusive, obscene, or irrelevant." Policy ¶ H(1) (emphasis added).[3]

The Board also added the following language to the Policy:

the Board will also adhere to the requirements of the FCC in gauging when to interrupt, warn, or terminate a participant's statement. As Board meetings are broadcast publicly, the Board is required to adhere to the FCC's regulations on content which restricts certain content between the hours of 6 a.m. and 10 p.m.

Policy ¶ H(2). This language does not reflect a new position. The parties

---

[3] Although the Policy no longer bars speakers from mentioning Board members, this revision does not impact Plaintiffs' request for injunctive relief against the "personally directed" prohibition's robust application to speakers' referencing of other people. Nor does the revision impact Plaintiffs' retrospective nominal damages claims arising from past censorship of speech mentioning Board members. *Keister v. Bell*, 29 F.4th 1239, 1251 (11th Cir. 2022).

have disputed whether FCC regulations justify Defendants' application of their "obscenity" ban. *See infra*.

The policy continues to provide that the presiding officer may expel anyone who "does not observe reasonable decorum," and ask law enforcement to remove "disorderly" people. Doc. 20 at 114, 118; Policy ¶¶ H(3) and (4). Defendants begin meetings by threatening speakers with prosecution, fines, and imprisonment per FLA. STAT. § 877.13 if they "disrupt" the meeting. Doc. 20 at 75-76, ¶ 165.

B.   Defendants' rationale for maintaining the Policy

Defendant Misty Haggard-Belford ("Belford"), who as then-Board Chair enforced the Policy in all instances referenced in the record, testified that the Policy allows the Chair to censor speakers if their words might upset the audience or harm children.[4] "The Policy is . . . aimed at maintaining decorum and avoiding the incitement of other audience members in a manner that would create an unsafe situation or one that may adversely impact children," as children are often present at Board meetings or watch Board meetings via livestream or recorded

---

[4] Defendants moved for summary judgment after Belford lost her re-election bid, continuing to rely on Belford's explication of the Policy.

6

video. Doc. 20 at 9, ¶ 22. "Maintain[ing] decorum" means not allowing speech that would "inflame the audience and create an unsafe environment." Doc. 91-1 at 20:17-25. When applying the Policy, "[t]he expectations of decorum in the boardroom, the ability to maintain safety in the boardroom," was "primarily [her] focus." *Id*. at 34:13-15.

Defendants banned speakers from addressing (and in practice, mentioning) individual Board members to prevent triggering audience members from "calling out and becoming disruptive" in response. Doc. 20 at 10, ¶ 23. Speakers' naming of individual Board members allegedly caused "a safety concern," and silencing such speech was "necessary to maintain safety." Doc. 91-1 at 22:9-24.

Belford testified that her application of the "obscenity" prohibition was guided by her view of FCC regulations. Doc. 91-1 at 33:7-11. "Because our board meetings are streamed on cable television, we are required to follow FCC guidelines . . . I have a blurb in the script that explains that FCC guidelines prohibit us from allowing profan[ity] . . . we have to keep it family clean . . . to ensure that nothing is said over the air that shouldn't be." *Id.* at 36:3-10.

C.   Moms for Liberty

Plaintiff Moms for Liberty – Brevard County, FL ("M4L") is the Brevard County, Florida chapter of Moms for Liberty, a nonprofit parental rights organization. Doc. 91-2 at 2:6-14. Per its founding Chair, Plaintiff Ashley Hall, "M4L is a group of joyful warriors [who] advocate our views in a positive, respectful, and peaceful manner. We rise above scorn and intolerance of those who disagree with us. Commitment to civility is central to M4L and its members. Plaintiffs do not engage in or condone any threatening words or behavior, or violence." Doc. 3-2 at 3, ¶ 9. Prior to BPS Board meetings, M4L reminds its members of their commitment to civil discourse. *Id.* at 3-4, ¶ 10.

Plaintiffs Joseph Cholewa and former BPS Board member Amy Kneessy are also M4L members. Doc. 91-4 at 2:5-13; Doc. 91-5 at 2:6-17. Plaintiff Katie Delaney was an M4L member when this litigation began but left the group in March 2022 over disapproval of a founder's voting record. Doc. 91-3 at 2:9-18.

M4L is committed to civil advocacy. Plaintiffs do not engage in or condone threatening words, behavior, or violence. Doc. 3-2 at 2. They believe the most effective advocates are "joyful warriors" that share

their views in a positive, respectful, and peaceful manner, and rise

above any scorn or intolerance from those who disagree with them. *Id*.

D.   Defendants' censorship of speakers at BPS meetings

The presiding officer frequently interrupts speakers, including

Plaintiffs and other M4L members, under the Policy's prohibitions of

"abusive, "personally directed," or "obscene" statements. The policy is

inconsistently applied. For example, Belford "admittedly did not handle

public comment well" in one meeting where she allowed seven Board-

friendly speakers in a row to violate the Policy, on account of

unspecified distraction. Doc. 91-1 at 29-30.

1.   *"Abusive"*

Belford declined to give a "definitive definition" of the Policy term

"abusive," but offered "yelling, screaming, profanity, those sorts of

things" as "some things that could potentially be considered abusive."

Doc. 91-1 at 16:4-13. "I don't know that I can give you an exhaustive –

definition strictly of abusive . . . I don't know that there is even an

exhaustive definition of abusive." *Id*. at 16:18-23; *id*. at 17:7-8. She

added that "abusive" could encompass "calling people names . . . that

are generally accepted to be unacceptable." *Id*. at 18:3-11.

Defendants did not modify or rescind the "abusive" speech ban in the latest policy revisions, and they invoke it to silence speech. For example, Belford objected to one speaker's criticism of school policies as "this evil LGBTQ agenda." Doc. 20 at 30. When the speaker asked, "Is there a problem with the word 'evil?'", Belford responded, "Yes sir. You're calling a group of people evil and the policy evil." *Id.* Belford equated calling a policy "evil" with calling its proponents "evil" and interrupted the speaker for being "abusive," yet denied that she had discriminated against the speaker's viewpoint. *Id.* at 31, ¶ 76.

### 2. *"Personally directed"*

Belford offered that speech is "personally directed" when it is directed at or mentions a person at the meeting, or if it reveals private information about someone absent from the meeting. Doc. 91-1 at 12:19-16:3. In practice, the rule is applied more broadly.

Speakers often violate the prohibition of "personally directed" speech by naming individuals or referring to groups of people. On one occasion, Cholewa criticized BPS's covid mask policies, and directed his comments to the Board member representing his school district. Doc. 3-4 at 3-5. But Board member (and now Chair) Matt Susin interrupted,

"You gotta cut him off. Don't call out one of our school board members." *Id*. at 3, ¶ 7. Cholewa asked, "So I can't talk about my representative from my district?" *Id*. at 4, ¶ 7. Belford replied, "No you cannot." *Id*.

For the same reason, Belford interrupted Hall when she attempted to thank Susin for his assistance by stating "Mr. Susin I wanted to thank you personally." Doc. 3-2 at 4, ¶ 13; Doc. 20 at 18, ¶ 51. Defendants applied the ban to other individuals as well, including a speaker that explained Board Member Jenkins gave Board supporters preferred access to a previous meeting. *See* Doc. 20 at 29, ¶ 75. As soon as the speaker uttered Jenkins's name, Belford interrupted him for allegedly not directing his comments to the Chair. *Id*.

At one meeting, a student criticizing Jenkins began her comments by stating, "Jennifer Jenkins personally showed up to my school," but Belford interjected, "So hold on just one second everything needs to be directed to me and not calling out any individual board members for me if you would. Okay? Thank you so much." Doc. 3-2 at 2, ¶ 4 (April 13, 2021 meeting, https://bit.ly/3jBdUs0, Item E10 at 29:25-29:37). The student continued criticizing Jenkins as "one board member," "this

11

specific board member," and "this board member," and identified others as "a few school board members." *Id.* at 29:40-30:48.

