# United States Court of Appeals

## for the

# Eleventh Circuit

MOMS FOR LIBERTY – BREVARD COUNTY,
FLORIDA, et al.,

*Plaintiffs-Appellants,*

v.

BREVARD PUBLIC SCHOOLS, et al.,

*Defendants-Appellees,*

On appeal from the United States District Court
for the Middle District of Florida
Honorable Roy B. Dalton Presiding

## BRIEF OF *AMICI CURIAE*
## FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
## AND MANHATTAN INSTITUTE
## IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL

ILYA SHAPIRO
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

JT MORRIS
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

*Attorneys for* Amici Curiae

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 28-1(b), counsel for *amici* certifies that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*. *Amici* the Foundation for Individual Rights and Expression (FIRE) and the Manhattan Institute are nonprofit corporations exempt from income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

The undersigned counsel of record certifies that the following listed persons and entities as described in 11th Cir. R. 26.1-2(a) have an interest in the outcome of this case, and were not included in the Certificates of Interested Persons in briefs that were previously filed per 11th Cir. R. 26.1–2(b).

1. Morris, JT

2. The Foundation for Individual Rights and Expression

3. Shapiro, Ilya

4. The Manhattan Institute.

# TABLE OF CONTENTS

**Page:**

TABLE OF CITATIONS ...............................................................v

INTEREST OF *AMICUS CURIAE*.............................................1

STATEMENT OF THE ISSUES...................................................2

SUMMARY OF ARGUMENT .....................................................3

ARGUMENT ..................................................................................6

    I.    Increasingly, School Boards and City Councils Rely On Unconstitutional Decorum Policies to Quell Speech With Which They Disagree. ..............6

        A.    Schools frequently cite decorum policies to remove and arrest critics. ...............................6

        B.    City councils and other government assemblies similarly abuse decorum policies to penalize speakers based on viewpoint. ......................9

    II.    Americans Do Not Give Up Their First Amendment Rights at Public Hearings. ...............12

        A.    Governments cannot ban "abusive" or "obscene" speech that is relevant to the issues open to public comment. ....................14

            1.    *Brevard County School Board's blanket ban on "abusive" speech constitutes viewpoint discrimination.*....................14

            2.    *Brevard County School Board's blanket ban on "obscene" speech is unreasonable in light of the purpose of the forum.* ....................19

B. Governments cannot prevent citizens from naming public officials during a public comment period. ............................................ 22

  *1. Brevard County School Board applied its "personally directed" comments ban to Plaintiffs in a viewpoint discriminatory way.* ............................................ 23

  *2. Brevard County's "personally directed" comments prohibition is unconstitutionally vague.* ............................................ 23

  *3. Brevard County's "personally directed" comments prohibition is overbroad.* ............................................ 25

CONCLUSION ............................................ 26

# TABLE OF CITATIONS

**Page(s):**

**Cases:**

*Cantwell v. Connecticut,*
310 U.S. 296 (1940) ............................................................... 20

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n,*
429 U.S. 167 (1976) ......................................................... 13, 22

*Cohen v. California.,*
403 U.S. 15 (1971) ........................................................... 19, 20

*Cornelius v. NAACP Legal Def. Ed. Fund, Inc.,*
473 U.S. 788 (1985) ............................................................... 19

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ............................................................... 13

*Hill v. Colorado,*
530 U.S. 703 (2000) ............................................................... 24

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) ................................................. 16, 17, 18

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.,*
3 F.4th 887 (6th Cir. 2021) ........................................... 17, 18

*Marshall v. Amuso,*
571 F. Supp. 3d 412 (E.D. Pa. 2021) ........................... 24, 26

*Massachusetts v. Oakes,*
491 U.S. 576 (1989) ............................................................... 25

*Matal v. Tam,*
582 U.S. 218 (2017) ................................................. 15, 16, 17

*McBrearity v. Sch. Bd. of RSU 22,*
2022 WL 2835458 (D. Me. July 20, 2022) ............................ 8

*Miller v. California,*
    413 U.S. 15 (1973) ..................................................... 19

