No. 23-10656-B

# In the United States Court of Appeals for the Eleventh Circuit

MOMS FOR LIBERTY – BREVARD COUNTY, FL, et al.,

*Plaintiffs-Appellants*,

v.

BREVARD PUBLIC SCHOOLS, et al.,

*Defendants-Appellees.*

Appeal from a judgment of the United States District Court
for the Middle District of Florida, The Hon. Roy B. Dalton, Jr.
(Dist. Ct. No. 6:21-cv-01849-RBD-DAB)

APPELLANTS' REPLY BRIEF

David Osborne
GOLDSTEIN LAW PARTNERS, LLC
4651 Salisbury Rd., Suite 400
Jacksonville, FL 32256
610-949-0444
dosborne@goldsteinlp.com

Alan Gura
Ryan Morrison
Brett R. Nolan*
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W.
Suite 801
Washington, DC 20036
202.301.3300
agura@ifs.org
rmorrison@ifs.org
bnolan@ifs.org
*admitted in Kentucky. Practice
 supervised by DC Bar members
 D.C. App. R. 49(c)(8)
Counsel for Appellants

July 7, 2023

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Astor, Martha – Counsel for Appellants

2. Baker, Hon. David A. – United States Magistrate Judge

3. Brevard County Public Schools Office of Legal Services – Counsel for Appellees

4. Brevard Public Schools – Appellee

5. Bridges, Gennifer – Counsel for Appellees

6. Burr & Forman LLP – Law firm representing Appellees

7. Campbell, Katye – Appellee

8. Cholewa, Joseph – Appellant

9. Dalton, Jr., Hon. Roy B. – United States District Judge

10. Delaney, Katie – Appellant

11. Gibbs, Paul – General Counsel for Brevard County School Board

12. Goldstein Law Partners, LLC – Law firm representing Appellants

13. Gura, Alan – Counsel for Appellants

14. Haggard-Belford, Misty – Appellee

15. Hall, Ashley – Appellant

16. Institute for Free Speech – Organization representing Appellants

17. Jenkins, Jennifer – Appellee

18. Kelly, Hon. Gregory J. – United States Magistrate Judge

19. Kneessy, Amy – Appellant

20. Londono, Valerie – Assistant General Counsel for Brevard County
    School Board

21. Marks, Howard – Counsel for Appellee

22. McDougall, Cheryl – Appellee

23. Moms for Liberty – Brevard County, FL – Appellant

24. Moms for Liberty, Inc. – National affiliate of Appellant

25. Morrison, Ryan – Counsel for Appellants

26. Nolan, Brett R. – Counsel for Appellants

27. Osborne, David – Counsel for Appellants

28. Susin, Matt – Appellee

29. Thakrar, Sheena – Counsel for Appellees

30. Trent, Gene – Appellee

31. Wright, Megan – Appellee

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

/s/ Alan Gura
Alan Gura
Counsel for Appellants

Certificate of Interested Persons ............................................................C-1

Table of Contents ...................................................................................... i

Table of Citations ..................................................................................... ii

Argument.....................................................................................................1

   I.   Plaintiffs have standing. ....................................................................1

      A.   *Plaintiffs have reasonably self-censored after watching Defendants enforce the Policy against them and other parties.* ..............................................................................1

      B.   *Plaintiffs have standing to recover nominal damages.* .............8

      C.   *The Policy change did not moot any part of Plaintiffs' claims.* 9

   II.   The Policy draws lines based on the words and message a speaker conveys and thus does not regulate the "manner" of speech.........12

   III.   The Court should apply *Tam* and *Brunetti* because the meaning of "viewpoint discrimination" does not change from case to case. ....20

   IV.   Applying the Policy to prevent offending the audience and causing a disruption is viewpoint discrimination.......................................28

   V.   Applying the obscenity ban to speech that falls outside of *Miller v. California* violates the First Amendment. ....................................29

   VI.   Defendants' conclusory arguments on void-for-vagueness and overbreadth come up short.............................................................30

Conclusion ................................................................................................32

TABLE OF CITATIONS

**Cases**

*303 Creative LLC v. Elenis,*

--- U.S. ---, 2023 U.S. LEXIS 2794 (June 30, 2023) ...............................9

*Am. Freedom Def. Initiative v. King Cnty.,*

904 F.3d 1126 (9th Cir. 2018)......................................................35, 36

*Am. Freedom Def. Initiative v. Suburban Mobility Auth.,*

978 F.3d 481 (6th Cir. 2020).................................................................38

*Ballard v. Patrick,*

163 F. App'x 584 (9th Cir. 2006) ....................................................33, 34

*Biden v. Nebraska,*

No. 22-506, --- U.S. ---, 2023 U.S. LEXIS 2793 (June 30, 2023) ..........10

*Cantwell v. Connecticut,*

310 U.S. 296 (1940).......................................................................28, 29

*Chaplinsky v. New Hampshire,*

315 U.S. 568 (1942)................................................................................29

*Charnley v. Town of S. Palm Beach,*

Case No. 13-81203, 2015 U.S. Dist. LEXIS 188326 (S.D. Fla. Mar. 23, 2015) ......................................................................................................25

