[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10656

_____

MOMS FOR LIBERTY - BREVARD COUNTY, FL,
AMY KNEESSY,
ASHLEY HALL,
KATIE DELANEY,
JOSEPH CHOLEWA,

Plaintiffs-Appellants,

*versus*

BREVARD PUBLIC SCHOOLS,
MISTY HAGGARD-BELFORD,
Chair, Brevard County School Board
in her individual capacity,
MATT SUSIN,
Vice Chair, Brevard County School Board
in his official and individual capacities,

2                    Opinion of the Court                    23-10656

CHERYL MCDOUGALL,
Member, Brevard County School Board
in her official and individual capacities,
KATYE CAMPBELL,
Member, Brevard County School Board
in her official and individual capacities, et al.,

Defendants-Appellees,

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-01849-RBD-DAB

————————————

Before WILSON, GRANT, and LAGOA, Circuit Judges.

GRANT, Circuit Judge:

For many parents, school board meetings are the front lines of the most meaningful part of local government—the education of their children.  And sometimes speaking at these meetings is the primary way parents interact with their local leaders or communicate with other community members.  No one could reasonably argue that this right is unlimited, but neither is the government's authority to restrict it.

A group called Moms for Liberty brought this lawsuit on behalf of members who say their speech was chilled and silenced at Brevard County School Board meetings.  According to the Board's presiding officer, their comments were "abusive," "personally directed," "obscene," or some combination of the three.  Because the first prohibition was viewpoint based, the second was both unreasonable and vague, and the application of the third was (at a minimum) unreasonable, these policies are unconstitutional.  The district court erred by granting summary judgment to Brevard Public Schools.

## I.

The Brevard County School Board, recognizing "the value to school governance of public comment," allows members of the public to speak for up to three minutes during designated portions of its meetings.  During the events leading up to this lawsuit, the Board enforced a variety of other rules too, a few of which are relevant here.  The first was that "no person may address or question Board members individually," so speakers were allowed to direct their comments only "to the presiding officer."[1]  Another policy barred statements that were "too lengthy, personally

---

[1] While this litigation was pending, the Board revised the policy banning "personally directed" comments.  Now "public speakers may address their comments to the Board as a whole, the presiding officer, or to an individual Board member."  Brevard Sch. Bd. Policy Manual § 0000 Bylaws, Code po0169.1 ¶ E [https://perma.cc/27TZ-93XN].  But the presiding officer may still interrupt remarks that are personally directed to anyone outside these three categories.  *Id*. ¶ H(1).  All other relevant policies remain unchanged.

directed, abusive, obscene, or irrelevant." Then-Board Chair Misty Haggard-Belford enforced these rules, and she testified that their general purpose was to maintain decorum and prevent "the incitement of other audience members in a manner that would create an unsafe situation or one that may adversely impact children."

For their part, the plaintiffs assert that Belford's pattern of enforcement was confusing at best, with the same kinds of speech silenced on some days but not on others, and some speakers interrupted for reasons that did not match up with what they were saying. Belford seldom gave speakers a contemporaneous explanation for why she interrupted or silenced them, at least not one that was tethered to the language in the participation policies. Rather, in preparation for this litigation Belford provided retrospective explanations for her enforcement decisions. Even still, her reasoning often relied on a combination of the policies. Because of the uneven and unpredictable enforcement history, these parents contend that they have been pressured to self-censor their comments or avoid speaking at all.

Moms for Liberty, along with several individual members, filed a lawsuit seeking declaratory and injunctive relief, along with nominal damages, against the Brevard Public Schools and members of Brevard County School Board.[2] These plaintiffs assert that the

---

[2] For ease of reference, we will collectively refer to the plaintiffs as Moms for Liberty and the defendants as "the Board."

prohibitions against personally directed and abusive speech violate the First Amendment, both facially and as applied. They also challenge the prohibition on obscene speech as applied. And they say all three categorical prohibitions are void for vagueness. Moms for Liberty moved for a preliminary injunction against the policies' enforcement, which the district court denied. The group then moved to stay further proceedings pending the outcome of its appeal from that denial. That request was also denied. In an unpublished decision, this Court summarily affirmed the denial of the preliminary injunction. *Moms for Liberty v. Brevard Pub. Schs.*, No. 22-10297, 2022 WL 17091924 (11th Cir. Nov. 21, 2022) (unpublished).

The district court ultimately granted the Board's motion for summary judgment. It first concluded that Moms for Liberty did not have standing because neither the organization nor its members could show that they had suffered an injury that was "actual or imminent." The Board's rules did not objectively chill their protected speech, the court held, because some members continued to speak at meetings and the Board Chair's interruptions were of minimal consequence to them.[3] Ordinarily that is where things would (and should) have ended, at least as far as the district court was concerned—if a party lacks standing, the court has no jurisdiction to decide the merits. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024). Even so, the district court here went on to

---

[3] The district court did not consider whether the plaintiffs had standing for harms they had already suffered.

conclude that the Board's policies and enforcement practices were constitutional.  This appeal followed.

## II.

We review a grant of summary judgment de novo.  *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017).  Summary judgment is appropriate when, drawing all inferences in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Del Castillo v. Sec'y, Florida Dep't of Health*, 26 F.4th 1214, 1219 (11th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).

## III.

We first consider standing.  As it did below, the Board contends that Moms for Liberty lacks standing to challenge the Board's policies because its members do not have a credible threat of impending injury—their fear, the Board says, is not "objectively reasonable."  Any threat of interruption or removal from meetings on account of these policies, the Board argues, is too minimal to really have had a chilling effect.  And, the Board says, Moms for Liberty has failed to show any past injuries from the Board's enforcement actions.  We disagree.

To begin, we recognize that Moms for Liberty has requested both retrospective relief in the form of nominal damages and prospective relief in the form of an injunction against future enforcement of the challenged policies against its members. Because "standing is not dispensed in gross," Moms for Liberty

must demonstrate standing for each of these forms of relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).[4]

As for its claims for nominal damages, this requirement is easily satisfied. Under § 1983, the provision under which Moms for Liberty has brought this suit, nominal damages are available when a plaintiff alleges that its constitutional rights were violated. *See Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009). Because several members have alleged that they were unconstitutionally censored at meetings by the enforcement of the Board's policies, Moms for Liberty and its members have standing to seek nominal damages to redress those violations.