At one meeting, Belford advised speakers to "make sure that you are not naming names for individuals unless you are telling your own story. Just to make sure that we're not putting out inaccurate information." Doc. 20 at 43, ¶ 104. Speakers advocating for the rehiring of two coaches could refer to "these two coaches," "these two gentlemen," and "these coaches," but not use their names. *Id.* at 44-45, ¶¶ 106-09.

But Defendants apply the "personally directed" ban inconsistently. A different student was allowed to address Jenkins by name and speak to her directly about accessing schools for theatrical production rehearsals. Doc. 3-2 at 2, ¶ 3 (Feb. 23, 2021 meeting, https://bit.ly/3ayunrX, Item E at 19:03-19:18). And while one student could not say that Jenkins visited her school, Belford allowed a friendly speaker to discuss what "Ms. Jenkins said." Doc. 20 at 62, ¶ 139. This only "reference[d] Jenkins' earlier comments," and Belford deemed it *not* "personally directed." *Id.*

Examples of Board-friendly speakers being allowed to address and mention individual board members and school personnel abound. *See* Doc. 3-1 at 3, ¶ 6 (April 27, 2021 meeting, https://bit.ly/3pVknSP, Item

E9 at 4:01-4:21) ("I'm going to talk about thanking the Board. I think I've emailed Ms. Jenkins, if not, everybody else and you all responded to me."); *id.* ¶ 8 (July 13, 2021 meeting, https://bit.ly/3BGafQP, Item E at 5:01:5:08) ("Dr. Mullins [BPS Superintendent] thank you so much for working with our community."), 10:13-10:38 ("I've had the opportunity to meet and work with a few of Brevard's very capable leaders, Mrs. Bowman [BPS Director of Secondary Leading and Learning], a few members of the teaching staff, Dr. McKinnon [BPS Director of Equity and Diversity], Dr. Mullins, and I'm familiar with the work that they do. And I thank them for the leadership that they provide."), 21:14-21:22 ("First, I'd like to thank Dr. Mullins for all you have done for our county."), 24:42-24:55 ("First, Dr. Mullins thank you for your work, your service. The, uh, Board. And I am so encouraged by the statements that Ms. Jenkins made."), 28:18-28:22 ("Thank you Dr. Mullins for your willingness to listen to the need of our community"), 30:39-30:41 ("Thank you Superintendent Mullins and Board"), and 33:36-33:58 ("To this Board, this hard working Board, Dr. Mullins, your staff, Dr. Sullivan [BPS Assistant Superintendent], Mrs. Cline [BPS Assistant Superintendent], and the like, I just want to say thank you for all that

you continue to do for our students here in Brevard County"); Doc. 3-2 at 3, ¶ 7 (October 26, 2021 meeting, https://bit.ly/ 2ZsO2YF, Item E10 at 53:44-56:42 (effusive praise and support of Jenkins by name).

Comments can be banned as "personally directed" even when they do not name specific people, or when they refer to people who are not BPS-affiliated. Belford interrupted a speaker for making the following "personally directed" comments: "The sad fact is that all children do not live with accepting and affirming families. Can you imagine the LGBTQ student who may live with families such as those who were here at the last meeting?" Doc. 20 at 28-29, ¶ 74.

Cholewa tried to express his dismay at BPS's mask mandate for children, which he criticized as being in line with various policies allegedly endorsed by the Democratic Party, but Belford ejected him from the meeting before he could finish his remarks. *See* Doc. 3-4 at 1, ¶¶ 4-5 (September 21, 2021 meeting, https://bit.ly/ 3aEvDd2, Item E at 1:06:19-1:07:55). Belford first interrupted Cholewa for criticizing the Party's alleged notion that babies are born racist. *Id.* at 5, ¶ 8. Cholewa continued, only for Belford to interrupt him again when he allegedly "insult[ed] half of [the] audience" by adding criticism of parents that

14

help their children transition their gender to his litany of masking comparisons. *Id.* at 5-6, ¶ 8.

After threatening to clear the meeting room when audience members became upset at her treatment of Cholewa, Belford allowed Cholewa to resume his remarks. *Id.* at 6, ¶¶ 9-10. But she abruptly ended Cholewa's speaking time, with approximately one minute remaining, and ordered him to leave the meeting after he questioned the Defendants' fidelity to First Amendment free speech values. *Id.* at 6, ¶ 10. Cholewa's statement that Belford ultimately found intolerable: "This is America. I know you don't like freedom. I know you don't like liberty. I know you don't like the Constitution. Guess what? I'm going to keep talking." *Id.*

Belford believed Cholewa violated the prohibition on "personally directed" speech by criticizing audience members "who aligned themselves with the Democratic Party." Doc. 91-1 at 24:2-14. She silenced Cholewa's criticism of Democrats because audience members "were clearly getting upset," and she feared that "[b]ehaviors were getting to escalate" into "a safety issue." *Id.* at 25:10-13. "[H]e kept referring to it as the Democratic Party and these are the things that go

along with it, and people were getting upset as a result." *Id.* at 25:15-18.

"[Cholewa's] remarks were personally directed, and he was creating a

safety hazard in the boardroom with his remarks." *Id.* at 27:18-20.

### 3. *"Obscene"*

Belford defines "obscene" as "things that are not appropriate for

young children[,] [l]anguage that is generally accepted to be profane,"

including "things that are sexually explicit" and "words that are

typically considered to be inappropriate for use in school." Doc. 91-1 at

18:24-19:9. Belford stopped one M4L member who objected to a book's

inclusion in a school library by quoting the book's sexually explicit

language, including an expletive, to the Board. Per Belford, the book's

language was not "clean." Doc. 20 at 105, ¶ 219; *id.* at 110, ¶ 230; Doc.

3-2 at 3, ¶ 7 (October 26, 2021 meeting, https://bit.ly/2ZsO2YF, Item

E10 at 50:00-50:34). Belford later stopped this speaker from criticizing

school library books, declaring, "if it is not appropriate for children hear

it, then I need you not to say it at the [meeting]." Doc. 91-10 at 1, ¶ 5

(May 10, 2022 Meeting, https://bit.ly/3PCCaYn, Item E9 at 5:30-7:20).

Belford also interrupted a woman for saying "hell" and "penis" in

criticizing BPS administrators who allowed an ex-teacher convicted of

indecent exposure on campus, and expelled her when she would not agree to modify her speech. Doc. 91-10 at 1, ¶ 4 (April 26, 2022 Meeting, https://bit.ly/3aNKq96, Items M44&N45 at 13:18-14:25). Belford also twice demanded a speaker "keep it clean" after he stated that another person told his son to "go to hell," Doc. 20 at 49-50, ¶ 116, and she interrupted another speaker who had complained that a protestor called her "bitch," "whore," and "prostitute," Id. at 27, ¶ 69.

E.  Continuing impact on Plaintiffs' speech

Plaintiffs self-censor their comments or do not speak at all due to the Policy, its enforcement history, and Defendants' threatened consequences for any violations. Hall, for example, refrains from speaking about school library books. Doc. 91-2 at 5:6-7. She watches her words, as she fears prosecution for "disruption" if she criticizes Defendants. Doc. 3-2 at 5, ¶ 16. "I cannot speak freely at meetings." *Id.* Delaney likewise has not been "able to comment the way that I would have liked to because of the threat of removal from the building," and potential fine and arrest. Doc. 91-3 at 4:12-15; *see also* Doc. 3-3 at 3.