*Minn. Voters All. v. Mansky,*
    138 S. Ct. 1876 (2018) .......................................... 24, 25

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ........................................ 5, 15, 18, 22

*Org. for a Better Austin v. Keefe,*
    402 U.S. 415 (1971) ..................................................... 20

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................ 13, 23

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ................................... 1

*Street v. New York,*
    394 U.S. 576 (1969) ..................................................... 16

*United States v. Williams,*
    553 U.S. 285 (2008) ................................................ 13, 25

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ...................................................... 4

**Statutes:**

15 U.S.C. § 1052(a) ............................................... 15, 16

**Rules**:

Fed. R. App. P. 29(a)(5) ............................................. 1

Fed. R. App. P. 32(a)(5) ............................................. 1

Fed. R. App. P. 32(a)(6) .............................................................. 1

Fed. R. App. P. 32(f)................................................................... 1

**Other Authorities:**

Avi Selk, *She was naming lawmakers who took oil and gas money – so they barred her from the public hearing*, Wash. Post (Feb. 12, 2018) ............................................................................. 11

Brittany Bernstein, *Speaker Kicked Out of Florida School Board Meeting for Reading from Sexually Explicit School Library Book*, Nat'l Rev. (Oct. 28, 2021) ....................................................... 7

*Florida Man Arrested for Saying 'Penis' at School Board Meeting*, Brevard Times (May 25, 2016) ............................................. 6

Joshua Q. Nelson, *Maine school board ordered to pay parent $40K for violating First Amendment rights*, Fox News (Sept. 12, 2022) ........ 8

Merrit Kennedy, *Outcry After Louisiana Teacher Arrested During School Board Meeting*, Nat'l Pub. Radio (Jan. 10, 2018) ...................... 9

William Morris, *Speaker charged for comments against olice at Newton council meeting acquitted*, Des Moines Reg. (Feb. 4, 2023) ................................................................................. 12

# INTEREST OF *AMICUS CURIAE*[1]

The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended the rights of individuals through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. *See, e.g.*, Brief of FIRE as *Amicus Curiae* in Support of Respondent, *Jack Daniel's Properties, Inc. v. VIP Prods. LLC*, No. 22-148 (2023); Brief of FIRE as *Amicus Curiae* in Support of Appellant, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022). FIRE's own work highlights how government officials at public hearings nationwide are increasingly relying on unconstitutional decorum policies to suppress the free speech of their citizens.

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, their members, or their counsel contributed money intended to fund this brief's preparation or submission. Plaintiffs-appellants consented to the filing of this brief, but defendants-appellees declined. A motion for leave to file this brief has been filed concurrently herewith.

The Manhattan Institute (MI) is a nonprofit public policy research foundation whose mission is to develop and disseminate new ideas that foster economic choice and individual responsibility. To that end, it has historically sponsored scholarship supporting the rule of law and opposing government overreach, including in the marketplace of ideas.

*Amici* urge this court to reverse the district court's erroneous judgment that the decorum policies at issue here do not violate the First Amendment, and ask this court to clarify that viewpoint discriminatory, vague, and overbroad speech restrictions violate citizens' right to express themselves at public hearings.

## STATEMENT OF THE ISSUES

1.      Whether speakers have standing to challenge speech restrictions when they self-censor, by modifying their speech or refraining from speaking altogether, for fear of enforcement;

2.      Whether civil rights plaintiffs have standing to seek nominal damages for past violations of their rights;

3.      Whether regulations banning "abusive" and "personally directed" speech at school board meetings, on their face and as-applied by Defendants; and Defendants' prohibition of allegedly "unclean" speech

as "obscenity," constitute viewpoint discrimination in violation of the First Amendment rights of free speech and petition; and

4.    Whether regulations banning "abusive" and "personally directed" speech at school board meetings are unconstitutionally vague and overbroad.