- ii -

*Charnley v. Town of S. Palm Beach, Fla.,*

    649 F. App'x 874 (11th Cir. 2016) ........................................................24

*City of Austin v. Reagan Nat'l Adver. of Austin, LLC,*

    142 S. Ct. 1464 (2022)..........................................................................17

*Cohen v. California,*

    403 U.S. 15 (1971)..........................................................................29, 30

*Davis v. Colerain Twp.,*

    51 F.4th 164 (6th Cir. 2022) ................................................................14

*Davison v. Rose,*

    19 F.4th 626 (4th Cir. 2021) ..........................................................34, 35

*Dyer v. Atlanta Independent School System,*

    852 F. App'x 397 (11th Cir. 2021) .............................................23, 24, 25

*Fairchild v. Liberty Indep. Sch. Dist.,*

    597 F.3d 747 (5th Cir. 2010)................................................................33

*Fort Lauderdale Food not Bombs v. City of Fort Lauderdale,*

    11 F.4th 1266 (11th Cir. 2021) ............................................................37

*Gooding v. Wilson,*

    405 U.S. 518 (1972)..........................................................................30, 41

*Harbourside Place, LLC v. Town of Jupiter*,

   958 F.3d 1308 (11th Cir. 2020) ............................................................. 16

*Henderson v. McMurray*,

   987 F.3d 997 (11th Cir. 2021) ............................................................... 15

*Iancu v. Brunetti*,

   139 S. Ct. 2294 (2019) ................................................................... passim

*Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*,

   3 F.4th 887 (6th Cir. 2021) ....................................................... 32, 34, 36

*Jones v. Heyman*,

   888 F.2d 1328 (11th Cir. 1989) ...................................................... 20, 21

*Keister v. Bell*,

   29 F.4th 1239 (11th Cir. 2022) ...................................................... 12, 13

*Marshall v. Amuso*,

   571 F. Supp. 3d 412 (E.D. Pa. 2021) .................................................. 41

*Matal v. Tam*,

   582 U.S. 218 (2017) ....................................................................... passim

*McCullen v. Coakley*,

   573 U.S. 464 (2014) ............................................................................. 20

*Milestone v. City of Monroe,*

    665 F.3d 774 (7th Cir. 2011).............................................................33, 34

*Miller v. California,*

    413 U.S. 15 (1973) ...................................................................................39

*Minn. Voters All. v. Mansky,*

    138 S. Ct. 1876 (2018)............................................................................32

*Otto v. City of Boca Raton,*

    981 F.3d 854 (11th Cir. 2020).............................................17, 18, 22, 25

*Reed v. Town of Gilbert,*

    576 U.S. 155 (2015) ...................................................................... passim

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*

    515 U.S. 819 (1995).................................................................3, 26, 32

*Rowe v. City of Cocoa Beach,*

    358 F.3d 800 (11th Cir. 2004).................................................................23

*Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.,*

    547 U.S. 47 (2006) ...................................................................................10

*Socialist Workers Party v. Leahy,*

    145 F.3d 1240 (11th Cir. 1998)..................................................................3

*Speech First, Inc. v. Cartwright,*

32 F.4th 1110 (11th Cir. 2022) ......................................................passim

*Speech First, Inc. v. Sands,*

69 F.4th 184, 2023 U.S. App. LEXIS 13386 (4th Cir. May 31, 2023)....5

*Steinburg v. Chesterfield Cnty. Planning Comm'n,*

527 F.3d 377 (4th Cir. 2008) ...................................................33

*Uzuegbunam v. Preczewski,*

141 S. Ct. 792 (2021) ...............................................................13

*Wandering Dago, Inc. v. Destito,*

879 F.3d 20 (2d Cir. 2018) ......................................................36

*Ward v. Rock Against Racism,*

491 U.S. 781 (1989).................................................................16

*Watts v. United States,*

394 U.S. 705 (1969).................................................................28

*West Virginia v. EPA,*

142 S. Ct. 2587 (2022).......................................................11, 12

*West Virginia v. U.S. Dep't of Treasury,*

59 F.4th 1124 (11th Cir. 2023) ...............................................10

**Other Authorities**

*Abusive*, Merriam-Webster,

available at https://perma.cc/R7DY-C9SR.....................................23, 32

Webster's Third New International Dictionary (1961) ..........................23

**Statutes**

FLA. STAT. § 877.13.........................................................................................4

I. PLAINTIFFS HAVE STANDING.

    A. *Plaintiffs have reasonably self-censored after watching Defendants enforce the Policy against them and other parties.*

This circuit has "long emphasized" the "loose[]" application of Article III's injury requirement "where First Amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). That makes the standing question easy. Plaintiffs need only show that "the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor." *Id.* (cleaned up). Given that Defendants routinely enforce the Policy by interrupting and terminating speakers for violating its terms, Plaintiffs' uncontroverted self-censorship is reasonable. Plaintiffs thus have standing to mount their pre-enforcement challenge.

Defendants argue that it is unreasonable for Plaintiffs to fear enforcement because no one has been fined, arrested, or prosecuted for violating the Policy, Def. Br. at 28, and the board chair lacks the authority to initiate that kind of (criminal or monetary) enforcement

anyway, *id.* at 30. But Defendants do not—and cannot—dispute that they have routinely enforced the Policy by preventing individuals from delivering their preferred remarks. *See* Pl. Br. at 9–17. And in one case, Belford expelled Plaintiff Cholewa for violating the Policy's ban on personally directed speech. *Id.* at 14–15. Plaintiffs have self-censored in response to these enforcement actions, by refraining from speaking altogether, Doc. 3-1 at 3–4, ¶¶ 12–13; 91-5 at 3:5–13 & 10:9–10; Doc. 20 at 14, ¶ 40, or choosing less-effective speech to avoid being interrupted or expelled, Doc 91-2 at 5:6–7; Doc. 3-2 at 5, ¶ 16; Doc. 91-3 at 4:12–15; Doc. 3-3 at 3, ¶ 7; Doc. 3-4 at 6–7, ¶ 11; Doc. 91-4 at 4:4–24. That is precisely the kind of "objective[] chill" that confers standing under Article III. *Speech First*, 32 F.4th at 1120.

Defendants sidestep their long history of enforcing the Policy by arguing that any chill is unreasonable because the only consequence is "interruption or termination of comments"—as if those consequences are unserious. Def. Br. at 30. But what case supports the claim that suppressing political speech, publicly reprimanding people for violating the board's rules, and expelling individuals from the board room are not significant enough to objectively chill speech? Defendants never say.