When it comes to standing for prospective relief in First Amendment cases like this one, the "injury requirement is most loosely applied" because of "the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991). So long as plaintiffs are "chilled from engaging in

---

[4] Under current Supreme Court doctrine, Moms for Liberty as an organization has standing to vindicate the rights of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quotation omitted). The Board does not challenge the latter two requirements, so to determine whether Moms for Liberty has standing, the question is whether any individual Moms for Liberty members would have standing to sue on their own. Of course, several individual members have also sued here.

constitutional activity," they have suffered a discrete harm that meets Article III's injury requirement. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (quotation omitted). When there is a danger of self-censorship, "harm can be realized even without an actual prosecution." *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc) (quotation omitted). So the plaintiffs have standing to seek prospective relief if the "operation or enforcement" of the Board's policies "would cause a reasonable would-be speaker to self-censor." *Speech First*, 32 F.4th at 1120 (alteration adopted and quotations omitted).

The Board's argument that Moms for Liberty—not to mention the individual plaintiffs—cannot meet this standard is borderline frivolous. Several members who are individual plaintiffs have credibly alleged that they have already self-censored their speech at Brevard County School Board meetings because of the Board's policies, and that a reasonable person in their shoes would have done the same. After all, the consequences could be severe. As Belford herself warned attendees prior to meetings, those who "cause a disruption" could be subject to criminal sanctions, "up to 60 days in jail and a $500 fine." The plaintiffs also claim that they have witnessed the Board interrupt and berate speakers—including other Moms for Liberty members—for violating the policies. Joseph Cholewa asserted that he writes his speeches on "pins and needles" because he knows he needs to be "very selective" with his words to avoid interruption or removal; in fact, he has been prevented from finishing his comments several times. Ashley Hall said that she is "more careful" about what she says at meetings

because she is "afraid that criticizing Defendants will be deemed a 'disruption,'" and that she "will be prosecuted." And Amy Kneessy revealed that she avoids speaking altogether because she wishes to speak about individual staff members and the programs they are implementing in Brevard Public Schools, but she fears that these comments would lead to her being "chastised, criticized, or silenced." At least one member has even been expelled from a Board meeting. We have no trouble concluding that the operation of the Board's policies governing participation in the public comment portions of their meetings objectively chills expression.

We also need to address two other antecedent issues—both relating to the scope of the record. The Board insists that we must confine our review to the five occasions during the relevant time period when Moms for Liberty members themselves were interrupted or removed from meetings. We reject that contention—the Board's proposed limitation is artificial and unwarranted. Enforcement acts against similarly situated speakers are relevant, both to whether the policies will be applied to Moms for Liberty members and to whether their speech is chilled as an effect. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 581–83, 588 (2023). We decline to limit our review based on the identity of the thwarted speaker.

We do, however, limit the record in a different respect. Moms for Liberty's briefing points out several episodes from 2022. A few involved restricting speech—one speaker was interrupted before she could begin reading an excerpt from a sexually

suggestive library book, and another was interrupted for personally directed speech relating to a former teacher showing his penis to a student.  The third example went in the other direction—Belford allowed a teacher to speak without interruption despite addressing school administrators by name.  But however probative these examples may have been, the district court struck them from the amended complaint, saying they postdated the filing of the litigation and would inappropriately broaden the scope of the case. Because Moms for Liberty did not appeal that decision, the additional evidence is outside the scope of our review and we do not consider it.

## IV.

We now turn to the merits of the appeal.  We agree with the parties that the school board meetings here qualify as limited public forums because they are created "for certain groups or for the discussion of certain topics."  *McDonough v. Garcia*, --- F.4th ---, No. 22-11421, 2024 WL 4195557, at *3, *6–7 (11th Cir. Sept. 16, 2024) (en banc) (quotation omitted).  The Brevard County School Board meetings are for parents and community members to "express themselves on school matters of community interest."  In a limited public forum, the government's restrictions on speech "must not discriminate against speech on the basis of viewpoint," and "must be reasonable in light of the purpose served by the forum."  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (quotation omitted).

The First Amendment generally "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Otto v. City of Boca Raton*, 981 F.3d 854, 864 (11th Cir. 2020) (emphasis omitted) (quoting *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). Indeed, though the Supreme Court has never categorically prohibited restrictions based on viewpoint, it has come close: "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995); *see also Taxpayers for Vincent*, 466 U.S. at 804. Viewpoint discrimination is thus "the greatest First Amendment sin." *Honeyfund.com Inc. v. Governor, Florida*, 94 F.4th 1272, 1277 (11th Cir. 2024). That constitutional constraint holds in limited public forums, meaning that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

The reasonableness inquiry, on the other hand, is more flexible and context specific, and will depend on the nature and purpose of the forum. *McDonough*, 2024 WL 4195557, at *6; *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011). To pass muster, such purpose-based restrictions must be "wholly consistent with the government's legitimate interest in 'preserving the property for the use to which it is lawfully dedicated,'" and prohibited speech must be "'naturally incompatible' with the purposes of the forum." *Cambridge Christian Sch., Inc. v. Florida High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1244–45 (11th Cir. 2019)

(alterations adopted and ellipsis omitted) (first quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 50–51 (1983); and then quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 690–91 (1992) (O'Connor, J., concurring)).    So what is reasonable in one forum may not be reasonable in another.    "[T]he purpose of a university," for example, "is strikingly different from that of a public park."  *Bloedorn*, 631 F.3d at 1233–34.  And a speech restriction in a limited public forum "need not be the most reasonable" or even "the only reasonable limitation."  *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 692 (2010) (quotation omitted).  But flexible is not the same thing as nonexistent—though reasonableness is a "forgiving" test, it is not a blank check.  *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 17 (2018).