Defendants' interruption and expulsion of Cholewa has altered his speech. "After that experience, I am more careful to abide by the Public

Participation Policy and I have not spoken as freely as I otherwise would because of it." Doc. 3-4 at 7, ¶ 11. Cholewa began writing his speeches "more on a pins and needles situation where I knew that I had to be . . . very selective with the words that I used to avoid being stopped." Doc. 91-4 at 4:6-8. Cholewa's "speeches did adjust based off [his] understanding that [the Chair] would be selective and subjective on what she was determining to be abusive or obscene or inappropriate." *Id.* at 4:9-12. "[Y]ou can't just write what you want to write because you know that . . . Belford is going to pick and choose what she finds to be subjective and obscene." *Id.* at 4:13-16.

Cholewa alters his words to "avoid being stopped in the middle of [his] speech, because being stopped . . . takes you off of your momentum, and it breaks your concentration." *Id.* at 4:17-20. "[G]etting back on track . . . is difficult . . . once that happens. So—so yes. I did find myself cautioning my speeches more because I knew . . . she'd be focused on trying to find ways to stop me . . . from speaking." *Id.* at 4:20-24.

Cholewa is inclined to follow rules. Asked about his belief as to what he "should be able" to say at school board meetings, Cholewa responded that "people should be able to speak their minds as long as it . . . does

not violate the rules of abusive or obscene or . . . irrelevant." Doc. 90-4 at 31:20-32:11. But he understands that in practice, that ideal is impossible. His understanding of the "abusive" speech ban is, "That's subjective . . . what I might find abusive . . . might not be [what] someone else finds abusive or vice versa." *Id.* at 14:4-8.

Kneessy has much to tell the Board during the public comment period. Doc. 3-1 at 3, ¶ 12. For example, "I want to be able to talk about individual senior staff members, programs that they're implementing, and what they're doing differently." Doc. 91-5 at 5:10-12. But Kneessy believes that "all my comments are forbidden under the Public Participation Policy," Doc. 3-1 at 4, ¶ 12, and would inevitably lead to a "scene" resulting in her expulsion, Doc. 91-5 at 10:9-10. She fears that her speech would trigger prosecution for "disruption," and does not feel free to speak. Doc. 3-1 at 4, ¶ 15. Unlike the other individual plaintiffs, Kneessy has not modified her speech before the Board; she completely refrains from speaking. Doc. 91-5 at 3:5-13; Doc. 20 at 14, ¶ 40.

F.  Procedural history

On November 5, 2021, Plaintiffs filed this lawsuit in the United States District Court for the Middle District of Florida against BPS and

its school board members, seeking declaratory and injunctive relief from Defendants' violation their First Amendment rights, as well as nominal damages. Doc. 1. Plaintiffs challenged Defendants' bans of "abusive" and "personally directed" speech, on their face and as-applied, for violating their rights to free speech and petition by discriminating against disfavored viewpoints. They also challenged Defendants' application of the prohibition of "obscene" speech, and argued that all three speech restrictions were void for vagueness.[5]

Along with the complaint, Plaintiffs moved for a preliminary injunction. Doc. 3. Defendants moved to dismiss the case. Doc. 41.

On January 24, 2022, the district court denied Plaintiffs' motion for a preliminary injunction. It claimed that "[o]n its face, the Policy is both content- and viewpoint-neutral." Doc. 46 at 5 (footnote omitted). "Requiring the speaker to address the Chair rather than individual Board members is not based on the speech's content, but because members do not possess the power of the Board." *Id.* (footnote omitted). Moreover, the court asserted that this rule facilitates speech, "because

---

[5] Plaintiffs also initially complained that Defendants granted their ideological allies preferential access to Board meetings, but later opted not to pursue that claim.

it 'turns down the heat' and 'gives people a sense of fairness' in hearing

all viewpoints." Doc. 46 at 6 n.7 (internal quotation marks omitted).

"And prohibiting abusive and obscene comments is not based on

content or viewpoint, but rather is critical to prevent disruption,

preserve 'reasonable decorum,' and facilitate an orderly meeting," which

are "permissible" goals. Doc. 46 at 6 (citations omitted).

In a footnote, the district court asserted that Plaintiffs' facial

viewpoint discrimination argument "barely warrants mention, as it is

based on wholly inapposite and unpersuasive out-of-Circuit cases that

directly conflict with binding and persuasive Eleventh Circuit

authority." Doc. 46 at 6 n.8 (citations omitted). The Sixth Circuit and

the Eastern District of Pennsylvania allegedly erred in crediting Justice

Alito's observation that "[g]iving offense is a viewpoint." *Matal v. Tam*,

582 U.S. 218, 243 (2017) (plurality opinion). Limiting *Tam* to its facts,

the district court disagreed that the Supreme Court held that the First

Amendment protects offensive speech. Doc. 46 at 6 n.8.

Likewise, the district court found that Plaintiffs' as-applied

argument was unlikely to succeed because M4L members were, on

occasion, allowed to speak unimpeded; because Defendants' censorship

21

was "brief and respectful," with Plaintiffs often eventually being able to finish; and because "the Policy was evenhandedly applied," with Defendants censoring some people who agreed with them, and allowing their opponents to "speak uninterrupted when they followed the policy." *Id.* at 7. The district court hesitated to engage in "Monday-morning quarterbacking of calls made by a presiding officer without the benefit of leisure[ly] reflection." *Id.* at 7, n.10 (internal quotation marks omitted).

The district court further asserted that the speech for which Defendants ejected Cholewa from a meeting was "abusive and disruptive," and it claimed that Plaintiffs were not chilled by the censorial policy because they had not been completely dissuaded from speaking. *Id.* at 8 & n.11.

The district court also held that the Policy is not overbroad or vague, because it does not "affect a substantial amount of constitutionally protected conduct," and because it "precisely lists what it expects of speakers." *Id.* at 9. And in a final footnote, the district court ruled against Plaintiffs on the remaining preliminary injunction factors. *Id.* at 10 n.13 (internal quotation marks omitted).

On January 31, 2022, Plaintiffs moved to stay further district court proceedings pending the outcome of their appeal from the preliminary injunction order. Doc. 50. But on July 12, 2022, the district court denied that motion, and granted Defendants' motion to dismiss, albeit with some leave to amend. Doc. 63.

First, the court held that the complaint should be dismissed as a "shotgun pleading" with leave to amend. *Id.* at 3-4. But it nonetheless proceeded to address the complaint's merits; in the end, the court did not give Plaintiffs full leave to amend.

The court held that M4L had associational standing to represent its members, but also held that Plaintiffs could make no allegations referencing Defendants' treatment of nonmembers. *Id.* at 4-5 & n.1. Because the complaint described instances of M4L members "actually speaking," the court found Plaintiffs lacked standing for being chilled by Defendants. *Id.* at 5. The court dismissed Plaintiffs' official capacity claims against the Board members as duplicative of their claim against BPS, *id.* at 6, which it allowed, *id.* at 7. It found that four of the Defendant board members had qualified immunity, as they allegedly

23

had not enforced the policy, but denied Belford qualified immunity because she had enforced it. *Id.*

The court then held that "restrictions aimed at maintaining decorum—such as the Policy at issue here—are content- and viewpoint-neutral." *Id.* at 8 (citations omitted). Referencing its preliminary injunction denial, the court held that "the Policy is nondiscriminatory on its face" and dismissed Plaintiffs' facial challenges with prejudice. *Id.* The district court then denied Plaintiffs' motion to stay.

Plaintiffs filed an amended complaint on July 26, 2022. But Defendants successfully moved to strike its references to instances of the policy's enforcement that had occurred since the complaint's filing, as well as Plaintiffs' updated citation of the policy owing to its intervening reissuance. Doc. 94.[6] Meanwhile, Plaintiffs moved this Court to stay the district court's proceedings, but the Court denied that motion. Order, *Moms for Liberty – Brevard Cnty.*, *Fl. v. Brevard Pub. Schs.*, 11th Cir. No. 22-10297 (Sept. 14, 2022).