## SUMMARY OF ARGUMENT

It is well-established that Americans have the right to free speech at public hearings, including the right to criticize public officials. Yet across the country, at city council, legislative committee, and school board meetings, elected officials are increasingly enforcing decorum policies to silence criticism from concerned citizens during public comment periods. For example, the mayor of Eastpointe, Michigan shouted down, cut off, and ruled out of order several members of the public, including FIRE clients, for attempting to peacefully comment on the mayor's public scandals or support other city council members. In Iowa, a man was criminally charged and actually prosecuted for criticizing a police traffic stop at a city council meeting. And in school board meetings from Maine to Louisiana to Defendants' own school district, parents and teachers have been forcibly removed from the

podium, handcuffed, and jailed for criticizing administrator pay hikes and school library books.

These are not isolated incidents. All involved citations by the offended board or council members to decorum policies, including bans on "obscenity," "personally directed" comments, and the ever-amorphous "abusive speech." These decorum policies are written or enforced in such a way that ordinary, law-abiding citizens can be cut off, physically removed, or even criminally charged—all because a member of the public dared to exercise their First Amendment right to criticize a government official. But it is axiomatic that "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Decorum policies are no exception to this ironclad rule, and this case must be decided accordingly. Here, members of Moms for Liberty sought to publicly criticize the Brevard County School Board for various policy decisions, including allowing students access to books Moms for Liberty members considered age-inappropriate; school masking policies during the COVID-19 pandemic; its treatment of an ex-teacher convicted

for indecent exposure on school property; and even the Board's conduct toward Moms for Liberty members during the meetings themselves. For their efforts, the School Board repeatedly cut off Moms for Liberty members, directed those members to avoid entire topics of debate because they were "inappropriate for children," and in some cases forced members off the podium. In doing so, the School Board relied on viewpoint discriminatory, unreasonable, vague, and overbroad prohibitions against "abusive," "personally directed," and "obscene" comments.

Taking public criticism might not be easy. But criticism of our government, its institutions, and its officials is as American as apple pie, even when it is "unpleasantly sharp." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). When the members of the Brevard County School Board chose to run for public office, they signed up for criticism as part of the job. But when that criticism arrived, the School Board officials chose to censor Moms for Liberty members instead of answering them. The First Amendment requires elected officials to be thick-skinned. Accordingly, this Court should reverse and clarify that the First Amendment trumps decorum policies at public comment periods.

# ARGUMENT

## I. Increasingly, School Boards and City Councils Rely On Unconstitutional Decorum Policies to Quell Speech With Which They Disagree.

The constitutional problems on display in this case are not an isolated issue. School boards, and government councils more broadly, increasingly wield similar decorum policies banning "abusive," "offensive," or "personally directed" speech to punish or silence their critics at public meetings.

### A. Schools frequently cite decorum policies to remove and arrest critics.

One need only look to the very Defendants in this lawsuit for additional examples of civility requirements being abused to suppress criticism. In 2016, the Brevard County School Board Chairman cut off a member of the public—who was also a candidate running for a School Board seat—from speaking during his allotted three-minute comment period because the Chairman thought he did not "keep it civil" and that his comments were "not appropriate." *Florida Man Arrested for Saying 'Penis' at School Board Meeting*, Brevard Times (May 25, 2016), https://brevardtimes.com/2016/05/florida-man-arrested-for-saying-penis-at-school-board-meeting/. After the speaker refused to leave the

podium, four Brevard County Sheriff's deputies forcibly carried him out of the hearing, arrested him, and charged him with disturbing a school function. *Id.* The reason? Using the words "penis" and "erect penis" to complain that a teacher who exposed naked pictures of his genitalia to underage students received insufficient punishment. *Id.*

More recently, and just one county over from Brevard, the Orange County School Board (Orlando) directed police officers to remove a speaker from a school board meeting for reading, during the public-comment period, "inappropriate" language from the book *Gender Queer*, available in some of the school district's high school libraries.[2] Brittany Bernstein, *Speaker Kicked Out of Florida School Board Meeting for Reading from Sexually Explicit School Library Book*, Nat'l Rev. (Oct. 28, 2021), https://www.nationalreview.com/news/speaker-kicked-out-of-flori da-school-board-meeting-for-reading-from-sexually-explicit-school-library-book/. The speaker's stated goal in reading "a scene from the book that described sexual acts using strap-on devices" was to make the point