For good reason. A pre-enforcement challenge requires showing only "a credible threat of application" of the unlawful policy. *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1245 (11th Cir. 1998). That requirement is met when applying the law would prevent the plaintiff from engaging in the political process—a "serious consequence[]" by any measure *Id.* at 1246–47. Censoring political speech easily meets that standard. Plaintiffs have a First Amendment right to speak about education policy in Brevard County. *See Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995). Taking that right away by preventing individuals from speaking (*i.e.*, "interruption or termination of comments," Def. Br. at 30) is enforcement enough to allow pre-enforcement review. *See Socialist Workers Party*, 145 F.3d at 1246–47.

Even still, Defendants disavowal of criminal sanctions cannot undo the chill their threats impose. They argue the Court should ignore that they begin their meetings by threatening speakers with prosecution for disrupting the meeting because they lack authority to enforce FLA. STAT. § 877.13. Def. Br. at 30–31. But that's the same argument this Court rejected just one year ago in *Speech First*.

In *Speech First*, the plaintiff challenged a speech code that the defendants had no power to enforce. 32 F.4th at 1122. The district court found the lack of enforcement authority fatal to the plaintiff's standing, but this Court reversed. *Id.* "The reason, already explained, is that a government actor can objectively chill speech—through its implementation of a policy—*even without formally sanctioning it.*" *Id.* (emphasis added). "Neither formal punishment nor the formal power to impose it is strictly necessary to exert an impermissible chill on First Amendment rights—indirect pressure may suffice." *Id.* at 1123.[1]

Defendants make the same mistake here that the district court made in *Speech First*. A reasonable individual listening to Defendants warn speakers that they could face criminal penalties for disrupting the meeting is likely to self-censor to avoid any risk that Defendants would

---

[1] Defendants never mention *Speech First* in their argument on standing, but they do cite another out-of-circuit case involving the same plaintiff. *See* Def. Br. at 27 (citing *Speech First, Inc. v. Sands*, 69 F.4th 184, 2023 U.S. App. LEXIS 13386 (4th Cir. May 31, 2023)). The Fourth Circuit's *Speech First* case raised the same issue that this Court decided last year—whether a defendant's lack of enforcement authority precludes standing. *Id.* at *12–13. But the Fourth Circuit decision on which Defendants rely reached the opposite conclusion from this Court's. *Id.* at *13–17.

consider his or her speech "disruptive" with a referral to local law enforcement. That is all the more true given that Defendants have repeatedly conflated pure speech with disruptive behavior—making any reasonable person unsure about what words might motivate Defendants to call the police.

Defendants also emphasize that some Plaintiffs—Delaney, Cholewa, and Hall—have kept speaking at board meetings but censor their words to avoid being interrupted and silenced. Def. Br. at 28–29. As Defendants see it, self-censorship is not a First Amendment injury so long as an individual keeps speaking (less effectively) using the government's approved words. But Cholewa self-censors because the Policy forbids him from using the words he prefers. And there is no "close enough" exception to the First Amendment that applies when the government decides that you can deliver just as effective a message using its approved list of words.

Defendants minimize Cholewa's censorship concern by focusing on his testimony that being interrupted by the chair throws off his "momentum" and breaks his "concentration." Def. Br. at 28–29. Never mind that Cholewa was expelled from a board meeting for violating the

Policy. *See* Pl. Br. at 15. Do Defendants really believe that *I Have a Dream* would have been as effective had a government official repeatedly interrupted the speech or asked Martin Luther King, Jr. not to refer to specific groups or individuals who might get upset? The words one uses to convey a message matter. The cadence and rhythm of political speech matter. And that's why "[t]he First amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal v. Tam*, 582 U.S. 218, 249 (2017) (op. of Kennedy, J.). "It protects the right to create and present arguments for particular positions *in particular ways, as the speaker chooses.*" *Id.* (emphasis added). Plaintiffs suffer harm when the reasonable fear of interruption and censorship causes them to choose less effective words than they otherwise would.[2]

---

[2] Defendants also claim that Cholewa—who has been expelled from the board room for violating the Policy—testified that he does not intend to break the rules in the future. Def. Br. at 29. This distorts his testimony, as Cholewa made clear that following the rules is impossible because the ban on "abusive" speech turns on the viewpoint of the speaker or hearer. Pl. Br. at 19 (citing Doc. 91-4 at 14:4–8). That is, the problem with banning "abusive" speech is that Cholewa might not consider his message "abusive," but the Defendants would.

Defendants also contend that Plaintiffs' fears do not match the record. They first claim that Plaintiff Kneessy's desire to discuss senior staff members does not violate the Policy. Def. Br. at 27. Defendants cite nothing for that claim, and Belford testified that mentioning individuals violates the rule against "personally directed" speech. Doc. 91-1 at 12:19–16:3; 24:6–9. And while Defendants have since amended the Policy so that individuals can mention individual board members, that exception does not extend to other individuals such as senior staff. *See* Pl. Br. at 5 n.3.

Defendants next claim that "there are no examples in the record whatsoever of a personally directed comment causing a 'scene' resulting in a speaker's 'expulsion.'" Def. Br. at 27. Yet Belford testified that she interrupted Cholewa and ordered him to leave because "[h]is comments were personally directed," Doc. 91-1 at 24:6–7, which made people "incredibly upset," *id.* 24:18–20, and caused "[b]ehaviors" of the crowd "to escalate," *id.* at 25:12. His crime? Making "personally directed" comments by criticizing people "aligned . . . with the Democratic Party." *Id.* at 24:11–13. Belford ordered him to leave. Doc. 3-4 at 6, ¶ 10.

Plaintiffs are not imagining consequences for violating the personally directed and abusive speech bans. The record makes that clear.[3]

*B. Plaintiffs have standing to recover nominal damages.*

Even absent a pre-enforcement challenge, Plaintiffs have standing to recover nominal damages for their past injuries. Defendants only half-heartedly resist that conclusion.