In fact, even restrictions that pursue legitimate objectives can be unlawful if their enforcement cannot be "guided by objective, workable standards."  *Id.* at 21.    After all, an "indeterminate prohibition carries with it the opportunity for abuse," particularly when that prohibition "has received a virtually open-ended interpretation."  *Id.* (alteration adopted and quotation omitted).  So a policy is unreasonable if it "fails to define key terms, lacks any official guidance, and vests too much discretion in those charged with its application."  *Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1347 (11th Cir. 2024).  At the very least, the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out."  *Mansky*, 585 U.S. at 16.    But a "grant of

unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional." *Atlanta J. & Const. v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003).  The government, in short, must avoid enforcement that is "haphazard and arbitrary." *Cambridge Christian Sch.*, 942 F.3d at 1243.[5]

Moms for Liberty challenges each of the policies as applied to its members, and it challenges the prohibitions on "abusive" and "personally directed" speech as facially invalid too.  An as applied challenge is just what it sounds like—we ask whether the policy was or can be constitutionally applied to the plaintiffs' protected activity.  *See Jacobs v. Florida Bar*, 50 F.3d 901, 906 (11th Cir. 1995); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270–71 (11th Cir. 2006).  In a facial challenge, by contrast, the plaintiff "seeks to invalidate a statute or regulation itself." *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000).  Facial challenges are ordinarily disfavored and are generally harder to win.  *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).  In First Amendment facial challenges, the question is whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (alteration adopted and quotation omitted).

---

[5] Moms for Liberty also argues that the prohibitions on "abusive" and "personally directed" speech are unconstitutionally vague.  Because we find that these policies are unconstitutional on other grounds, we have no need to reach that issue.

In the context of the "reasonableness" analysis specifically, our Court has explained that a law or policy found to be constitutionally unreasonable "due to lack of standards and guidance is by definition facially invalid." *Young Israel*, 89 F.4th at 1350. That is because whether a policy is "incapable of reasoned application" does not depend on the speaker's identity or the message they wish to convey, but on "the vagueness and imprecision" of the policy "in a vacuum." *Id.* at 1351 (quotation omitted). Thus, a policy that is invalid for those reasons is necessarily invalid in all of its applications.

In sum, in a First Amendment case like this one—involving a limited public forum—the government's rules must be viewpoint neutral and reasonable.

## V.

Moms for Liberty challenges three Board policies: the rule against "abusive" speech, the rule against "personally directed" speech, and the rule against "obscene" speech. For each one, a simple look at the written policy yields an incomplete picture. But the Board's explanation of its policies, as well as its record of enforcement, fill in the blanks—revealing serious constitutional problems.

## A.

We start with the policy permitting the Board's presiding officer to interrupt speech seen as "abusive." The way that Board Chair Belford interprets and enforces the rule diverges from the common understanding of the word "abusive." As enforced, the

policy bars using terms that people generally agree are "unacceptable."

Because the Board's policies for public participation do not offer any meaning for the term "abusive," we start by looking at dictionaries, which define it to mean "using harsh, insulting language," and "habitually cruel, malicious, or violent; esp., using cruel words or physical violence." *Abusive*, Merriam-Webster, [https://perma.cc/B9RH-TFWC]; *Abusive*, Black's Law Dictionary (11th ed. 2019). Belford initially explained "abusive" in a way that was at least directionally similar to these definitions: "yelling, screaming, profanity, those sorts of things."

Fair enough—but that is not where she landed. When asked to give her own definition, the one used to enforce the policy in Board meetings, Belford could not do so. At least at first—she eventually elaborated on her initial definition, explaining that speech would be abusive if "someone were yelling, screaming, cussing, you know, calling people names." Expanding on that last element, Belford said the policy would prohibit calling people "names that are generally accepted to be unacceptable." That definition is constitutionally problematic because it enabled Belford to shut down speakers whenever she saw their message as offensive.

The record of enforcement supports the contention that this was the operative definition. At one meeting, for example, she interrupted a speaker who criticized the Board's Covid-19 masking policy as a "simple ploy to silence our opposition to this evil

LGBTQ agenda." Belford quickly stopped the speaker, who had not yelled, screamed, or otherwise caused a disruption. In her affidavit, Belford explained that she interrupted him because his "characterization of people as 'evil' was abusive."

Belford interrupted another speaker who was criticizing the Board's policies on gender in school bathrooms and school-sponsored sports. According to Belford, the speaker had engaged in abusive "name-calling" by referring to the "liberal left." Yet another speaker was interrupted for repeating insults leveled at her by protestors outside the Board meeting. In stopping her, Belford contended that the speaker had improperly repeated words that were abusive to the speaker herself.

No one likes to be called evil, but it is not "abusive" to use that term. Restrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them. A prohibition on all offensive— or "unacceptable," as Belford put it—speech may appear neutral. After all, it prohibits a speaker from saying anything offensive about any person or any topic. But "[g]iving offense is a viewpoint." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality opinion); *see also Iancu v. Brunetti*, 588 U.S. 388, 396 (2019). And a restriction barring that viewpoint effectively requires "happy-talk," permitting a speaker to give positive or benign comments, but not negative or even challenging ones. *Matal*, 582 U.S. at 246 (plurality opinion); *id.* at 249 (Kennedy, J., concurring in part and concurring in the judgment). And if the only ideas that can be communicated

are views that everyone already finds acceptable, why have the school board meetings in the first place? A state cannot prevent "both willing and unwilling listeners from hearing certain perspectives," because "for every one person who finds these viewpoints offensive, there may be another who welcomes them." *Honeyfund.com*, 94 F.4th at 1282.

To say that a government may not burden speech simply because some listeners find it unacceptable is nothing new. Indeed, it is "firmly settled" under our Constitution that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969); *see also Texas v. Johnson*, 491 U.S. 397, 414 (1989). The government has no authority to curtail the sphere of acceptable debate to accommodate "the most squeamish among us." *Cohen v. California*, 403 U.S. 15, 25 (1971). Instead, we expect listeners to judge the content of speech for themselves. The government is ill-equipped in any event to decide what is or is not offensive. *Id.* Enduring speech that irritates, frustrates, or even offends is a "necessary cost of freedom." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575 (2011).[6]

---

[6] The only other circuit court to consider a similar policy has reached the same conclusion. Considering another school board policy prohibiting "abusive" speech, the Sixth Circuit likewise concluded that the term "abusive"—at least as defined by the Board—operated to "prohibit speech purely because it disparages or offends," in violation of the longstanding principle that "the government may not censor speech merely because it is 'offensive to some.'" *Ison*

To be sure, a different policy—one prohibiting viewpoint-neutral characteristics of speech, for example, or explicitly and narrowly defining "abusive"—could be constitutional. But here, the ban on "abusive" speech is an undercover prohibition on offensive speech. Because the government "may not burden the speech of others in order to tilt public debate in a preferred direction," the Board's policy on "abusive" speech is facially unconstitutional. *Id.* at 578–79.