---

[6] As Defendants conceded, "The new policy does not change the language that Plaintiffs challenge in this action." Doc. 90 at 5 n.3.

24

On November 21, 2022, this Court issued an unpublished two-paragraph opinion summarily affirming the district court's denial of Plaintiffs' preliminary injunction motion on grounds that it was not an abuse of discretion. *Moms for Liberty – Brevard Cnty., Fl. v. Brevard Pub. Schs.,* 11th Cir. No. 22-10297 (Nov. 21, 2022).

On February 13, 2023, the district court granted Defendants' motion for summary judgment and denied Plaintiffs' motion for summary judgment. The court noted that "M4L members, including Hall, Delaney, and Cholewa, have regularly continued to speak at meetings," and from that gathered that the policy's enforcement has not chilled their speech. Doc. 115 at 5. The court dismissed the relevance of the fact that Plaintiffs had altered their speech because "the only specific alterations to their comments" that Delaney and Hall allegedly identified at deposition were not uttering board members' names and not speaking about school library books. *Id.* at 5-6 & n.2.[7] Painting Belford's interruptions as "brief and respectful," and claiming that "Plaintiffs freely finished speaking," the court held that "[s]uch light

_____

[7] The court also cited Kneessy's deposition for this assertion, but she completely refrains from speaking before the Board.

25

enforcement of the Policy, with very minimal consequences, would not cause a reasonable speaker to self-censor." *Id.* at 6 (citations omitted).

The court then offered that "[e]ven if Plaintiffs had standing to bring their as-applied claims, they still would not be entitled to summary judgment because the Policy is viewpoint- neutral as applied." *Id.* at 7. The court asserted that it is "mostly true" that the First Amendment protects "abusive" and "personally directed" speech. *Id.* In a footnote referencing Defendants' enforcement against allegedly "obscene" speech from a school library book, the court offered that even "if the speech is protected it is still subject to the constitutional restrictions of the Policy, which prohibits obscene speech." *Id.* n.7 (citations omitted).

The court then held that the Policy was constitutional as applied because it was allegedly applied evenhandedly. When people "spoke within the confines of the Policy, they did so uninterrupted," but when they violated the Policy, even if they were supportive of the Board, they were interrupted. *Id.* at 9 (citations omitted). That "Plaintiffs may point to a few instances when the Chair strayed from evenhanded application" was immaterial. *Id.* n.6.

On February 14, 2023, the district court entered final judgment in Defendants' favor. Doc. 117. On February 28, 2023, Plaintiffs timely appealed. Doc. 119.

### SUMMARY OF ARGUMENT

The district court erred in finding that Defendants do not injure Plaintiffs because some of them still manage to speak—if, in Defendants' eyes, they follow the challenged Policy. Defendants plainly cause those M4L members who still speak to self-censor. And Defendants have dissuaded at least one Plaintiff from speaking at all— a fact the district court repeatedly overlooked. Plaintiffs' fears are reasonable, based not only on their observations but also on their experiences suffering interruption and expulsion under the Policy.

Accordingly, Plaintiffs have not only pre-enforcement standing to seek prospective relief against the Policy's continuing enforcement, but also standing to seek nominal damages for the injuries they already suffered—another point the district court repeatedly overlooked.

Regarding the merits, the district court erred in dismissing Plaintiffs' facial challenges to the Policy, and in granting the wrong summary judgment motion with respect to Plaintiffs' as-applied claims.

The First Amendment does not exist to protect speech that officials tolerate. The rights of free speech and petition come into play only where, as here, officials seek to silence views that they fear or dislike. Americans cannot silence each other at school board meetings by taking offense. Defendants, however, interrupt, silence, and even expel speakers for purportedly "abusive," "personally directed," or "obscene" speech. The first two categories are facially defective, explicitly enabling viewpoint discrimination and subjecting fundamental rights to hopelessly subjective official judgment. And "obscenity" cannot include discomfiting political speech, including the quotation of books that Defendants place on school library bookshelves.

The district court erred in equating allegedly offensive speech with disruptive conduct, and it erred in upholding Defendants' censorship on grounds that it has been applied either evenly (against everyone) or inconsistently (only sometimes). Under the First Amendment, unlawful censorship should not be practiced at all.

STANDARD OF REVIEW

"We review a district court's decision on summary judgment *de novo* and apply the same legal standard used by the district court, drawing

all inferences in the light most favorable to the non-moving party and recognizing that summary judgment is appropriate only where there are no genuine issues of material fact." *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017) (citation omitted). A genuine issue of material fact exists if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor. *Patterson & Wilder Constr. Co. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000). "We review the grant of a motion to dismiss under Rule 12(b)(6) de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty.*, 48 F.4th 1222, 1229 (11th Cir. 2022) (citation omitted).

## ARGUMENT

I. PLAINTIFFS HAVE STANDING TO SEEK RELIEF FROM THE POLICY'S ENFORCEMENT BECAUSE IT CHILLS THEIR SPEECH.

The district court repeatedly erred by failing to acknowledge the injuries establishing Plaintiffs' pre-enforcement standing. Even were it true that "interruption" is the "only consequences [sic]" for violating the Policy, Doc. 115 at 6, that would suffice to establish the standing of speakers thereby dissuaded from attempting to speak. But there is

29

more. Plaintiffs witnessed Defendants interrupting and berating speakers, including fellow M4L members, for Policy violations.[8] Defendants even expelled Chowala under the Policy. As Plaintiffs detailed, their apprehension about the Policy's enforcement quite reasonably caused them to alter their speech or, as in Kneessy's case, to refrain from speaking altogether. The district court's overlooking of critical facts, its euphemistic characterization of Defendants' behavior as "brief and respectful" "light enforcement of the Policy, with very minimal consequences" that allows Plaintiffs to "freely finish[] speaking," Doc. 115 at 6, cannot be sustained on this record under First Amendment pre-enforcement standing doctrine—especially "in the light most favorable to the plaintiff[s]." *Chabad*, 48 F.4th at 1229 (citation omitted).

How many times must Plaintiffs witness or suffer interruption or ejection under the Policy before they can seek a federal court's help in relieving their fear? The answer may well be zero. "Standing to challenge laws burdening expressive rights requires only a credible

---

[8] Defendants' treatment of other speakers, even if they were not M4L members, reasonably informed Plaintiffs' apprehensions about the Policy as well.

statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 739 (D.C. Cir. 2016) (internal quotation marks omitted); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Reviewing its First Amendment standing precedent, the Supreme Court explained, "In each of these cases, the plaintiff had eliminated the imminent threat of harm by simply not doing what he claimed the right to do . . . . That did not preclude subject-matter jurisdiction because the threat-eliminating behavior was effectively coerced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citation omitted).

"We have long emphasized that the injury requirement is most loosely applied—particularly in terms of how directly the injury must result from the challenged governmental action—where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (internal quotation marks and citations omitted).

> [T]o determine whether a First Amendment plaintiff has standing, we simply ask whether the operation or enforcement of the

government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights. In making that assessment, the threat of formal discipline or punishment is relevant to the inquiry, but it is not decisive. The fundamental question under our precedent—as well as under the precedent of other courts that have decided similar "speech code" cases—is whether the challenged policy objectively chills protected expression.

*Id.* (internal quotation marks and citations omitted).

Plaintiffs are not imagining the Policy's enforcement. They have seen and experienced enforcement. And Defendants do not dispute that they designed the Policy to alter the speech that would otherwise be uttered at their meetings. They succeeded—and created Plaintiffs' standing.