---

[2] *Amicus* FIRE has argued against the removal of *Gender Queer* from school libraries. *See, e.g.*, Brief of *Amici Curiae* FIRE and Woodhull Freedom Foundation in Support of Interested Parties, *In re Gender Queer, A Memoir*, No. CL22-1985 (Va. Cir. Ct. July 25, 2022).

that the book was too sexually explicit to be available to high school students. *Id.* Yet under the School Board's overbroad decorum policy, reading from a book accessible to teenagers was "not appropriate" for a room of adults. Notably, reading similar language from a library book to complain about its inclusion in county schools was the same reason the School Board here interrupted and cited one of the Plaintiffs. Appellants' Br. at 16.

Similarly, last year, a federal court in Maine ordered the RSU 22 School District to pay a parent $40,000 for violating his First Amendment rights when they banned him from speaking at school board meetings for eight months. *See* Joshua Q. Nelson, *Maine school board ordered to pay parent $40K for violating First Amendment rights*, Fox News (Sept. 12, 2022), https://www.foxnews.com/media/maine-school-board-ordered-to-pay-parent-40k-violating-first-amendment-rights; *McBreairty v. Sch. Bd. of RSU 22*, No. 1:22-CV-00206-NT, 2022 WL 2835458, at *5 (D. Me. July 20, 2022). The school board had instituted the ban based on the parent's comments "complaining about a book [in the school library] that he said contained 'hardcore anal sex'," on the grounds that those comments "contained obscenity." *Id.* But the court held that his

comments were still protected, "though they reference sexual conduct," because they did "not appeal[] to any prurient interest and [we]re offered to make a political or philosophical point." *Id.*

In another school board case out of Louisiana, a security guard removed a teacher from a school board meeting, forcibly handcuffed her, and booked her into jail overnight after complaining that the school superintendent should not receive a raise when teachers were being underpaid. Merrit Kennedy, *Outcry After Louisiana Teacher Arrested During School Board Meeting*, Nat'l Pub. Radio (Jan. 10, 2018), https://www.npr.org/sections/thetwo-way/2018/01/10/577010534/outcry-after-louisiana-teacher-arrested-during-school-board-meeting. As this case demonstrates, school board officials do not qualify only vulgar or profane statements as "abusive" or "offensive"—some disgruntled officials are willing to ban any criticism under the broad, undefined umbrella of decorum policies.

**B. City councils and other government assemblies similarly abuse decorum policies to penalize speakers based on viewpoint.**

School boards are not the only government assemblies abusing unconstitutional decorum policies to punish their critics and dissenters.

As *amicus* FIRE's work demonstrates, city councils and state committees also frequently rely on vague and overbroad decorum policies to shut down criticism of publicly elected officials.

Few cases better illustrate the harm of granting elected officials broad discretion to silence critics than FIRE's recent lawsuit against Monique Owens, the mayor of Eastpointe, Michigan. As alleged in FIRE's verified complaint and motion for preliminary injunction, Mayor Owens shouted down and cut off one public speaker from discussing recent protests against the mayor, despite allowing a different speaker at a separate meeting to make "personally directed" comments calling the mayor "wonderful" and "beautiful." Mot. for Prelim. Inj., *Hall-Rayford v. Owens*, Case No. 2:22-cv-12714, Dkt. No. 3, at 9–10 (E.D. Mich. Nov. 11, 2022). Similarly, Mayor Owens cut off another citizen from voicing general words of support for another councilman with whom the Mayor was having a public dispute, but allowed her supporters "to call allegations against her 'foolery,' 'childish,' and 'ridiculous'" at council meetings earlier that same year. *Id.* at 7. And while Mayor Owens prohibited direct criticism of her own actions, she allowed her supporters to directly criticize her critics. For example, Mayor Owens did not

intervene when her supporters called a sitting councilman and his wife "tacky" and compared the councilman's wife to a "five-year-old child." *Id.* at 11.[3]