 Defendants first argue that Kneessy and Delaney cannot recover nominal damages because Kneessy has refrained from speaking entirely and Delaney has never been interrupted. Def. Br. at 33. But Delaney explained that Defendants' enforcement of the Policy did, in fact, impact her choice of words. Doc. 3-3 at 3, ¶ 7; Doc. 91-3 at 4:12–15. At any rate, no one disputes that the Defendants have enforced the Policy against Hall and Cholewa to prevent them from delivering their preferred speech. Def. Br. at 33 (conceding they stopped Hall from complimenting a Board member); *id.* at 34 (conceding they ordered Cholewa to stop speaking and leave the meeting). "If at least one plaintiff has standing,

---

[3] Defendants also argue that Plaintiffs are unimpacted by watching them enforcing the Policy and censoring others. Def. Br. at 32. But a government's history of past enforcement against other parties does establish pre-enforcement standing. *Cf. 303 Creative LLC v. Elenis*, --- U.S. ---, 2023 U.S. LEXIS 2794, at *17–18 (June 30, 2023).

the suit may proceed." *Biden v. Nebraska*, No. 22-506, --- U.S. ---, 2023
U.S. LEXIS 2793, at *18 (June 30, 2023) (citing *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Yet Defendants argue that even they lack standing for their nominal-damages claim because "the Policy is constitutional." Def. Br. at 34–35. That argument "goes to the merits of [Plaintiffs'] claims, not their standing to raise them." *West Virginia v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1137 (11th Cir. 2023). To assess standing, courts must "assume that on the merits the plaintiffs would be successful in their claims." *Id.* So here, the Court must assume that Defendants enforced an unconstitutional policy against Hall and Cholewa. If so, they have standing to seek nominal damages.

*C. The Policy change did not moot any part of Plaintiffs' claims.*

Defendants argue that the claim against the "personally directed" policy is moot because they recently changed the policy so it no longer prohibits individuals from addressing individual board members. The Policy still prohibits addressing individuals (or groups) not on the board—which is exactly what happened when Belford censored Cholewa for criticizing "Democrats." Doc. 91-1 at 24:2–20. The claim is not moot.

"[V]oluntary cessation does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (cleaned up). The burden rests on the government to prove mootness in those cases. *Id.* And "[t]hat burden is heavy where, as here, the only conceivable basis for finding of mootness in the case is the [defendants'] voluntary conduct." *Id.* (cleaned up).

While this Court gives the government "the benefit of the doubt in voluntary-cessation cases," it "cannot always moot a case by simply changing the challenged policy or law." *Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. 2022). "If a new policy leaves the challenged aspects of the old policy substantially undisturbed, the case avoids mootness." *Id.* (cleaned up). "A change in policy will moot a case only if it fundamentally alters the original policy so as to render the original controversy a mere abstraction." *Id.* (cleaned up).

Here, Defendants have not "fundamentally alter[ed] the original policy" in such a way to moot this claim. Previously, Defendants prohibited speakers from personally directing their comments toward all individuals and groups, except for the board chair. Now, Defendants

prohibit speakers from personally directing their comments toward all individuals and groups, except for the board chair and individual board members. The same constitutional problems with this policy persist.

Yet the Court "need not consider" whether Defendants' new policy "fundamentally altered" the original policy to dispense with the mootness issue. *See id.* at 1251. That's because Plaintiffs seek nominal damages for past violations of their First Amendment rights. *See id.*; *supra* at 8–9. "Ceasing an offending policy going forward does not redress an injury that occurred in the past." *Keister*, 29 F.4th at 1251. So "a request for nominal damages saves a matter form becoming moot as unredressable when the plaintiff bases his claim on a completed violation of a legal right." *Id.* (citing *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021)).

Defendants claim that the Court can still dismiss Plaintiffs' nominal-damages claim as moot because they "cannot demonstrate a past injury." Def. Br. at 23. But that's a merits question that goes to Plaintiffs' injury. And the one case that Defendants cite for their novel theory of mootness—*Davis v. Colerain Twp.*, 51 F.4th 164 (6th Cir. 2022)—does not support their claim. In *Davis*, the court held that a

policy change "mooted [the plaintiff's] claim for *prospective* relief," *id.* at 175 (emphasis added), and it dismissed a separate claim for nominal damages because the plaintiff failed to "plead a cognizable past injury." *Id.* at 176. These are separate issues under Article III. Defendants' change in policy cannot moot Plaintiffs' claim for nominal damages based on their past injuries.

II.   THE POLICY DRAWS LINES BASED ON THE WORDS AND MESSAGE A SPEAKER CONVEYS AND THUS DOES NOT REGULATE THE "MANNER" OF SPEECH.

Defendants contend that the Policy is a content-neutral regulation that merely "guides the manner in which speakers espouse their viewpoints." Def. Br. at 37. Thus, Defendants say, the Policy allows speakers to "deliver any viewpoint to the Board" so long as they do so in a "manner" that's not abusive, personally directed, or obscene. *Id.* at 40. But what makes speech "abusive" other than the words one uses? And how can Defendants identify "personally directed" comments if not based on the language the speaker chooses?

Defendants never say. While they fill pages insisting that these terms only regulate the "manner" of speech or the "conduct" of the speaker, they fail to offer even a vague definition of what the Policy

prohibits. Instead, Defendants repeat old errors that this Court and the Supreme Court have repeatedly rejected: They argue that because the Policy aims to prevent disruptive conduct, that content-neutral purpose somehow transforms their facially content-based restrictions into something else.