## B.

We next consider the Board's prohibitions on "personally directed" speech. Both policies were in effect during all of the events relevant to this lawsuit. Now, one has been changed and one remains on the books. The first disallowed addressing or questioning Board members individually, requiring instead that all statements be directed to the presiding officer; this restriction was repealed shortly after this appeal was filed. The other rule, which remains in effect, allows the presiding officer to stop a speaker when her remarks are "personally directed" at anyone not on the Board. We consider each policy.

### 1.

We start with the first—the policy that prohibited speakers from addressing Board members individually. The Board argues that all of Moms for Liberty's arguments against the personally

---

*v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 894 (6th Cir. 2021) (quoting *Matal*, 582 U.S. at 244 (plurality opinion)).

directed prohibition are moot because the old policy is gone. No such luck. Though prospective relief barring enforcement of the pre-amendment policy is no longer available, nominal damages for past harms are. That means the claim is still live: "a request for nominal damages saves a matter from becoming moot as unredressable when the plaintiff bases his claim on a completed violation of a legal right." *Keister v. Bell*, 29 F.4th 1239, 1251 (11th Cir. 2022); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021).

With that out of the way, we consider whether the policy prohibiting speakers from addressing individual Board members was viewpoint neutral and reasonable in light of the meetings' purpose. *Mansky*, 585 U.S. at 13. Based on the record here, we do not see evidence of viewpoint-based discrimination. So the only question is whether the policy was reasonable. It was not.

The reasonableness test, as we have explained, asks in part whether a restriction on speech is enforced in an arbitrary or haphazard way. *Cambridge Christian Sch.*, 942 F.3d at 1240. Asking if the Board's approach to this policy was "haphazard" is like asking if the sky is blue—enforcement was so inconsistent that it is impossible to discern the standard used to assess which speech was permitted at any given meeting.

At some meetings, speakers were allowed to address Board members by name to give them thanks and praise. Offering thanks, however, was not always a shield; one speaker was interrupted when she tried to thank a Board member for his

positive impact on her daughter.  And at another meeting, Belford cut off a Moms for Liberty member who tried to personally thank a Board member.

On yet another occasion, Belford said nothing when a local high school student addressed one Board member by name while advocating for her theater group to rehearse in the school's indoor facilities.  But when a Moms for Liberty member questioned how he, as a parent, could "stand up for District Two" while having to watch the Board member for that district "behind a plastic prison" (referring to a plexiglass barrier in place during the Covid-19 era), Belford and another Board member interrupted him for calling out one of the Board members and informed him that he could not talk to or about his specific representative.

This kind of inconsistent enforcement is exactly what this Court and the Supreme Court have warned against.  *See Mansky*, 585 U.S. at 16–22; *Young Israel*, 89 F.4th at 1347–49.  Permitting certain speech on some days and not on others without "any credible explanation of what may have changed is the essence of arbitrary, capricious, and haphazard—and therefore unreasonable—decisionmaking." *Cambridge Christian Sch.*, 942 F.3d at 1244.  For that reason, we agree with Moms for Liberty that the now-repealed prohibition against addressing individual Board members was unconstitutionally applied.

**2.**

Turning to the current policy, we consider whether disallowing speech that is "personally directed" can stand as

reasonable.  As with the prohibition on "abusive" speech, the Board's policy does not define "personally directed."  Belford first described it as "[a]nything that's directed at a person."  But when pressed for more, she suggested that the policy prohibited speech naming an individual, possibly (but not always) coupled with some sort of personal information about that person.  One refrain that Belford repeated in her testimony was that the applicability of the policy "would depend on the circumstances."

Belford followed up with various examples.  She explained that "if someone is saying to me, 'My friend Susie's son has an IEP for this,' yes, I'm going to stop them because they're sharing someone else's information that shouldn't be public information." But if the speaker just said "'my daughter's friend said that this occurred in school,' and there's no name, that's a different situation."  Just mentioning a name, however, might not be enough: "So if you're saying your wife's name and you're just mentioning her name, I don't know that I could consider that personally directed.  If you're saying, 'My friend John was raped by someone or my'—you know what I mean?"  Respectfully, we do not.

Belford's own inability to define the policy that she was tasked with enforcing speaks volumes.  The track record of this policy's enforcement mirrors Belford's muddled definition. Sometimes just mentioning someone's name was enough to provoke interruption, but other times using a name was met with no resistance.  At one meeting, for example, speakers advocating

for the rehiring of two coaches were interrupted for naming the coaches and were told to refer to them as "these coaches" instead. But at another meeting, multiple speakers were allowed to address and thank the Superintendent by name throughout the meeting.

Even though Belford's definition seemed to require, at least as a baseline, that a speaker use someone's name to violate this policy, the record reflects several times when speakers were interrupted for personally directed speech even though they did not name anyone—at all. Nor did they direct their speech toward anyone in particular. At one meeting, for example, Belford interrupted a speaker who gestured toward one side of the room and said "I keep hearing this side talk about freedom and their choices." This reference, Belford said, violated the policy against personally directed speech. And at yet another meeting, Belford interrupted yet another comment she said was "personally directed": "The sad fact is that all children do not live with accepting and affirming families. Can you imagine the LGBTQ student who may live with families such as those who were here at the last meeting?" Again, no names.

As these examples illustrate, enforcement of this policy was as inconsistent as the definitions offered to support it. The Board has not articulated any "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16. Such unpredictable and haphazard enforcement is not reasonable. Instead, it reflects no boundaries beyond the presiding officer's real-

time judgment about who to silence. *See Cambridge Christian Sch.*, 942 F.3d at 1243–44.

In part because of the unsettled boundaries of the policy purportedly banning personally directed comments, we also find it difficult to discern what ends it might serve. The Board claims that the policy's purposes include ensuring "that speakers can share their perspectives, regardless of viewpoint, while preventing disruption or interference with the Board's ability to conduct its business." It also asserts that the policy is meant to "maintain decorum and avoid inciting audience members in a manner that would create an unsafe situation." But even a charitable reading of the policy does not obviously (or even indirectly) advance these goals. For example, would using someone's name—even in a positive comment and whether or not the person is there— "disrupt" or "incite" audience members, or create an "unsafe situation"? We do not see how.