The district court's repeated claims that Defendants' policy chills no one because three of the individual Plaintiffs still sometimes speak, Doc. 63 at 5; Doc. 115 at 5, ignores Kneesy's silence for fear that all her comments violate the Policy and would lead to a "scene." Doc. 3-1 at 4; Doc. 91-5. It also ignores Plaintiffs' tiptoeing around Defendants' sensitivities, such as Cholewa's explanation that he writes his speeches on "pins and needles," being "very selective" with his words, and "can't just write what [he] want[s] to write." Doc. 91-4 at 4. Cholewa's self-censorship in an effort to avoid the running afoul of the Board's vague speech prohibitions and threat of punishment is exactly what this Court

has found to satisfy a showing of an "objective chill" on speech. *Speech First*, 32 F.4th at 1121 (pointing to the "imprecision" of university's policy as well as the threat of retribution for those who did not follow the policy to demonstrate "objective chill.").

The district court's assertion that Plaintiffs' "only specific alterations" were their "choosing" not to name Board members and complain about books, Doc. 115 at 5-6 & n.2 is contradicted by the record, errs in portraying these as choices, *see MedImmune*, *supra*, and confuses standing with the merits. The district court's (erroneous) belief that the use of particular words, references to individuals, or speech about library books do not convey discrete viewpoints does not change the fact that dissuading and barring people from using particular words, referencing individuals, and talking about library books inflicts an injury-in-fact, traceable to the Policy and redressable by the court. Plaintiffs have pre-enforcement standing.

II. PLAINTIFFS HAVE STANDING TO SEEK NOMINAL DAMAGES FOR THEIR PAST INJURIES.

There is no dispute that Defendants have applied the Policy to censor and expel M4L members. Accordingly, Plaintiffs sought nominal damages for their past injuries in being censored and expelled. Doc. 1 at

33

27, 28, 30, 31, 32, 33; Doc. 78 at 22, 24, 25. Plaintiffs sought nominal damages in moving for summary judgment, Doc. 91 at 19; Doc. 97 at 1, and raised their nominal damages claim in arguing against Defendants' summary judgment motion, Doc. 96 at 12. Nonetheless, the district court's opinions overlooked the issue. Its standing discussion addressed only Plaintiffs' prospective chilling effect claims. Doc. 115 at 5.

The district court's oversight is a reversible error. If Plaintiffs "experienced a completed violation of [their] constitutional rights when [Defendants] enforced their speech policies against [them]," their requested nominal damages will redress their injuries. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). Plaintiffs have standing to complain about their interruption and ejection by Defendants.

III.  DEFENDANTS' PROHIBITIONS OF "ABUSIVE" AND "PERSONALLY DIRECTED" SPEECH ARE FACIALLY UNCONSTITUTIONAL FORMS OF VIEWPOINT DISCRIMINATION.

"If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Otto v. City of Boca Raton*, 981 F.3d 854, 872 (11th Cir. 2020) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). That concept applies to

Defendants' board meetings, even when Defendants fear that an idea's offensive or disagreeable nature will trigger disruption. This Court should join the others holding that school board prohibitions of "abusive" and "personally directed" speech are facially unconstitutional.

"The government's power to restrict First Amendment activities depends on 'the nature of the relevant forum.'" *Gay Lesbian Bisexual Alliance v. Pryor*, 110 F.3d 1543, 1548 (11th Cir. 1997) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 800 (1985)). "A limited public forum . . . exists where a government has reserv[ed a forum] for certain groups or for the discussion of certain topics." *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017) (internal quotation marks omitted). Public comment periods of school board meetings are limited public fora. *Id.* at 1225*; Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 & n.7 (1983).

Speech restrictions in a limited public forum "must be reasonable and viewpoint neutral." *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) (citation omitted). While "a limited public forum may rightly limit speech at the forum to only certain content, the First Amendment does not tolerate viewpoint-based discrimination against speech within

the scope of the forum's subject matter." *Barrett*, 872 F.3d at 1225 n.10
(citation omitted). Government officials "cannot engage in bias,
censorship or preference regarding [another] speaker's point of view."
*Otto*, 981 F.3d at 864 (internal quotation marks omitted). "If the topic of
debate is, for example, racism, then exclusion of several views on that
problem is just as offensive to the First Amendment as exclusion of only
one." *Rosenberger v. Rectors and Visitors of the Univ. of Virginia*, 515
U.S. 819, 831 (1995).

Viewpoint discrimination "goes beyond mere content-based
discrimination and regulates speech based upon agreement or
disagreement with the particular position the speaker wishes to
express." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Ath. Ass'n*,
942 F.3d 1215, 1241 (11th Cir. 2019) (internal quotation marks and
citation omitted). "When the government targets not subject matter, but
particular views taken by speakers on a subject, the violation of the
First Amendment is all the more blatant. Viewpoint discrimination is
thus an egregious form of content discrimination." *Speech First*, 32
F.4th at 1126 (quoting *Rosenberger*, 515 U.S. at 829).

36

"[G]overnment must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Otto*, 981 F.3d at 864 (quoting *Rosenberger*, 515 U.S. at 829). "The Supreme Court has reiterated time and again—and increasingly of late—the 'bedrock First Amendment principle' that '[s]peech may not be banned on the ground that it expresses ideas that offend.'" *Speech First*, 32 F.4th at 1126 (quoting *Tam*, 582 U.S. at 223). Restrictions "'based on viewpoint are prohibited,' seemingly as a *per se* matter." *Id.* (quoting *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018)) (other citation omitted). "Giving offense is a viewpoint." *Tam*, 582 U.S. at 243 (plurality opinion).

Belford might have a tough time defining "abusive," but the Supreme Court has understood it as "harsh insulting language." *Gooding v. Wilson*, 405 U.S. 518, 525 (1972) (internal quotation marks omitted). It is, in any event, plainly a form of speech marked by giving offense. And while Belford's understanding of "personally directed" differs from its application, her definition and the rationale underlying this prohibition invoke a sense of unfairness, and the speech's purported risk of eliciting negative reaction.

37

The legal status of such speech is not controversial. Simply put: "abusive" and "personally directed" speech is constitutionally protected—no matter who it offends. The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (citations omitted). "At the heart of [its] guarantee is the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Otto*, 981 F.3d at 861 (internal quotation marks omitted).

Moreover, "[t]he First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Tam*, 582 U.S. at 249 (Kennedy, J., concurring); *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2299, 2301 (2019). Speakers cannot be barred from using particular words. *See, e.g., Cohen v. California*, 403 U.S. 15 (1971).

38

Accordingly, officials may not stymie speakers' efforts to criticize people under a sort of "Voldemort Rule" that reduces them to mention individuals only in obtuse, indirect ways, or that forces speakers to refrain entirely from mentioning individuals in the course of public debate.[9] This is especially true with respect to the Policy's targeting of speech about school officials and staff.

> Debate over public issues, including the qualifications and performance of public officials (such as a school superintendent), lies at the heart of the First Amendment. Central to these principles is the ability to question and challenge the fitness of the administrative leader of a school district, especially in a forum created specifically to foster discussion about a community's school system.

*Leventhal v. Vista Unified Sch. Dist.*, 973 F. Supp. 951, 958 (S.D. Cal. 1997) (internal quotation marks and citation omitted); *Bach v. Sch. Bd. of Va. Beach*, 139 F. Supp. 2d 738, 743 (E.D. Va. 2001). A school district's purported interests in securing its employees' privacy "pale in comparison to the expressive rights of the public." *Leventhal*, 973 F. Supp. at 959. And a school "holds [these interests] only as an employer,

---

[9] In the Harry Potter universe, a taboo condemns mentioning the evil wizard Voldemort by name. *See, e.g.,* J.K. Rowling, HARRY POTTER AND THE CHAMBER OF SECRETS 15 (1999) ("'Harry Potter speaks not of his triumph over He-Who-Must-Not-Be-Named—' 'Voldemort?' said Harry. . . . 'Ah, speak not the name, sir! Speak not the name!' 'Sorry,' said Harry quickly. 'I know lots of people don't like it . . . .'")

not as a government entity, *e.g.*, a legislative body charged with permitting public comment at its meetings." *Id.* (quoting *Baca v. Moreno Valley Unified School Dist.*, 936 F. Supp. 719, 732 (C.D. Cal. 1996)).