In a case out of West Virginia, an advocate against a bill that would allow oil and gas companies to drill on private land without the consent of the owner spoke before members of the West Virginia House Judiciary Committee and used her public comment to name members of the committee who had taken monetary contributions from energy companies. Avi Selk, *She was naming lawmakers who took oil and gas money – so they barred her from the public hearing*, Wash. Post (Feb. 12, 2018), https://www.washingtonpost.com/news/energy-environment/wp/2018/02/12/she-was-naming-lawmakers-who-took-oil-and-gas-money-so-they-barred-her-from-the-public-hearing/. The committee chair cut her

---

[3] After the plaintiffs in the Eastpointe lawsuit filed a motion for preliminary injunction, on December 7, 2022, the district court entered a stipulated preliminary injunction banning Mayor Owens from shutting down criticism of her actions, protecting the First Amendment right of members of the public to direct their comments at a specific local official and barring Mayor Owens from prohibiting members of the public from commenting on her scandals. *See* Stipulation to Entry of Order Regarding Inj. Relief, *Hall-Rayford v. Owens*, Case No. 2:22-cv-12714, Dkt. No. 13 (E.D. Mich. Dec. 7, 2022).

off, admonished her for making "personal comments," then cut her mic and had her physically removed from the podium after she protested. *Id.*

And recently in Iowa, police and local prosecutors not only handcuffed and arrested a man for his comments at the podium during a city council meeting, but went as far as to actually criminally charge and prosecute him—all because of his repeated criticism of police for a controversial traffic stop. William Morris, *Speaker charged for comments against police at Newton council meeting acquitted*, Des Moines Reg. (Feb. 4, 2023), https://www.desmoinesregister.com/story/news/crime-and-courts/2023/02/04/iowa-man-wins-first-amendment-case-over-arrest-at-city-council-meeting/69868317007/. While the man was ultimately acquitted on First Amendment grounds, this and other episodes demonstrate the chilling effect of enforcing unconstitutional decorum policies. The message to citizens is clear: Don't offend the board or council members, or you could wind up with a criminal record.

## II. Americans Do Not Give Up Their First Amendment Rights at Public Hearings.

The prior examples demonstrate the extent to which ordinary Americans are being deprived of their freedom of expression, all in the name of overbroad and unevenly enforced decorum rules. That is not to

say that all decorum restrictions are unconstitutional—it would of course not violate the First Amendment to remove a speaker from the podium for leveling true threats at elected officials, for example. But aside from such an extreme case, it is well-established that Americans have the right to free speech at public hearings, including the right to criticize public officials. *See City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Emp. Rels. Comm'n,* 429 U.S. 167, 174–76 (1976) (recognizing the public's right to speak at school board meetings "when the board sits in public meetings to conduct public business and hear the views of citizens").

Because public hearings are limited public forums, officials cannot quell speech based on the viewpoint a citizen expresses. Instead, they may impose content-based regulations only when they are reasonable in light of the purpose of the forum and viewpoint-neutral. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Those regulations also cannot be vague or overbroad. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."); *United States v. Williams*, 553 U.S. 285, 292 (2008) (a regulation or statute "is facially invalid if it prohibits a substantial

amount of protected speech . . . not only in an absolute sense, but also relative to the statute's plainly legitimate sweep").

The Brevard County School Board's policies fail every test. Brevard's policy against "abusive" speech is viewpoint discriminatory and its policy prohibiting "obscene" speech is unreasonable in light of the purpose of the forum. As for its ban on "personally directed comments," that policy hits the trifecta: It is viewpoint discriminatory, vague, *and* overbroad. Accordingly, the district court erred and summary judgment should be granted in favor of Moms for Liberty.

## A. Governments cannot ban "abusive" or "obscene" speech that is relevant to the issues open to public comment.

Brevard County School Board's ban on "abusive" speech discriminates against offensive speech and its ban on "obscene" speech is unreasonable when applied to block any discussion of school library policies. Both policies violate the First Amendment.