"The relaxed scrutiny for regulations of the time, place, and manner of speech applies only to regulations that are 'justified without reference to the content of the regulated speech.'" *Henderson v. McMurray*, 987 F.3d 997, 1003 (11th Cir. 2021) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). So "[i]n order to determine whether a regulation of speech is content based, [the Court] must first consider whether, 'on its face,' it 'draws distinctions based on the message a speaker conveys.'" *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1317 (11th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

The Policy's ban on "abusive" and "personally directed" speech does not fit the bill. Each category of prohibited speech draws lines based on words and language used. The ban on "abusive" speech prohibits, for example, "insulting" words. Doc. 91-1 at 18:7–18. And the ban on

"personally directed" speech targets words that name or describe individuals and groups. *Id.* at 12:19–23. The plain meaning of these provisions requires drawing distinctions based on the content of speech—prohibiting some words while allowing others. They are not "agnostic as to content." *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). They depend on it.

Defendants, though, insist that this content-based line-drawing becomes content-neutral because of the Policy's purpose—to prevent disruption and ensure orderly meetings. But "[t]he mere assertion of a content-neutral purpose is not enough to save a law which, on its face, discriminates based on content." *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020) (cleaned up). "Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech." *Reed*, 576 U.S. at 167. The question is not whether the Policy's purpose is to stop disruptions or ensure decorum, but rather "whether [the Policy] restricts or penalizes speech on the basis of that speech's content." *Otto*, 981 F.3d at 862. Good intentions or not, that's precisely what the Policy does. If speech

conveys an "abusive" or "personally directed" message, Defendants forbid it.

In a limited public forum, content restrictions may confine speech to a designated subject matter, but the government may not police words on the pretense that doing so polices conduct. Words convey views. Using different words conveys different views, and stronger language conveys a stronger view. Everyone understands that calling a public official a "Nazi" conveys a different message than politely disagreeing with a policy proposal. These are not the same views expressed in a different "manner." And the government cannot ban name-calling (*see* Doc. 91-1 at 18:7–18) under the pretense that doing so is a content-neutral restriction on the "way" individuals express their viewpoint.

Under the Defendants' reasoning, the same game they play with "abusive" and "personally directed" could be played with "offensive." A ban on "offensive" speech would be constitutional so long as the government insists it merely bans people from speaking in an "offensive manner." And because doing so is "content-neutral" under Defendants' argument, the government could apply that rule to traditional public

fora, like sidewalks and parks. *See McCullen v. Coakley*, 573 U.S. 464, 476–77 (2014).

Thankfully, this Court "has already rejected the practice of relabeling controversial speech as conduct," *Otto*, 981 F.3d at 861. There is no such thing as a "manner" restriction that allows the government to ban speech, without more, on the grounds that the speaker's choice of words is inappropriate.

None of the cases Defendants rely on for their speech-is-conduct theory say otherwise.[4] Defendants cite *Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989) (per curiam), for example, to argue that the government can "limit[] disruptive speech to ensure the orderly conduct of business." Def. Br. at 42. But one paragraph earlier Defendants' own

_____

[4] Defendants cite these cases as part of their argument that the Policy is "viewpoint neutral." Def. Br. at 40–47. But the substance of this part of their brief argues that the Policy regulates the "manner" of speech (*id.* at 41), the "orderly conduct" of the meeting (*id.* at 42), the board's "interest in maintaining decorum" (*id.* at 43), the need to prevent "the disruption that offensive speech causes" (*id.* at 46), and "disruptive *behavior*" of individuals (*id.* at 47). These arguments dispute that the Policy is content-based at all, mentioning viewpoint only when claiming *ipse dixit* that the Policy allows individuals to express whatever viewpoint they want so long as they do not do so in an "abusive," "personally directed," or "obscene" manner. *See, e.g.*, Def. Br. at 47.

brief quotes *Jones* as upholding the government's authority "to regulate irrelevant debate and disruptive *behavior* at a public meeting." *Id.* at 41 (quoting *Jones*, 888 F.2d at 1333) (emphasis added). The disruption issue turned on behavior, not speech.

To escape this problem, Defendants argue that the court in *Jones* "describe[d] a speaker's 'conduct' by reference to the speaker's verbal expression." Def. Br. at 47 (citing *Jones*, 888 F.2d at 1332). Not so. In *Jones* there were two issues: the individual's speech was off-topic (a content-based issue) and he behaved disruptively (a conduct issue). *Jones*, 888 F.2d at 1332. The examples of speech Defendants point to ("admonishing the Commission" and a "retort") both violated the ban on irrelevant speech. *Id.* at 1332. The *conduct* that caused problems was ignoring the presiding officer's instructions and acting violently. *Id.* at 1332. This Court did not use speech as a proxy for conduct, and doing so would contradict *Reed* and *Otto*.[5]

---

[5] To this end, if Defendants are right that *Jones* characterized pure speech as conduct, that holding has been abrogated by *Reed*. There's a reason the Defendants put so much stock in pre-*Reed* cases in their brief—the law today clearly cuts against the Defendants' position.

Defendants cite *Rowe v. City of Cocoa Beach*, 358 F.3d 800 (11th Cir. 2004), to argue that the government's "interest in conducting orderly, efficient meetings" justifies the restriction here. Def. Br. at 42–43 (quoting *Rowe*, 358, F.3d at 803). That inverses the inquiry. The government's interest matters only if the Policy is viewpoint-neutral. And *Rowe*, a case about whether the government can limit public comments at a meeting to residents, offers no insight on that. 358 F.3d at 803. A residency requirement does not tell speakers what words they can use to convey their message.