Not only does this policy against personally directed speech not advance the goals that the Board claims it serves, it actively obstructs a core purpose of the Board's meetings—educating the Board and the community about community members' concerns. If a parent has a grievance about, say, a math teacher's teaching style, it would be challenging to adequately explain the problem without referring to that math teacher. Or principal. Or coach. And so on. Likewise when a parent wishes to praise a teacher or administrator. Such communications are the heart of a school board's business, and the ill-defined and inconsistently enforced

policy barring personally directed speech fundamentally impedes it without any coherent justification.

To be sure, sometimes meetings can get tense—no one enjoys being called out negatively, and some may even dislike public praise.  But that is the price of admission under the First Amendment.  Rather than curtail speech, as "a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate."  *Snyder v. Phelps*, 562 U.S. 443, 461 (2011).  Because the policy's contours are undefined and the record of enforcement only casts a shadow over the school board meetings' purposes, the Board's prohibition on personally directed speech is unreasonable and thus facially unconstitutional.  *See Young Israel*, 89 F.4th at 1350–51.

## C.

Last, we turn to the policy prohibiting "obscene" speech. Once again, the Board did not define its terms, but Belford did. Obscene speech, she said, includes "things that are not appropriate for young children.  Language that is generally accepted to be profane."  Profanity, in turn, includes "things that are sexually explicit" and "words that are typically considered to be inappropriate for use in school."  Moms for Liberty challenges this part of the policy not on its face, but as applied—specifically as applied to reading a book from an elementary school library.

Again, it seems clear that at least some iterations of an obscenity policy would be constitutional—obscenity is one of the few unprotected categories of speech under the First Amendment.

*Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 791 (2011). But that constitutional standard is exceptionally narrow: material is obscene when (1) "the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest"; (2) "the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and (3) "the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973) (quotation omitted). So if the Board were to use this part of the policy to prohibit true obscenity, that action would survive under even the strictest review. We do not, however, decide whether or how the school board could properly prohibit other profane or explicit speech at school board meetings, even if it does not rise to the level of true obscenity—that question is not before us.

Instead, the Board used its obscenity policy to bar protected speech, and it did so in a way that impeded the purpose of a school board meeting. During the incident Moms for Liberty cites, a member shared her concern that her child's elementary school library contained inappropriate books. She began reading one, which detailed an in-school sexual encounter:

> I tiptoed toward the door, peering through the window at the boy's pants around his ankles squeezed between April's straddled legs as she lay on the teacher's desk. I swung the door open letting a soft

light from the hallway shine a spotlight on them.
'Shit!' he muttered.

Belford quickly interrupted the speaker when she got to the word
"shit."

That word, though not polite, is also not obscene. Nor is the
book's other content, no matter how objectionable it may be as
early childhood reading material. Moreover, the content of books
in school libraries is a matter of serious community interest. It
would be difficult, if not impossible, for speakers to adequately air
their concerns about a particular book without informing both the
Board and the community about what that book says. Describing
the content of a book is not as potent as reading its words—nor is
it as informative. And it is remarkable for the Board to suggest that
this speech can be prohibited in a school board meeting because it
is inappropriate for children when it came directly from a book that
is available to children in their elementary school library.

Because this prohibition on obscenity is not about obscenity,
and frustrates the purpose of the forum, it is an unreasonable
policy, at least as it applies to reading portions of books from
school libraries. It is therefore unconstitutional as applied here.

⋆    ⋆    ⋆

The government has relatively broad power to restrict
speech in limited public forums—but that power is not unlimited.
Speech restrictions must still be reasonable, viewpoint-neutral, and
clear enough to give speakers notice of what speech is permissible.

The Board's policies for public participation at Board meetings did not live up to those standards.  The district court's judgment is therefore **REVERSED** and the case is **REMANDED** for proceedings consistent with this opinion.

23-10656          WILSON, J., Dissenting in Part          1

WILSON, Circuit Judge, Concurring in Part and Dissenting in Part:

I join the majority in its judgment to reverse and remand regarding the Brevard Public School (BPS) Board Policy on abusive and obscene speech. As the majority outlines, the Policy's restrictions on abusive and obscene speech were imprecise prohibitions that impermissibly chilled speech. Similarly, the past prohibition on personally directed speech was inconsistently enforced in an unreasonable way given the purpose of the forum. However, I dissent from the majority in Part V.B.2 of the judgment. I would find the present prohibition on personally directed speech facially constitutional given its viewpoint neutrality and reasonableness in light of the forum.

Further, I write separately to contextualize several of the comments that appear in the majority opinion, along with additional examples to illustrate the tenor of comments and interruptions at BPS meetings. By including links to video recordings of each interaction discussed below, I hope to shed some light upon the difficulties of enforcing these policies in real time during heated meetings.

I.          Background

The BPS[1] Policy includes a section titled "Public Participation at Board Meetings." This Policy aims to ensure "orderly

---

[1] The BPS members mentioned in the complaint were Misty Haggard-Belford, Matt Susin, Cheryl McDougall, Katye Campbell, and Jennifer Jenkins. Only

conduct or proper decorum" during meetings.   To achieve this goal, the Policy allows the presiding officer to "interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed, abusive, obscene, or irrelevant."  The presiding officer can expel any individual who "does not observe reasonable decorum" and request law enforcement assistance to remove "disorderly" individuals.  During the months when the meetings at issue occurred, the Policy required speakers to direct comments "to the presiding officer; no person may address or question board members individually."[2]  The BPS Policy did not define "abusive," "obscene," or "personally directed."

      All instances at issue in this case occurred between January 19, 2021, and October 26, 2021.  Within that window, at least thirty-four people identified themselves as Moms for Liberty (M4L) members and collectively spoke at BPS meetings at least 109 times.[3]  Of

_____

the claim against Belford survived the motion to dismiss because she was the only one who enforced the Policy.

[2] In March 2023, the BPS Board altered the policy to allow speakers during public comment periods to "address their comments to the Board as a whole, the presiding officer, or to an individual Board member" but "[s]taff members or other individuals shall not be addressed by name during public comment."  Further, the Policy now states that the presiding officer may "interrupt, warn, or terminate a participant's statement when the statement is too lengthy, personally directed (except as allowed above), abusive, obscene or irrelevant."