Other courts have struck down identical school board bans on "abusive" and "personally directed" speech. The Sixth Circuit facially invalidated a school board's prohibition of such speech "because it opposes, or offends, the Board or members of the public, in violation of the First Amendment." *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 895 (6th Cir. 2021). Relying on *Ison*, the Eastern District of Pennsylvania preliminarily enjoined a school board's similar policy barring "personally directed" and "abusive" speech at its meetings as a form of impermissible viewpoint discrimination. *Marshall v. Amuso*, 571 F. Supp. 3d 412, 422-23, 427-30 (E.D. Pa. 2021). The Northern District of Georgia likewise followed *Ison* in facially enjoining bans on addressing individual school board members and "abusive" speech, *Mama Bears of Forsyth Cty. v. McCall*, No. 2:22-cv-142-RWS, 2022 U.S. Dist. LEXIS 234538, at *24-*25, *38 (N.D. Ga. Nov. 16, 2022); *but see id.* at *38 (suggesting sub-categories of abuse may be banned, "such as

hateful racial epithets"); *see also Moore v. Asbury Park Bd. of Educ.*, No. 05-2971, 2005 U.S. Dist. LEXIS 18372, at \*35 (D.N.J. Aug. 23, 2005) (school board's "personally directed" speech ban enjoined as viewpoint discrimination); *Anderson v. Hansen*, 489 F. Supp. 3d 836, 842 (E.D. Wis. 2020) ("[B]asic First Amendment principles prevent the District from subjecting the plaintiff to adverse action for no other reason than it considered her speech at the board meeting intolerant, offensive, or hateful.").

Such bans violate not only the right of free speech, but also the right to petition the government for a redress of grievances, "one of the most precious of the liberties safeguarded by the Bill of Rights, [standing] high in the hierarchy of First Amendment values." *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (internal punctuation marks and citations omitted). The right "is such a fundamental right as to be implied by the very idea of a government, republican in form," *id*. at 1288 (internal punctuation marks and citations omitted), as it "allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011).

"A petition may consist of a 'personal grievance addressed to the government' and may be an oral grievance." *Floyd v. Cty. of Miami-Dade*, No. 17-cv-21709, 2017 U.S. Dist. LEXIS 76631 at *9 (S.D. Fla. May 18, 2017) (quoting *Guarnieri*, 564 U.S. at 394); *Mack v. Loretto*, 839 F.3d 286, 299 (3d Cir. 2016). "Courts should not presume there is always an essential equivalence in the two Clauses or that Speech Clause precedents necessarily and in every case resolve Petition Clause claims," *Guarnieri*, 564 U.S. at 388 (citation omitted), but Speech Clause analysis may decide Petition Clause claims, *id.* at 389; *Grigley v. City of Atlanta*, 136 F.3d 752, 754-55 (11th Cir. 1998).

Much if not most public comment at school board meetings qualifies as petitioning for redress of grievances. The viewpoint discrimination analysis for Plaintiffs' speech claims also governs—and proves—their petition claims.

The district court thus erred repeatedly in finding that government officials may ban whatever speech they determine to be offensive. First, the district court equated offensive *speech* with disruptive *behavior*. *See, e.g.,* Doc. 46 at 8 ("Cholewa was permissibly excluded on that one occasion because his speech was abusive and disruptive"). To be sure,

the government has an interest in preventing disruption, maintaining a level of decorum that supports an exchange of views, and facilitating order. But "[t]he government cannot regulate speech by relabeling it as conduct." *Otto*, 981 F.3d at 865.

Nothing in this Court's precedent allows a school board to label speech it dislikes "abusive," etc., and then prohibit it as a form of disruption. The cases upon which the district court relied for this assertion, *Rowe v. City of Cocoa Beach*, 358 F.3d 800 (11th Cir. 2004) (per curiam); *Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) (per curiam); and *Dyer v. Atlanta Indep. Sch. Sys.*, 852 F. App'x 397 (11th 2021) (per curiam), do not support it. *Rowe* stands only for the undisputed proposition that "[t]here is a significant governmental interest in conducting orderly, efficient meetings of public bodies." *Rowe*, 358 F.3d at 803 (citation omitted). It upheld a city's power to restrict council meeting participation to its residents, which has nothing to do with viewpoint discrimination. *Id.* at 803-04.

In *Jones*, the plaintiff was ejected from a city commission hearing because of his "disruptive conduct and failure to adhere to the agenda item under discussion." 888 F.2d at 1332. The "disruptive conduct"

43

consisted of Jones telling the mayor that he had a "problem" for requiring on-topic speech, followed by a threat to fight the mayor. *Id.*

The district court's reliance on *Dyer* was also misplaced. *Dyer* is an unpublished opinion arising from a case brought *pro se* by a plaintiff who had "failed to brief" one of his issues "adequately or failed to raise it below in the district court." 852 F. App'x at 401 (citations omitted). *Dyer* had engaged in extremely offensive speech, to be sure, but that was not the direct cause of his problems. The school acknowledged, and this Court agreed, that *Dyer*'s speech was constitutionally protected. *Id.* *Dyer*'s conduct, including refusing to leave the podium when instructed, and shouting and cursing, *id.* at 399, was not.

> We agree . . . that [the school] did not regulate Dyer's speech based on its content, *i.e.*, because it was offensive. Rather, [the school] regulated Dyer's offensive speech because it was disruptive. The letters sent by [the school] explained that his suspensions were the result of his conduct "fail[ing] to advance any meaningful discourse."

*Id.* at 402.

The district court misread *Dyer*, describing it as "upholding the exclusion of speaker for 'abusive, abhorrent, and hate-filled' comments." Doc. 46 at 8 (quoting *Dyer*, 852 F. App'x at 402)). But that is *not* what *Dyer* provides. "[T]he fact that [the school] also told Dyer that his

comments were 'abusive, abhorrent, [and] hate-filled' was merely support for the suspensions for disruptive and unruly *behavior*; the offensiveness of the comments themselves was not the basis for his suspension." *Dyer*, 852 F. App'x at 402 (emphasis added).

None of the speech that Defendants censor is accompanied by anything approaching the misconduct in *Jones* and *Dyer*. Defendants are regulating viewpoints, not behavior. And neither *Jones* nor *Dyer* contradicts the long line of established Supreme Court precedent, followed in cases such as *Ison* and *Marshall*, establishing that offensive speech does, indeed, convey a protected viewpoint.

The district court should have followed rather than warred with Supreme Court precedent. It expended much effort attempting to limit *Tam* to its facts and discounting the plurality opinion, but it ignored *Brunetti*, wherein the Supreme Court adopted *Tam* without reservation: "[A]s the Court made clear in *Tam*, a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Brunetti*, 139 S. Ct. at 2301 (quoting *Tam*, 582 U.S. at 223). "[A]ll the [*Tam*] Justices agreed" that the "disparagement bar" at issue in that case "was viewpoint-based." *Id.* at 2299 (citations omitted). A law that

45

"reflects the Government's disapproval of a subset of messages it finds offensive" is "the essence of viewpoint discrimination." *Id.* (quoting *Tam*, 582 U.S. at 249 (op. of Kennedy, J.)) (quotation marks omitted).