### 1. Brevard County School Board's blanket ban on "abusive" speech constitutes viewpoint discrimination.

Brevard County's blanket restriction on "abusive" speech at a public hearing necessarily constitutes viewpoint discrimination and violates the First Amendment because it "offends a bedrock First

Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 582 U.S. 218, 223 (2017). That is particularly true when allegedly "offensive" or "abusive" speech is directed at government, which must be viewed "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. Regardless of whether the speech at issue here is actually "abusive" in a lay sense, it is constitutionally protected.

In two recent cases, the Supreme Court has made expressly clear that "[g]iving offense is a viewpoint." *Matal*, 582 U.S. at 243. The first, *Matal v. Tam*, involved a disparagement clause to the Lanham Act that prohibited the Patent and Trademark Office from registering a trademark "which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute." 15 U.S.C. § 1052(a). The Court held that the disparagement clause violated the Free Speech Clause of the First Amendment because, even though it "evenhandedly prohibits disparagement of all groups," the

actual determination of whether something gave offense and, therefore, was disparaging, required the government to engage in viewpoint discrimination. The Court noted that "[w]e have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal*, 582 U.S. at 244 (quoting *Street v. New York*, 394 U.S. 576, 592 (1969), and string-citing cases).

Two years later, the Court reaffirmed this core principle in *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019). The case dealt with a similar provision of the Lanham Act that prohibited the registration of "immoral or scandalous" trademarks. *Id.* at 2297 (citing 15 U.S.C. § 1052(a)). The Court held that the determination of whether something is "immoral" or "scandalous" is just as viewpoint-based as whether something is disparaging, because it "distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation." *Id.* at 2300.

These holdings in *Matal* and *Iancu* are not cabined to the trademark sphere; instead, they apply broadly to all First Amendment

expressive rights jurisprudence, including the limited public forums of school board meetings. The Sixth Circuit recognized as much when it invalidated a school board decorum policy very similar to the one in place in Brevard County in *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887 (6th Cir. 2021). There, the court considered a school board's "restrictions on 'abusive,' 'personally directed,' and 'antagonist[ic]' statements," and their use to cut off a student's statements at a public school board meeting. *Id.* at 893. After discussing the Supreme Court's holdings in *Matal* and *Iancu*, the Sixth Circuit noted that "[t]he antagonistic restriction, by definition, prohibits speech opposing the Board"; that "abusive prohibits 'insulting' language"; and that "personally directed" speech was construed by the Board to mean "simply abusive speech directed at one person." *Id.* at 894. All three categories of restricted speech "plainly fit in the 'broad' scope of impermissible viewpoint discrimination because, like in *Matal*, *Iancu*, and [another Sixth Circuit case], they prohibit speech purely because it disparages or offends." *Id.* As a result, the court held the policies to be unconstitutional both on their face and as applied to the silenced student plaintiff. *Id.* at 894–95.

Brevard County's ban on "abusive" speech is on all fours with the unconstitutional policy in *Ison*. As in *Ison*, no written rule or regulation objectively delineates the otherwise subjective scope of "abusive" for the School Board, leaving its operative meaning entirely up to the discretion of enforcing Board members. Defendant School Board member Belford described "abusive" speech as being so broad that she "[did]n't know that there is even an exhaustive definition of abusive," and that it included not only yelling and profanity but even "calling people names . . . that are generally accepted to be unacceptable." Appellants' Br. at 9. Belford later interpreted this facially invalid policy against Moms for Liberty members to ban words as banal as "evil." *Id.* These are the exact types of social more-based distinctions that the Supreme Court held to be viewpoint discrimination in *Iancu*: allowing remarks "when their messages accord with, but not when their messages defy, society's sense of decency or propriety." 139 S. Ct. at 2300. And even worse than in *Iancu*, here those distinctions are being used to suppress government criticism in direct contravention of our long-established "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270.

### 2. Brevard County School Board's blanket ban on "obscene" speech is unreasonable in light of the purpose of the forum.