Defendants also cite two unpublished decisions—*Dyer v. Atlanta Independent School System*, 852 F. App'x 397 (11th Cir. 2021), and *Charnley v. Town of S. Palm Beach, Fla.*, 649 F. App'x 874 (11th Cir. 2016) (per curiam)—but neither helps their cause. The *Dyer* Court specifically distinguished between the conduct of the speaker (refusing to leave the podium and shouting), from the content of his message ("abusive, abhorrent, [and] hate-filled" words). 852 F. App'x at 402. The former, the Court explained, is what justified removing the speaker.[6] *Id.*

---

[6] *Dyer* creates problems for Defendants. Defendants argue that banning

("[T]he offensiveness of the comments themselves was not the basis for his suspension."). And in *Charnley*, this Court affirmed without any discussion, 649 F. App'x at 875, a report and recommendation that held a speaker's "disparaging personal remarks [were] not protected [speech]." *See Charnley v. Town of S. Palm Beach*, Case No. 13-81203, 2015 U.S. Dist. LEXIS 188326, at *20 (S.D. Fla. Mar. 23, 2015). That holding is plainly wrong, *see Dyer*, 852 F. App'x at 401, and it's unclear what the rest of the decision means without it.

The largely unpublished, pre-*Reed* caselaw Defendants marshal does not support their policies and practices. They cannot point to a single, published decision after *Reed* that treats words as conduct and allows the government to regulate it as such. This Court has rebuffed such maneuvering. *See Otto*, 981 F.3d at 861. It should do so here again.

---

"abusive" speech is not the same as banning "offensive" speech. Def. Br. at 48–49. This Court thought otherwise in *Dyer*, putting "abusive" and "offensive[]" in the same bucket. 852 F. App'x at 402. *Dyer* also undercuts Defendants' argument that *Tam* does not apply in a forum case, Def. Br. at 48–53, as the Court relied on *Tam* in part, 852 F. App'x at 401.

III.   THE COURT SHOULD APPLY *TAM* AND *BRUNETTI* BECAUSE THE
       MEANING OF "VIEWPOINT DISCRIMINATION" DOES NOT CHANGE FROM
       CASE TO CASE.

Defendants argue that the "abusive" and "personally directed" speech

ban does not target viewpoints because it "does not favor certain ideas

and disfavor others." Def. Br. at 50. This argument "reflects an

insupportable assumption that all debate is bipolar." *Rosenberger*, 515

U.S. at 831. It's not. "The First Amendment's viewpoint neutrality

principle protects more than the right to identify with a particular side."

*Tam*, 582 U.S. at 249 (op. of Kennedy, J.). "It protects the right to create

and present arguments for particular positions *in particular ways*, as

the speaker chooses." *Id.* (emphasis added).

*Tam* and *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), make this point

clear—which is why Defendants urge the Court to ignore them. But

their attempts to distinguish *Tam* and *Brunetti* fall flat.

Defendants first distinguish *Tam* and *Brunetti* on the grounds that

"[t]he Policy does not address 'offensive' speech, but rather 'abusive'

statements." Def. Br. at 49. But Defendants leave out that the statutes

struck down in *Tam* and *Brunetti* did not employ the term "offensive"

either, but the terms they used were close enough: "disparage," 137 S.

Ct. at 1751, "immoral" and "scandalous," 139 S. Ct. at 2298. In *Brunetti*, after recounting a variety of different words that all relate to the same idea, including "wicked," "vicious," "disgraceful," "disreputable," and yes, "offensive," the Court explained that the statute "distinguishes between two opposed sets of ideas: those aligned with conventional moral standards and those hostile to them; those inducing societal nods of approval and those *provoking* offense and condemnation." *Brunetti*, 139 S. Ct. at 2299–2300 (emphasis added). "Abusive" is just another word for "offensive."

Defendants disagree. And while it is not every day that federal courts create a new category of unprotected speech, Defendants ask this Court to do just that and declare that the First Amendment does not protect "abusive" speech. Indeed, Defendants argue that the Supreme Court has already defined "abusive" speech as an unprotected category when it referenced the concept in *Cantwell v. Connecticut*, 310 U.S. 296 (1940).

The argument is novel. Unprotected speech may include perjury, defamation, obscenity, copyright infringement, blackmail, incitement, true threats, criminal solicitation, child pornography, and "fighting

words," but there is no "abusive speech" doctrine, and *Cantwell* did not create one. *Cantwell* used the term, among others, in describing what the government may proscribe as inciting a breach of peace. It did not set out "abusive" speech as the sine qua none of that crime, constitutionally defined. Indeed, the Supreme Court later explained that "[t]he language in the political arena, like the language used in labor disputes, is often vituperative, *abusive*, and inexact." *Watts v. United States*, 394 U.S. 705, 708 (1969) (emphasis added).

*Cantwell* discussed "abusive remarks" in a different context than today. The Supreme included "profane" and "indecent" alongside "abusive" in describing the kind of "remarks" that are not "safeguarded by the Constitution." 310 U.S. at 309–10. Yet the Constitution *does* protect profanity and indecency most of the time. *See Cohen v. California*, 403 U.S. 15, 20 (1971). And since *Cantwell*, the Supreme Court has clarified that that bans on "abusive epithets" must be limited to those "inherently likely to provoke violent reaction"—*i.e.*, "fighting words." *Cohen v. California*, 403 U.S. 15, 20 (1971) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); *Cantwell*, 310 U.S. at 309).

Defendants' anachronistic reliance on the word "abusive" in *Cantwell* does not do the work they need it to. After all, Defendants concede that "abusive" must be given its ordinary meaning—not limited to a "legal term[] of art," Def. Br. a 61, such as "fighting words" under Supreme Court precedent. "Abusive" means "harsh insulting language." *Gooding v. Wilson*, 405 U.S. 518, 525 (1972) (citing Webster's Third New International Dictionary (1961)); *accord Abusive*, Merriam-Webster ("using harsh, insulting language"), available at https://perma.cc/R7DY-C9SR. It does not mean words "inherently likely to provoke violent reaction." *Cohen*, 403 U.S. at 20; *accord Gooding*, 405 U.S. at 525. And "harsh" and "insulting" plainly target a viewpoint—just like "disparaging" and "offensive."