[3] Four M4L members—Ashley Hall, Joseph Cholewa, Amy Kneessy, and Katie Delaney—brought this lawsuit in their individual capacities along with M4L as an organization.  Ashley Hall was the founding chair of Brevard County's chapter.  Joseph Cholewa and Amy Kneessy are M4L members.  Katie Delaney

those 109 instances, M4L identify four times when their members were interrupted. Of the four interruptions, only one escalated to a M4L member being asked to leave a meeting for violating the Policy. Hall spoke thirteen times during the relevant period and was interrupted once when she violated the Policy by thanking a specific school board member. Delaney spoke thirteen times with zero interruptions. Kneessy, a former school board member, did not speak at any meetings during the relevant window. Cholewa spoke five times and was interrupted twice, and based on comments he made after continuing to speak after one of those interruptions, he was asked to leave one meeting. The record also indicates interruptions of speakers with viewpoints that differ from those of M4L members.

## II. Applicable Law[4]

Parents and community members can speak at BPS meetings to "express themselves on school matters of community

---

was an M4L member but left in March 2022. Additional speakers whose interruptions are discussed in the majority opinion include Thomas Jefferson and Lois Lacoste.

[4] Before reaching the merits, I note that I concur with the majority in finding that M4L and its individual members have standing for prospective relief by meeting our liberal standard to show that enforcing the Board's policy "would cause a reasonable would-be speaker to self-censor." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (internal quotation marks omitted and alteration adopted). They also have standing to challenge the past iteration of the policy barring personally directed speech because "a request for nominal damages satisfies the redressability element of standing where a

interest."  Doc. 20 at 113.  Like the majority, I agree that school board meetings are limited public forums because they are created "for certain groups or for the discussion of certain topics."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Government restrictions on speech in a limited public forum must be (1) "viewpoint neutral" and (2) "reasonable in light of the forum's purpose."  *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017).  Reasonable restrictions do not need to "be the most reasonable or the only reasonable limitation."  *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011) (quotations omitted). Our circuit has recognized "a significant governmental interest in conducting orderly, efficient meetings of public bodies," *Rowe v. City of Cocoa*, 358 F.3d 800, 803 (11th Cir. 2004) (per curiam).  Restrictions to further this interest must remain reasonable.  *See Barrett*, 872 F.3d at 1224–25.

Both the Supreme Court and our circuit have been imprecise and inconsistent when conducting forum analyses.  *See, e.g.*, *Rosenberger*, 515 U.S. at 829 (first delineating limited public forums as their own category); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–78 (1998) (seeming to change the definition of a limited public forum); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (reaffirming the categories recognized in *Rosenberger*); *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (only listing three types of forums rather than the four previously recognized); *Rowe*, 358 F.3d

---

plaintiff's claim is based on a completed violation of a legal right."  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

at 802 (applying a narrowly tailored to a significant government interest test to a limited public forum); *Bloedorn*, 631 F.3d at 1225–26, 1231 (applying the viewpoint neutrality and reasonableness test to a limited public forum).  Perhaps given the considerable overlap between a limited public forum analysis and nonpublic forum analysis, the majority almost exclusively relies on nonpublic forum precedent.  Nonetheless, I am concerned by the dearth of limited public forum cases in the majority's opinion.

Speech restrictions in both nonpublic forums and limited public forums must be both viewpoint neutral and reasonable in light of the forum's purpose.  *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (discussing limited public forums); *Mansky*, 585 U.S. at 11 (discussing nonpublic forums).  Although both types of forums use the same legal test, limited public forum cases provide closer factual analogues to BPS meetings.  Because a limited public forum analysis requires a reasonableness inquiry, finding a close factual analogue matters even more than in other contexts.  Limited public forum cases that involve school board or municipal meetings will often have similar purposes and set out similar speech parameters to meet those purposes, which makes them valuable data points for our analysis.

### III.    Analysis

Although I concur in judgment with all but part V.B.2 of the majority opinion, I write separately to provide additional context

6           WILSON, J., Dissenting in Part        23-10656

for the statements at issue in this case and to elaborate on where my analysis departs from that of the majority.[5]

### A.    *Abusive Speech*

I concur in the judgment finding the BPS Policy's ban on abusive speech facially unconstitutional, but I struggle to see the ban on abusive speech as "an undercover prohibition on offensive speech." Maj. Op. at 18. When viewed in context, the interruptions mentioned by the majority seem rooted in the difficulties of conducting orderly school board meetings when confrontational speakers make contentious comments.[6] Further, the record reflects numerous arguably offensive statements that went uninterrupted and do not appear in the majority's analysis.

First, I agree with the majority that as written, the Policy's ban on abusive speech could be weaponized and used in a

---

[5] The facial challenges are being appealed from the motion to dismiss and the as-applied challenges are being appealed from the motion for summary judgment. We apply a de novo standard of review to both types of appeals. *Chabad Chayil, Inc. v. Sch. Bd. Of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022) (regarding motions to dismiss); *King v. King*, 69 F.4th 738, 742 (11th Cir. 2023) (per curiam) (regarding motions for summary judgment).

[6] Item K from the July 29 meeting shows how heated BPS meetings could become. Jenkins spoke about the threats she had received because of her stance on the mask mandate. Jenkins's remarks about masks begin at about 15:15. The video recording indicates yelling and jeering from the audience at about 15:50, which resulted in one audience member being escorted out at about 16:24. BPS, July 29, 2021 School Board Meeting. *See* Item K. Board Member Reports/Discussion. https://brevardpublicschools.new.swagit.com/videos/257590.

viewpoint discriminatory way.[7]  The Policy does not define "abusive," and Belford struggled to articulate a clear definition during her deposition.  In the abstract, this enables the BPS chair to censor offensive speech, which triggers the dual problems of chilling potential speech and enabling viewpoint discrimination.  As the Supreme Court has stated, "[g]iving offense is a viewpoint."  *Matal v. Tam*, 582 U.S. 218, 243 (2017) (describing limited public forums in a trademark case).  The majority concedes that a more narrow or explicit definition for "abusive" could survive a facial challenge, and I agree.  *See* Maj. Op. at 18.

In addition to analyzing the policy as written, we also must engage with the facts as they appear in the record.  Therefore, I include direct quotes from BPS meetings to provide additional context for the interruptions mentioned by the majority.