In any event, this Court has since applied *Tam* outside the trademark context, and unequivocally followed *Tam*'s instruction that the First Amendment protects offensive speech from viewpoint discrimination. *See Speech First*, 32 F.4th at 1126. Contrary to the district court's view, Doc. 46 at 6 n.8, the Sixth Circuit in *Ison*, and the Eastern District of Pennsylvania in *Marshall*, correctly followed *Tam* (and *Brunetti).*

This Court should reject the district court's invitation to create a circuit split on the question of whether school boards may ban "abusive" and "personally directed" speech. Well-established First Amendment doctrine forbids them from doing so. The district court's dismissal of Plaintiffs' facial challenges should be reversed.

IV.   DEFENDANTS' ENFORCEMENT OF THEIR "ABUSIVE" AND
       "PERSONALLY DIRECTED" SPEECH BANS VIOLATED AND CONTINUES
       TO VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS.

Because these prohibitions of "abusive" and "personally directed" speech are facially unconstitutional, it follows that their application

against Plaintiffs is also unconstitutional. *See Ison*, 3 F.4th at 895. The district court's assertion that Defendants have not violated anyone's rights because they allowed their opponents to "speak uninterrupted when they followed the policy," Doc. 46 at 7, misses the point of civil-rights litigation. Of course plaintiffs always retain the option of shutting up and complying (if they can figure out what the rules require of them). But courts exist to determine whether government officials violate constitutional rights by enforcing speech codes. That Defendants do not interrupt speakers whom they perceive to follow their rules is no answer to the question of whether application of those rules violates the First Amendment.

The district court's opinion is premised on the erroneous opinion that all speech endorsing a particular conclusion expresses the same viewpoint. *Id.* It failed to understand that when Defendants label speech "abusive" and "personally directed," they refer to viewpoints, even if the speech also conveys other views. As noted *supra*, viewpoint neutrality does not merely protect the right to pick sides. "To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so." *Tam*, 582 U.S. at 249 (Kennedy, J., concurring); *see*

*Rosenberger*, 515 U.S. at 831-32 ("The . . . declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways").

Moreover, the district court erred in suggesting that Plaintiffs' allegedly offensive speech may be censored lest it *cause* disruption. Belford eliminated any potential doubt as to her violation of Plaintiffs' rights when she testified that it was "primarily [her] focus" in enforcing the Policy to bar speech that would "inflame the audience and create an unsafe environment." *Supra* at 7.

Defendants cannot silence speakers for alleged fear of how others may react to their views. "Speech cannot be . . . punished or banned, simply because it might offend a [crowd]." *Forsyth County. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) (citation omitted). Defendants "may not regulate speech because it causes offense or makes listeners uncomfortable, or because it might elicit a violent reaction or difficult-to-manage counterprotests." *Fort Lauderdale Food not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1294 (11th Cir. 2021) (internal quotation marks and brackets omitted). "Participants in an orderly demonstration in a public place are not chargeable with the

danger . . . that their critics might react with disorder or violence."

*Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (citation omitted).

"Desirable as [the prevention of conflict] is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." *Buchanan v. Warley*, 245 U.S. 60, 81 (1917). Indeed, "a principal function of free speech under our system of government is to invite dispute," and speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Johnson*, 491 U.S. at 408-09 (internal quotation marks omitted).

Nor does it help Defendants that they only sometimes engage in improper censorship. "[A]llowing a viewpoint to be offered on some occasions without interruption does not prove the policy viewpoint neutral. Indeed, selective enforcement of a policy only when a presiding officer is feeling provoked does not help to support the policy's constitutionality." *Marshall*, 571 F. Supp. 3d at 422; *see also McBreairty v. Sch. Bd. of RSU22*, No. 1:22-cv-00206-NT, 2022 U.S. Dist. LEXIS 128353, at *13 (D. Me. July 20, 2022).

V.   DEFENDANTS' APPLICATION OF THEIR "OBSCENITY" PROHIBITION
     VIOLATED AND CONTINUES TO VIOLATE PLAINTIFFS' FIRST
     AMENDMENT RIGHTS.

With respect to Plaintiffs' as-applied challenge to the "obscenity" ban,
the district court did not explain its reasoning in granting Defendants
summary judgment. In a cryptic footnote, the court merely held that it
need not decide whether Plaintiffs' language met the obscenity test of
*Miller v. California*, 413 U.S. 15 (1973), "because if the speech is
protected it is still subject to the constitutional restrictions of the policy,
which prohibits obscene speech." Doc. 115 at 7 n.4. But if Plaintiffs'
speech is not obscene, it cannot be constitutionally banned as obscenity.

In *Mama Bears*, the court enjoined a school board's application of a
"civility" requirement against a mother who had been ejected from a
school board meeting, and banished from future meetings, for criticizing
the school library's circulation of a sexually explicit book by reading
from it at public comment. *Mama Bears*, 2022 U.S. Dist. LEXIS 234538
at *26-*28. The school board had responded to the lawsuit by, among
other things, adopting an obscenity prohibition. The court declined to
enjoin the obscenity prohibition on its face, because *Miller*-defined
obscenity is unprotected, *id.* at *28-*29, and it declined to offer as-

50

applied relief because the prohibition had not yet been applied and its
future application appeared uncertain, *id.* at *29-*30. But the court
admonished the school board that it

> must make sure to apply the *Miller* test in determining whether
> speech is obscene and thus unprotected. Should the Board misapply
> the *Miller* test and exclude speech it deems to be obscene that should
> in fact be protected, Plaintiffs could then prevail on their as-applied
> challenge to this provision.

*Id.* at *30-*31. Responding to a school board's frivolous invocation of its
obscenity ban, the *Marshall* court similarly advised the board to heed
*Miller. Marshall*, 571 F. Supp. 3d at 428 n.9; *see also McBreairty*, 2022
U.S. Dist. LEXIS 128353, at *15 (finding "comments to the School
Board, though they reference sexual conduct, are not appealing to any
prurient interest and are offered to make a political or philosophical
point," and are thus protected).

   Defendants, for their part, have not claimed that Plaintiffs' speech
meets *Miller*'s obscenity test—which would be an odd claim to make of
books that they provide children. Indeed, Belford's understanding of
"obscenity" sweeps far wider than *Miller* allows, and nothing in this

record remotely approaches *Miller*'s definition of "obscenity."[10] Defendants cannot invoke an obscenity ban to place their library books beyond criticism or forbid all mention of sex that might otherwise be fit for discussion at a board meeting. Plaintiffs are entitled to summary judgment on their as-applied challenge to the obscenity ban.

Defendants' efforts to justify their application of the "obscenity" ban, pleading FCC compulsion and a generalized child-protection interest, would not sustain this prohibition under different language. *See Mama Bears*, 2022 U.S. Dist. LEXIS 234538, at *37 (enjoining "profane" speech ban).

The FCC excuse, asserted in this litigation with respect to "obscenity" and already separately codified post-judgment, is easily disposed of. First, the FCC tail cannot wag the First Amendment dog. Defendants cannot ban protected speech by choosing to broadcast it

---

[10] "The basic guidelines for the trier of fact must be: (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller*, 413 U.S. at 24 (citation and quotations omitted).

where it might be restricted. In the event of such a conflict, the broadcast might stop, but the meeting would continue—in full compliance with the First Amendment.

But there is no such conflict. Even if the FCC's definitions of indecency and profanity overlapped with Belford's vision of "obscenity," BPS meetings air on *cable*. Doc. 91-1 at 36:3-4; School Board Meeting Videos, Brevard Public Schools, https://www.brevardschools.org/Page/2305 (last visited Apr. 9, 2023). FCC indecency and profanity regulations "do not apply to cable." FCC, Obscene, Indecent and Profane Broadcasts, www.fcc.gov/sites/default/files/obscene_indecent_and_profane_broadcasts.pdf (last visited Apr. 9, 2023).