Brevard County's blanket ban on all "obscene" speech, even when that speech is directly addressing recent actions taken or policies instituted by the School Board, is likewise unconstitutional because it is not a "reasonable" content discrimination practice "in light of the purpose served by the [limited public] forum" of a school board meeting. *Cornelius v. NAACP Legal Def. Ed. Fund, Inc.*, 473 U.S. 788, 806 (1985).

Generally speaking, obscenity, properly defined, is one of a very few categories of speech that *may* be banned under the First Amendment. But unprotected obscenity is significantly narrower than everyday profanity, and the former's exacting legal definition does not prohibit the use of "curse words" in public spaces, even in courthouses.[4] The Supreme Court made this clear in the landmark case *Cohen v. California*. 403 U.S. 15, 25 (1971). There, the Court cleared a man convicted of disturbing the peace for wearing a jacket that read "Fuck the Draft" in a public

---

[4] As defined in *Miller v. California*, 413 U.S. 15, 24 (1973), speech qualifies as unprotected obscenity only if it, "taken as a whole, lacks serious literary, artistic, political, or scientific value," among other requirements.

courthouse building, even though the criminal statute prohibited "offensive conduct" (including obscenity) and even though there were "women and children present." *Id.* at 16. The Court noted that "[w]hile the four-letter word displayed by Cohen in relation to the draft is not uncommonly employed in a personally provocative fashion, in this instance it was clearly not 'directed to the person of the hearer,'" and "[n]o individual actually or likely to be present could reasonably have regarded the words on appellant's jacket as a direct personal insult." *Id.* at 20 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940)). Accordingly, "'so long as the means are peaceful, the communication need not meet standards of acceptability.'" *Id.* at 25. (quoting *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). The Court finally noted that if governments were allowed to "forbid particular words," they "might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Id.* at 26.

The cited instances of "obscenity" in this case perfectly illustrate this final concern of the *Cohen* court. Each citation of a Moms for Liberty member for making an "obscene" utterance was used to suppress criticism of a Brevard County School Board policy or action, not to

prohibit "fighting words" directed at a particular individual. For example, one Moms for Liberty member was blocked from complaining that the School Board allowed sexually explicit books in its school libraries because the library book she was reading from included an expletive and was not "clean"—exactly her complaint. Appellants' Br. at 16. The School Board later banned that Moms for Liberty member from criticizing school library books writ large because the books' subject matter was "not appropriate for children to hear." *Id.* The "obscenity" policy thus barred her from complaining about *any* age-inappropriate material in Brevard County's school library. Other speakers were interrupted and expelled for using "obscene" language like "penis" when criticizing the School Board's treatment of an ex-teacher convicted of indecent exposure on campus, and when complaining that protestors outside the School Board meeting were calling them various expletives. *Id.* at 16–17.

The very purpose of a school board public meeting is for the public to comment on actions taken by the school board. It therefore can never be "reasonable" content discrimination to bar criticism of controversial Board actions at those meetings, even if that criticism necessarily involves vulgar or profane speech quoted from books or news reports. *Cf.*

*Sullivan*, 376 U.S. at 270 (First Amendment protects even "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). Allowing "reasonable" content discrimination means, for example, that a school board can prohibit a speaker from using his allotted public comment time to complain about the power company, not that the school board can pick and choose which grievances the public may air. *See City of Madison*, 429 U.S. at 175 n.8. Were the opposite true, a city council, under the guise of being "viewpoint neutral," could prohibit residents from discussing a proposed tax increase, the public utility commission could prohibit residents from raising the subject of a proposed rate hike, or, like here, an embattled school board could prohibit discussion of controversial library books. As such, Brevard County School Board's blanket "obscenity" ban is unconstitutional.

### B. Governments cannot prevent citizens from naming public officials during a public comment period.

Brevard County School Board's ban on "personally directed" comments is likewise unconstitutional for three reasons: it was unevenly applied in a viewpoint discriminatory manner, it is void for vagueness, and it is overbroad.

### 1. Brevard County School Board applied its "personally directed" comments ban to Plaintiffs in a viewpoint discriminatory way.