Defendants next argue that unlike the provisions from the Lanham Act at issue in *Tam* and *Brunetti*, the Policy "does not distinguish between positive and negative comments." Def. Br. at 49. But the ban on "abusive" speech prevents speakers from calling board members "negative" names. Doc. 90-1 at 18:14–16.

Defendants' last line of defense against *Tam* and *Brunetti* is to point out that they did not involve a forum analysis. Def. Br. at 51. But so

what? *Tam* and *Brunetti* explained what viewpoint discrimination means, and here, everyone agrees that viewpoint discrimination is prohibited in a limited public forum. Thus, what *Tam* and *Brunetti* say about that issue controls. The First Amendment does not define viewpoint discrimination in one way for a limited public forum, but a different way for a university speech code. That is why both opinions in *Tam* cite limited-public-forum cases to explain viewpoint discrimination. *See* 582 U.S. at 243 (op. of Alito, J.); *id.* at 248 (op. of Kennedy, J.). And it is why this Court has done the same in cases that do not require a forum analysis. *See Speech First*, 32 F.4th at 1126 (citing *Rosenberger* and *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018), as well as *Tam*, *Brunetti*).

The Sixth Circuit recognized how *Tam* and *Brunetti* should apply to speech codes in a limited public forum, *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893–95 (6th Cir. 2021), and this Court should follow its lead. *See* Pl. Br. at 40–41. While Defendants would like to relegate *Ison* to "outlier" status, Def. Br. at 52, they fail to cite a single similar case analyzing this issue and coming out the other way. Most of

the cases they cite arose before *Tam* and *Brunetti*. *Id.*[7] The one

exception is *Davison v. Rose*, 19 F.4th 626 (4th Cir. 2021), which

purportedly upheld a policy banning speech that is "harassing or

amount[s] to a personal attack against any identifiable individual." Def.

Br. at 52 (citing *Davison*, 19 F.4th at 635). If *Davison* holds a school

---

[7] Those cases include *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747 (5th Cir. 2010); *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377 (4th Cir. 2008); *Milestone v. City of Monroe*, 665 F.3d 774 (7th Cir. 2011); and *Ballard v. Patrick*, 163 F. App'x 584 (9th Cir. 2006). Not only were those decisions issued before *Tam* and *Matal*—they were issued before *Reed* as well, meaning the courts largely grappled with these issues without *Reed*'s clear statement that a content-neutral purpose cannot save a discrimination speech policy. *See* 576 U.S. at 166–67. In *Fairchild*, the Fifth Circuit held only that the government can declare some subjects—such as "individualized personnel matters"—off topic in a limited public forum. 597 F.3d at 759. *Steinberg* is even less helpful, as the court there redefined "personal attack" to mean "irrelevant." 527 F.3d at 386–87. That kind of word play would allow the government to redefine any number of viewpoints as subject matters, thus avoiding the restrictions on limited public fora. What would stop Defendants, for example, from banning all negative comments as "irrelevant?" In *Milestone*, the Seventh Circuit relied on an outdated reading of *Ward* to uphold a restriction against "demeaning" language. 665 F.3d at 783. Its holding cannot survive *Reed*, nor can it overcome *Tam*'s explanation that "disparag[ing]" is not viewpoint-neutral. Finally, in *Ballard*, the Ninth Circuit offered no explanation for its unpublished affirmance. 163 F. App'x at 585. None of these cases had the benefit of *Reed* or *Tam* and *Brunetti*, and Defendants' suggestion that later cases like *Ison* are an outlier badly misstates the current legal landscape.

---

district can forbid criticizing individuals, it amounts to viewpoint discrimination and this Court should not follow it.

To be sure, *Davison* did not even mention *Tam* or *Brunetti*, and the plaintiff apparently failed to cite those cases. *See id.*, No. 20-1683 at Doc. 28, 31, 34. The decision says nothing about how the Fourth Circuit would apply *Tam* and *Brunetti* to a limited public forum if asked to do so.

In any event, *Davison* ran afoul of the policy only "when he tried to talk about individual board members in a public hearing about the elementary zoning process and *never seemed to address the designated topic of the hearing.*" *Davison*, 19 F.4th at 636 (emphasis added). Unlike the practice in Brevard County, "Davison was allowed to speak uninterrupted, despite mentioning individual board members, when his comments focused on the topic of the board meeting." *Id.*

Other courts have recognized that *Tam* and *Brunetti* apply to cases involving a forum analysis. The Ninth Circuit did so in *American Freedom Defense Initiative v. King County*, 904 F.3d 1126 (9th Cir. 2018), holding that a city advertising policy that banned "[d]emeaning" and "[d]isparaging" content "discriminat[ed], on its face, on the basis of

viewpoint." *Id.* at 1131. The court addressed the forum issue head on, explaining that while "[i]t is true that this case involves a nonpublic forum, where the government generally has more leeway to restrict speech," "it is settled law that, in a nonpublic forum, regulations must be reasonable *and viewpoint neutral.*" *Id.* at 1132. The Second Circuit reached the same conclusion. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 39 (2d Cir. 2018) (applying *Tam* and explaining that the rules against viewpoint discrimination apply "regardless of how the property is categorized under the forum doctrine").

*Ison* is no outlier. Its holding that banning "abusive" and "personally directed" speech at a school board meeting violated the First Amendment correctly applied *Tam* and *Brunetti*. This Court should reach the same conclusion.