First, the majority mentions that Belford interrupted a speaker, Thomas Jefferson, who frequently attends BPS meetings.  At the March 23 meeting, he characterized the COVID-19 mask policy as "a simple ploy to silence our opposition to this evil

---

[7] Because I concur in judgment to find the ban on "abusive" speech facially invalid for allowing impermissible viewpoint discrimination, I do not reach whether the prohibition on "abusive" speech is void for vagueness or overbroad.

LGBTQ agenda."[8]  After that interruption, Jefferson continued and was able to express the following views without interruption:

> You are elected to represent the majority of our constituents not the minority of our constituents.  And the majority of the people in Brevard County oppose any and all LGBTQ policy changes or implement [sic] in our schools.  There may be a minority, possibly three percent that would support such a policy.  However, the three percent will not get you reelected.  There are some people out there that like to label us as a hate group.  However, I want to make it perfectly clear here and now we hate the sin not the sinner. . . . We hate the sin not the sinners.  We are the Christians of Brevard county and all over the world and will not sit silent and allow you to put your evil, sinful policies on our children. . . .  We will make sure that all members that do not take a stand against these anti-Christ, LGBTQ agenda policies, that we will vote you out the next election cycle.  This is God's country, and God will [sic] be done.  We the people have spoken.  To God be the glory.

Immediately after Jefferson finished speaking, a board member stated: "I just want to throw this out there.  I am concerned that

---

[8] BPS, Mar. 23, 2021 School Board Meeting.  *See* Item E (Part 2 of 2).  Public Comment.  Jefferson's remarks begin at approximately 13:23, https://brevard-publicschools.new.swagit.com/videos/03232021-1098.

we're allowing comments that our students can hear and are prob-ably watching at home that are calling them sinners."

Next, the majority points to an interruption during a speaker's criticism of BPS efforts to support transgender children. Lois Lacoste stated:[9]

> If you have students who are not sure if they are a boy or a girl, please let me help you in knowing that God created us with one or the other chromosome, which makes us male or female.  But the liberal left, who seem to rely so heavily on "science," . . . .

She was interrupted for her use of "liberal left," but was permitted to proceed. Lacoste finished her remarks with the following:

> [T]he issue is not about equity or equality.  It's about the end of decency in America.  The citizens of Bre-vard County are watching you.  More importantly, God Almighty is watching you.  How will each one of you answer to Him?

Although the interruption came after the "liberal left" reference, I hesitate to isolate the phrase from the entire comment.

Then, the majority discusses a speaker who was interrupted for repeating language that was "abusive to the speaker herself." Maj. Op. at 16.  But the majority omits critical context that this

---

[9] BPS, Mar. 9, 2021 School Board Meeting. *See* Item E (Part 1 of 2).  Public Comment.  Lacoste's remarks begin at approximately 9:30, https://brevard-publicschools.new.swagit.com/videos/03092021-1009.

speaker was a student who spoke about feeling unsafe as she walked into a BPS meeting.  This student recounted walking into the meeting as parents outside "screamed at [her], called [her] a bitch, a whore, a prostitute."[10]  I am hesitant to sanitize these facts by removing them from the context of parent protestors calling a BPS student these explicit names.

Beyond the examples included by the majority, I include others to demonstrate the general tenor of the interruptions when they occurred.  Cholewa, a party to this case, often spoke at BPS meetings.  On September 21, 2021, he opened his remarks by stating the following:[11]

> "It's not about freedom."  That's a direct quote from the current president of the United States of America, who's a Democrat and a bully.  It's definitely about politics, but it's not about science or freedom.  I wonder what it was about for any of those who fought against slavery or discrimination, or anyone who has ever fought and died serving our military.  It's always been about freedom.

---

[10] BPS, Mar. 9, 2021 School Board Meeting.  *See* Item E (Part 2 of 2).  Public Comment.  The student's remarks begin at approximately 1:40:15, https://brevardpublicschools.new.swagit.com/videos/03092021-1009.

[11] BPS, Sept. 21 2021 School Board Meeting.  *See* Item E.  Public Comment.  Cholewa's remarks begin at approximately 1:05:02, https://brevardpublicschools.new.swagit.com/videos/09222021-781.

Although arguably already offensive, Cholewa's remarks were not interrupted.  He continued until he said the following: "Let's look at some of the other leftist ideologies we're fighting.  We're talking about the party that accepts the murder of full-term babies with abortion.  The party that says babies, white babies are born racist and oppressive."  At this point, Belford interrupted to say, "Joey, you, you're pushing the limit.  Please be respectful, okay?"  The recording indicates that Cholewa's comments led to disruption, including yelling and disorder in the room.  Amidst this disruption, Belford asked audience members to stop yelling and asked Cholewa to be respectful.  However, Cholewa was asked to leave during the following exchange:

> Cholewa: And I will fight you.  I'll be here every weekend, and I will be yelling at you and screaming at you and telling you things that you don't want to hear, and that's right, because this is America.  I know you don't like freedom, I know you don't like liberty, you don't like the Constitution—
>
> *Belford: All right.*
>
> Cholewa: Guess what.  I'm going to keep talking.
>
> *Belford: Leave please.  Have a good night.*

Finally, the record reflects numerous instances where speakers made offensive comments without interruption.  For example, one mother of BPS students expressed frustration with the district's mask mandate: "Our freedoms are worth something.  It is worth fighting for.  And it starts with a yellow star on your chest.

These masks are the yellow star on our chests."[12]  Another example came from another set of comments from Jefferson who referred to the BPS board as a "board of dictators" and said, "This is America, not Nazi Germany.  However, each day in America it seems we are getting closer to Nazi Germany."[13]

If the ban on abusive speech were an undercover prohibition on offensive speech, comments like these would have been categorically interrupted.  Rather, the ban on "abusive" speech was an imprecisely worded prohibition, which impermissibly chilled speech by allowing viewpoint discrimination.  However, as the above examples illustrate, I do not believe the record reflects it was weaponized.  Therefore, I concur in the judgment but go no further.

### B.    *Personally Directed Speech*

Although I concur in judgment with respect to Part V.B.1 to find the previous policy prohibiting personally directed speech unconstitutional as applied to M4L, I dissent from Part V.B.2 finding the present policy facially unconstitutional.[14]

---

[12] BPS, May 21 2021 School Board Meeting.  *See* Item E6.  Public Comment. Relevant comments begin at approximately 49:07, https://brevard-publicschools.new.swagit.com/videos/05212021-941.