Defendants' reliance on a child-protection interest to censor all sex-related talk at a public meeting is likewise unavailing. The leading precedent on the intersection of child protection and First Amendment rights saw the Supreme Court strike down a general prohibition of allegedly immoral books that was justified on such grounds. The government may not "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957) "[Q]uarantining the general reading public against books not too rugged

for grown men and women in order to shield juvenile innocence . . . is to burn the house to roast the pig." *Id.* The Court suggested that a properly tailored solution would only restrict these books to children.

Decades later, the Supreme Court struck down a postal regulation forbidding the mailing of contraceptive advertisements. "The level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." *Bolger v. Youngs Drugs Prods. Corp.*, 463 U.S. 60, 74 (1983).

School board meetings implicate the interests of children, but so do all government hearings. And political discourse often concerns topics that most parents would restrict from their young children, including war, disease, violent crime, and sex. News reports concerning the exploits of various politicians, including multiple Presidents, have long prompted parents to change the channel. Whether children should watch a school board hearing is a parental decision. Parents can review the evening's agenda before deciding whether a meeting is appropriate for their child.

But Defendants may not silence adults who wish to participate in civic affairs, and bar them from presenting their viewpoints, merely

54

because a child might overhear. Unlike children, adults vote, and they are entitled to participate fully in the political conversation. If Defendants want less "unclean" speech at their school board meeting, they should consider introducing less such speech into the schools for parents to complain about.

VI.   DEFENDANTS' PROHIBITIONS OF "ABUSIVE" AND "PERSONALLY DIRECTED" SPEECH ARE OVERBROAD AND VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A regulation can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)). And "where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas

were clearly marked." *Grayned*, 408 U.S. at 109 (internal punctuation marks and citations omitted).

"The void-for-vagueness doctrine addresses 'at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). Indeterminate prohibitions create opportunities for abuse through open-ended interpretation. *Mansky*, 138 S. Ct. at 1891. The discretion of a board meeting's presiding officer "must be guided by objective, workable standards. Without them [the official's] own politics may shape his views on what counts as [prohibited speech]." *Id.*

"In First Amendment free speech cases . . . 'rigorous adherence to th[e]se requirements is necessary to ensure that ambiguity does not chill protected speech.'" *Burns*, 999 F.3d at 1349 (quoting *Fox Television Stations*, 567 U.S. at 253-54). "Content-based regulations thus require a more stringent vagueness test." *Wollschlaeger v. Governor*, 848 F.3d

1293, 1320 (11th Cir. 2017) (en banc) (internal quotation marks omitted). The "'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

Relatedly, "a law is facially invalid if it 'punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Fla. Ass'n of Prof'l Lobbyists Inc. v. Div. of Legislative Info. Servs.*, 525 F.3d 1073, 1079 (11th Cir. 2008) (quoting *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003)). A regulation is overbroad when the government allows the "scope" of the rule "to reach both unprotected expression as well as, at least potentially, protected speech." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1502 (11th Cir. 1990). Speech regulations "may not 'sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Wacko's Too, Inc. v. City of Jacksonville*, 522 F. Supp. 3d 1132, 1159 (M.D. Fla. 2021) (quoting *NAACP v. Alabama*, 377 U.S. 288, 307 (1964)). "In First Amendment cases, there exists a serious concern that overbroad laws may lead to a chilling effect on protected expression." *Id.* (citing *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998); *Dombrowski v. Pfister*, 380

U.S. 479, 487 (1965)). Prohibiting "words offensive to some who hear them . . . sweeps too broadly." *Gooding*, 405 U.S. at 527 (citation omitted).

*Marshall* struck down a school board's prohibition of "abusive" and "personally directed" comments not only for sanctioning viewpoint discrimination, but also on vagueness and overbreadth grounds. *Marshall*, 571 F. Supp. 3d at 424-26. It correctly held that these terms, as here, were unconstitutionally vague because that policy lacked "'objective, workable standards' to guide" enforcement. *Id*. at 424 (quoting *Mansky*, 138 S. Ct. at 1891). The lack of defined terms allowed "little more than the presiding officer's own views" to determine what violated the public speaking policy, which "openly invite[d] viewpoint discrimination." *Id*.

And the prohibitions of "personally directed" and "abusive" statements rendered the public speaking policy overbroad because they prevented criticism of a school employee's "wrongful conduct or competence." *Id*. at 425-26. Expressing "[a]n opinion that a school employee is incompetent in performing school duties or violating the law governing the performance of the employee's duties is in fact

58

relevant [at school board meetings] and presents a viewpoint against which the [s]chool [b]oard may not discriminate." *Id*. at 426. The public speaking policy was unconstitutional because it prohibited these opinions "under any reasonable interpretation" of its terms. *Id*.

As in *Marshall*, Defendants' policy is unconstitutionally vague and overbroad. It sets no boundaries for its prohibitions on speech that is "abusive," "personally directed," or "obscene." Instead of providing "objective, workable standards," the Policy allows Defendants' "own politics" to shape their views of what is prohibited. *Mansky*, 138 S. Ct. at 1891. The rules' scope allows Defendants to prohibit "both unprotected expression as well as, at least potentially, protected speech." *Am. Booksellers*, 919 F.2d at 1502. These terms' "[u]ncertain meanings" cause speakers to steer further from the unlawful speech zone than might be necessary. *Grayned*, 408 U.S. at 109.

The district court, however, failed to engage these arguments, and instead ruled *ipse dixit* that the Policy was neither overbroad nor vague. It simply asserted that the Policy is not overbroad "because abusive, irrelevant, and disruptive speech is permissibly restricted in a limited public forum," Doc. 46 at 9, and the Policy is not vague because it "lists

five concrete reasons for which the Chair may interrupt speakers," *id.*, without addressing the argument that some of those listed reasons are not at all "concrete."

Given its lack of analysis, it is unsurprising that the cases listed by the district court as supporting its conclusions are inapposite. None of them addressed bans on "abusive," "personally directed," or "obscene" speech in the context of a public forum. *Dyer*, as noted *supra*, involved a person who was expelled from a meeting for being actually disruptive, threatening, and offering speech that might have been protected in other fora but which was irrelevant to a city council meeting. The definition of "street performance" was the subject of *Horton v. City of St. Augustine*, 272 F.3d 1318 (11th Cir. 2001). "Abusive" and "obscene" telephone calls featured in *United States v. Eckhardt*, 466 F.3d 938 (11th Cir. 2006), where a criminal defendant "called his victim approximately 200 times during a year and a half period," with sexually explicit language meant to threaten and harass. *Id.* at 944. And *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018), a case about a college stalking prohibition, did not reference any of the speech categories challenged here. The *Doe* prohibition only required, among other

60

elements of stalking, that the proscribed "knowing course of conduct" be "directed at a specific person." *Id.* at 1228.

*Marshall* is directly on-point, and correctly so. Defendants' prohibitions of "abusive" and "personally directed" speech are unconstitutionally vague and overbroad.

## CONCLUSION

The district court's judgment should be reversed, and the order granting Defendants' motion to dismiss should be vacated.

Dated: April 10, 2023               Respectfully submitted,

                                    /s/ Alan Gura
David Osborne                       Alan Gura
GOLDSTEIN LAW PARTNERS, LLC         Ryan Morrison
4651 Salisbury Rd., Suite 400       INSTITUTE FOR FREE SPEECH
Jacksonville, FL  32256             1150 Connecticut Ave., N.W.
610-949-0444                        Suite 801
dosborne@goldsteinlp.com            Washington, DC 20036
                                    202.301.3300
                                    agura@ifs.org
                                    rmorrison@ifs.org

                                    *Counsel for Appellants*

61

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 11,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Dated: April 10, 2023                    /s/ Alan Gura
                                         Alan Gura
                                         *Counsel for Appellants*