Defendants' application of its "personally directed" speech prohibition was viewpoint discriminatory because it was applied unevenly based on the speaker's view or topic. For example, the Board stringently enforced it against Moms for Liberty members to block "personally directed" discussions of controversial topics like masking policies, Appellants' Br. at 10–11, but relaxed the prohibition to allow "personally directed" discussions of more tame topics like theater rehearsals, *id.* at 12, and to allow Board-friendly speakers to compliment individual Board members. *Id.* at 12–14 (collecting examples). These are textbook examples of the government suppressing speech "otherwise within the forum's limitations" in an effort to suppress "the speaker's specific motivating ideology, opinion, or perspective." *Rosenberger*, 515 U.S. at 830. It is therefore unconstitutional viewpoint discrimination as applied.

### 2. Brevard County's "personally directed" comments prohibition is unconstitutionally vague.

The School Board's policy barring public remarks "direct[ed]" at a member of the board is unconstitutionally vague because "it fails to

provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Though "there is no requirement of narrow tailoring in a nonpublic [or limited public] forum, the [government] must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018). While some discretion is permissible, "'that discretion must be guided by objective, workable standards' to avoid the moderator's own beliefs shaping his or her 'views on what counts' as a policy violation." *Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) (quoting *Mansky*, 138 S. Ct. at 1891). Vagueness of a content-based regulation is particularly troublesome "because of its obvious chilling effect on free speech." *Id.* (cleaned up).

Brevard County's prohibition on "personally directed" comments is "irreparably clothed in subjectivity." *Id.* As the record evidence proves, this policy was applied sporadically and lopsidedly to permit "personally directed" compliments of individual board members and their actions, but ban "personally directed" criticism of the same. Appellants' Br. at 10–14 (gathering evidence). It was even applied to ban comments that did

not name specific people, such as a comment on a hypothetical "LGBTQ student" or general criticism of audience members who were affiliated with the Democratic Party. *Id.* at 14–16. This policy is therefore not "capable of reasoned application," *Mansky*, 138 S. Ct. at 1892, and creates a serious, imminent danger of arbitrary enforcement against the School Board's critics—a danger that has already been realized in this case.

### 3. *Brevard County's "personally directed" comments prohibition is overbroad.*

The School Board's ban on "personally directed" comments is additionally unconstitutional because it "prohibits a substantial amount of protected speech . . . relative to [its] plainly legitimate sweep." *Williams*, 553 U.S. at 292. The overbreadth doctrine "is predicated on the danger that an overly broad statute, if left in place, may cause persons whose expression is constitutionally protected to refrain from exercising their rights for fear" of violating the law. *Massachusetts v. Oakes*, 491 U.S. 576, 581 (1989).

To the extent the Brevard County School Board's policy has any legitimate sweep, it is dwarfed by the plethora of impermissible applications, such as prohibiting concerned parents from stating "I disagree with your vote" and "I hope you will reconsider your position."

One Moms for Liberty member was even barred from talking to his own elected school board representative. Appellants' Br. at 10–11. No reasonable limiting construction can cure the policy's constitutional infirmity; its continued existence serves only to chill concerned parents like the members of Moms for Liberty from engaging in the full array of protected First Amendment speech before the school board. *See Marshall*, 571 F. Supp. 3d at 425–26 (granting preliminary injunction against "personally directed" public comment policy, holding, *inter alia*, the policy unconstitutionally overbroad).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and summary judgment entered in favor of Moms for Liberty.

Dated: April 17, 2023

ILYA SHAPIRO
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

/s/ JT Morris

JT MORRIS
   *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
   RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org

*Counsel for* Amicus Curiae
   *Foundation for Individual*
   *Rights and Expression*

**Certificate of Compliance With Type-Volume Limit**

1. This document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f): this document contains 6,080 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.


Date: April 17, 2023

/s/ JT Morris
_____
JT Morris
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION

# CERTIFICATE OF SERVICE

The undersigned certifies that on April 17, 2023, an electronic copy of the Foundation for Individual Rights in Education Brief of *Amicus Curiae* was filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: April 17, 2023

/s/ JT Morris
JT MORRIS
  *Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
jt.morris@thefire.org