IV.   APPLYING THE POLICY TO PREVENT OFFENDING THE AUDIENCE AND CAUSING A DISRUPTION IS VIEWPOINT DISCRIMINATION.

Defendants concede that they apply the Policy's ban on "abusive" and "personally directed" speech in response to how the audience reacts. Def. Br. at 54. They argue, however, that censoring speech to quell the disturbance of an offended crowd is not viewpoint discrimination so long as they do so for speakers expressing all kinds of opinions. *Id.*

This argument invokes the same erroneous "bipolar" view of viewpoint-neutrality discussed above. *Supra* 20–21. The First Amendment prohibits Defendants from regulating speech "because it causes offense or makes listeners uncomfortable, or because it might elicit a violent reaction or difficult-to-manage counterprotests." *Fort Lauderdale Food not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1294 (11th Cir. 2021) (cleaned up). Doing so amounts to a ban on offensive speech—banning speech that offends the audience so much it acts disruptive. *Id.* It makes no difference under the First Amendment that Defendants might apply that ban on speech to prevent offending Democrats and Republicans alike—regulating speech to avoid offense is viewpoint discrimination. *Brunetti*, 139 S. Ct. at 2299–300; *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 499–500 (6th Cir. 2020).

The Court should not lose sight of the "slipperiness" of Defendants' claim. *See Speech First*, 32 F.4th at 1122. Defendants claim that Belford censored Cholewa because his comments "caused disruption in the audience." Def. Br. at 54. But how so? Defendants never say. They refuse to connect the dots by explaining *how* someone's speech might

disrupt the audience. But the answer is obvious: *By offending people in the crowd.* Belford censored Cholewa because he criticized Democrats, which caused people to "get[] incredibly upset." Doc. 91-1 at 24:6–19. If that sounds like a ban on offensive speech, dressed up as a ban on "disruption," that's because it is.

## V. APPLYING THE OBSCENITY BAN TO SPEECH THAT FALLS OUTSIDE OF *MILLER V. CALIFORNIA* VIOLATES THE FIRST AMENDMENT.

The Defendants' cursory response to the as-applied challenge to the obscenity ban misunderstands the issue. They argue that because their overbroad definition of obscenity applies to all speakers regardless of viewpoint, Plaintiffs cannot prevail on their as-applied challenge. Def. Br. at 58–59.

The as-applied question is not about whether Defendants have enforced the obscenity ban against Plaintiffs but not others. A ban on "obscene" speech only passes constitutional muster if it meets the narrow definition of *Miller v. California*, 413 U.S. 15 (1973). *See* Pl. Br. at 51–52. But Defendants have enforced their obscenity ban against the Plaintiffs for speech that falls outside *Miller*'s confines. The as-applied claim thus challenges the ban on obscenity as applied to speech not captured by *Miller*. Defendants misunderstand the as-applied challenge

and, as a result, offer no constitutional defense for their ban on "obscene" speech.[8]

## VI. DEFENDANTS' CONCLUSORY ARGUMENTS ON VOID-FOR-VAGUENESS AND OVERBREADTH COME UP SHORT.

The bans on "abusive" and "personally directed" speech are void-for-vagueness and overbroad. Defendants' response does nothing to dispel that conclusion.

On void-for-vagueness, Defendants spend two sentences arguing that a person of ordinary intelligence can understand the terms "abusive" and "personally directed." Def. Br. at 61. Yet Defendants never define the terms, despite conceding that the "ordinary or natural meaning" of the words should prevail. *Id.* So while Defendants submit that "abusive" and "personally directed" are easy to understand, they avoid telling the Court what those words mean.

---

[8] In a footnote, Defendants continue to press their argument that they must ban obscenity because of the FCC's regulations. Plaintiffs addressed this error in their opening brief. Pl. Br. at 53. But whether Defendants are right about the FCC's regulations is beside the point. Defendants cannot avoid the First Amendment by choosing to broadcast their meetings on cable. If protected speech cannot be aired, Defendants must stop their broadcast and resume it when appropriate.

Presumably, Defendants worry that defining these terms according to their ordinary meaning would undermine their other arguments. After all, the ordinary or natural meaning of "abusive" is "harsh" and "insulting"—a definition that invokes the same viewpoint problems as "offensive." *See Gooding*, 405 U.S. at 525 (citing Webster's Third New International Dictionary (1961)). Read together with the plain meaning of "personally directed," the ban on "abusive" speech prevents anyone from criticizing school officials' "wrongful conduct or competence." *See Marshall v. Amuso*, 571 F. Supp. 3d 412, 425–26 (E.D. Pa. 2021). Defining these terms thus makes the constitutional problems even more apparent—which is why Defendants avoid doing so. Yet that only exacerbates the vagueness problem, as Plaintiffs are left to wonder what definition the presiding officer might employ. *See* Pl. Br. at 18–19 (describing Cholewa's testimony that complying with the ban on abusive speech is impossible because the word is too subjective to give notice of its scope).

As for overbreadth, Defendants mostly reiterate their claim that none of the speech banned by the Policy is constitutionally protected because it only applies to "disruptive conduct." But that's plainly not

true. The ban on "personally directed" speech prevents individuals from complimenting school officials. It prevents individuals from criticizing senior staff for their incompetence. No amount of wordplay can turn those kinds of bans into mere restrictions on conduct. And Defendants fail to confront the overbreadth problems of a policy that prohibits speakers from referring to individuals by name *regardless* of any associated conduct.

CONCLUSION

The Court should reverse the district court's judgment.

Dated: July 7, 2023                          Respectfully submitted,

                                             /s/ Alan Gura
David Osborne                                Alan Gura
GOLDSTEIN LAW PARTNERS, LLC                  Ryan Morrison
4651 Salisbury Rd., Suite 400                Brett R. Nolan*
Jacksonville, FL  32256                      INSTITUTE FOR FREE SPEECH
610-949-0444                                 1150 Connecticut Ave., N.W.
dosborne@goldsteinlp.com                     Suite 801
                                             Washington, DC 20036
                                             202.301.3300
                                              agura@ifs.org
                                              rmorrison@ifs.org
                                              bnolan@ifs.org

                                             *admitted only in Kentucky,
                                             practice supervised by DC Bar
                                             members, D.C. App. R. 49(c)(8)

July 7, 2023                                 Counsel for Appellant

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 6,457 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.


Dated: July 7, 2023           /s/ Alan Gura          
                              Alan Gura
                              *Counsel for Appellants*