[13] BPS, July 29 2021 School Board Meeting. *See* Item E (Part 2 of 2).  Public Comment.  Jefferson's remarks begin at approximately 2:43, https://brevard-publicschools.new.swagit.com/videos/257590.

[14] This ban on personally directed speech does not meet our circuit's standard for vagueness.  *See Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 807 (11th Cir. 2020).  Individual speakers do not need to guess as to what speech is barred

### 1.    Past Policy

As I acknowledged above, I believe M4L has standing to pursue nominal damages related to past enforcement of the old restriction against personally directed speech.  Rather than truly banning "personally directed" speech, I believe the old ban functioned as an inconsistently enforced ban on *naming* people.  Both parties acknowledge that this was viewpoint neutral.  That is not enough to protect the policy, which must be reasonable in light of the forum's purpose.  *See Barrett*, 872 F.3d at 1225.  One core purpose of school board meetings is to provide feedback about people and programs in the district.  As applied to M4L (and others) as essentially a ban on naming people, the restriction does not meet our reasonability requirement.  Therefore, I concur in judgment as to Part V.B.1.

### 2.    Present Policy

I dissent from the majority as to Part V.B.2 because I would find the new Policy facially constitutional.  Presently, the Policy allows speakers to "address comments to the Board as a whole, the presiding officer, or to an individual board member."  I read this text to suggest that these are the only people speakers can address, not the only people speakers may mention.  This appears to me to

---

by the ban.  Further, the restriction does not "cover[] substantially more speech than the First Amendment allows."  *Speech First*, 32 F.4th at 1125.  Therefore, it is not impermissibly overbroad.

14                    WILSON, J., Dissenting in Part                23-10656

be both viewpoint neutral and reasonable given the purposes of a
school board meeting.

The new Policy bans speakers from directing comments *at*
particular people.  But, for example, a parent addressing the entire
board may comment *about* particular teachers or coaches.  In addi-
tion to remaining viewpoint neutral, I would find this restriction
reasonable given the feedback purpose of a school board meeting.
We acknowledge a municipal body's interest in conducting orderly
meetings.  *See Rowe*, 358 F.3d at 803.  Footage from the meetings
indicates the most disruptive comments being those that seemed
directed at members of the audience, such as when Jenkins dis-
cussed a person who lurked around her home being present in the
board room or when people in the crowd began yelling *at* Jenkins
during her same report.[15]  We do not require a limited public forum
to have the only reasonable or even the most reasonable restriction
on speech, but only a reasonable restriction, given the purpose of
the forum.  *See Bloedorn*, 631 F.3d at 1231.  As written, the new re-
striction on personally directed speech is a viewpoint neutral re-
striction reasonable in light of the forum's purpose.  I dissent from
the majority finding otherwise.

---

[15] BPS, July 29 2021 Regular/Tentative Budget Hearing Meetings.  *See* Item K.
Board Member Reports/Discussion Points.  She speaks about the man at
about 18:40, which leads to some disruption.  Members of the audience begin
yelling at Jenkins again at about 19:40.  This commotion continued until Bel-
ford      called      for      a      brief      recess.      https://brevard-
publicschools.new.swagit.com/videos/257590.

### C. Obscene Speech

I agree with the majority that a ban on "some iterations of an obscenity policy would be constitutional" because obscenity is not protected speech. Maj. Op. at 24; *see Miller v. California*, 413 U.S. 15, 24 (1973). Because obscenity is not protected speech, M4L could not bring a facial challenge to the BPS Policy's obscenity ban. Instead, M4L brought an as-applied challenge to this portion of the policy as an *obscenity* ban. Because the prohibition was not applied to obscenity as used as a term of art in the First Amendment context, I concur in judgment.

Like the majority, I agree that this case does not present a question of "whether or how the school board could properly prohibit other profane or explicit speech at school board meetings." Maj. Op. at 25. I would not reach the purposes of the forum for this analysis and would remain more rooted in the record.

Again, the rendition of facts in Part V.C. of the majority's opinion removes them from both the immediate context of the speaker's surrounding speech and the broader context of confrontational speakers at a school board meeting.

Here, Michelle Beavers, another M4L member who is not a party to the case, read an alleged excerpt of a book[16]. After beginning her remarks by discussing masks, she mentioned not having

---

[16] BPS, October 26, 2021 School Board Meeting. *See* Item E10. Public Comment. Beaver's remarks begin at approximately 47:48. She pivots about 50:02. https://brevardpublicschools.new.swagit.com/videos/257590.

much time to talk about books. Abruptly, she pivoted, without prefacing that the following remarks were from a book and not her own:

> I tiptoed toward the door, peering through the window at the boy's pants around his ankles squeezed between April's straddled legs as she lay on the teacher's desk. I swung the door open letting a soft light from the hallway shine a spotlight on them. "Shit!" he muttered.

After Belford stated, "Ma'am, I need for you to keep your language clean," Beavers continued "[o]h this was our schoolbooks." However, Beavers never mentions what book this quote allegedly came from, the school in which this alleged book was purportedly located, or the age of the students who had access to the book. Later, she claims to quote from a different book found in libraries for second graders. Based on the record, I hesitate to make definitive statements about the language repeated by Beavers as coming "directly from a book that is available to children in their elementary school library." Maj. Op. at 26.

Finally, M4L only challenges restrictions on speech at BPS board meetings and does not raise any challenges related to alleged obscenity in books.[17] Though I concur in judgment based on

---

[17] I would refrain from labeling text in any schoolbooks "obscene." M4L and its members have made statements regarding the contents of books in BPS schools, but this case relates to speech at BPS meetings. This case does not involve books, and I would refrain from discussing the contents of books.

obscenity's definition as a term of art in First Amendment jurisprudence, I believe the majority goes further than necessary in its analysis.[18]

\*     \*     \*

Overall, I find it imperative to contextualize the comments and interruptions at issue within the contentious conversations that occurred at BPS meetings. School board meetings are limited public forums. As such, school boards may restrict speech so long as their restrictions are reasonable in light of the purpose of the forum and maintain viewpoint neutrality. Several of the restrictions used by BPS did not meet these requirements. Therefore, I concur in judgment to all but Part V.B.2 of the majority's opinion.

---

[18] Because I concur in judgment to find the obscenity ban unconstitutional as applied, I do not reach the vagueness or overbreadth challenges to this portion of the policy raised by M4L.